**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CINDY PAGE, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>           v.<br><br>RITE AID CORPORATION, HEYWARD DONIGAN, MATT SCHROEDER, and CHRIS DUPAUL,<br><br>                       Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Cindy Page ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rite Aid Corporation ("Rite Aid" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Rite Aid securities

between April 14, 2022 and September 28, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Rite Aid, through its subsidiaries, operates a chain of retail drugstores in the U.S. The Company operates through two segments, Retail Pharmacy and Pharmacy Services. The Pharmacy Services segment provides integrated suite of pharmacy benefit management ("PBM") offerings through, *inter alia*, the Company's Elixir subsidiary, including technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication, and pharmacy discount programs.

3.      In Rite Aid's Q4 2022 earnings call on April 14, 2022, Rite Aid's President and CEO, Defendant Heyward Rutledge Donigan ("Donigan"), addressed the growth of Elixir's PBM services business during the selling season ending January 1, 2023, stating that (i) in the past few months, Elixir had already "sold 35,000 new members" (as against a total of 55,000 new members in the prior year), (ii) Elixir was a finalist for 150,000 additional new members, and "results have shown that once we get to finalist, we're winning deals 35% of the time," and (iii) Elixir had "a current pipeline of nearly 1 million members and growing."

4.      In a letter to shareholders, dated June 10, 2022, appearing in Rite Aid's 2022 Notice of Annual Meeting of Stockholders and Proxy Statement, Defendant Donigan stated, "[o]ur Elixir account and sales teams are gaining momentum, and we are executing more efficiently by consolidating functions. And the market is noticing—we have added 34,000 individuals covered by Elixir's PBM services since January 1, 2022, with many more in the pipeline."

5.      In Rite Aid's Q1 2023 earnings call on June 23, 2022, Defendant Donigan stated concerning the PBM services business that "[o]ur strong network contracts, new rebate capabilities, innovative clinical services and expertise in government programs have enabled us to add 80,000 new lives for January 1, 2023 start date. These are more new lives than we sold last year. And additionally, the selling season is still in progress, and we've got close to 1 million lives remaining in the pipeline for January 1, 2023." On the same call, Elixir's COO, Defendant Chris DuPaul ("DuPaul"), advised that "we've had a pretty strong start to our selling season, particularly on the health plan side," and "we're feeling really good about where our lives are headed going into [1/1/23]. . ."

6.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) despite representations to the contrary, the number of new members (i.e., "lives") that the Elixir PBM services business was adding during the selling season ending on January 1, 2023 was in material decline; (ii) Rite Aid was likely to recognize a significant charge for the impairment of goodwill related to Elixir due to a decrease in "lives" covered by Elixir's PBM services business; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

7.      On September 29, 2022, Rite Aid announced a $252.2 million charge for the impairment of goodwill related to the Company's Elixir subsidiary.  On an earnings call held later in the day, Rite Aid's Chief Financial Officer ("CFO"), Matt Schroeder ("Schroeder"), explained that the large impairment charge was related to Elixir based on "an update to our estimate of lives for 2023 based on the latest selling season," and that Rite Aid "expected[ed] lives *to go down*."

8.     On this news, Rite Aid's stock price fell $1.97 per share, or 28.02%, to close at $5.06 per share on September 29, 2022.

9.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Rite Aid is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.    Plaintiff, as set forth in the attached Certification, acquired Rite Aid securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Rite Aid is a Delaware corporation with principal executive offices located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.   Rite Aid's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "RAD".

16.     Defendant Heyward Donigan ("Donigan") has served as Rite Aid's President and Chief Executive Officer ("CEO") at all relevant times.

17.     Defendant Schroeder has served as Rite Aid's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

18.     Defendant Chris DuPaul ("DuPaul") has served as Elixir's Chief Operating Officer ("COO") at all relevant times.

19.     Defendants Donigan, Schroeder, and DuPaul are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Rite Aid's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Rite Aid's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with Rite Aid, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Rite Aid and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Rite Aid, through its subsidiaries, operates a chain of retail drugstores in the U.S. The Company operates through two segments—Retail Pharmacy and Pharmacy Services. The Pharmacy Services segment provides integrated suite of PBM offerings  through the Company's Elixir subsidiary, including technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication, and pharmacy discount programs.

### Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on April 14, 2022, when Rite Aid hosted a conference call with investors and analysts to discuss the Company's Q4 and full year 2022 financial results and full year 2023 outlook (the "2022 Earnings Call").   During the scripted portion of the 2022 Earnings Call, Defendant Donigan stated, in relevant part:

[W]e will grow Elixir. We are on target to sell 300,000 new members for 1/1/2023.

So as you know, the first step to achieving net growth is retaining the business we already have. After accounting for previously known losses due to health plan consolidation, we're on track to retain 95% of our business for the 2023 selling season and I'm excited to share that we recently renewed in a very competitive situation, our largest Medicare Advantage client with a three year contract.

So the next step is to win new business and to do that we have to first be competitive on price. That's the price of entry. We're doing that through strong network pricing and our new rebate aggregator.

Now we're getting to the finalist position on a regular basis where we are presenting a unique and compelling value proposition. ***Our results have shown that once we get to finalist we are winning deals 35% of the time***.

Well we are very early in the selling season, better pricing with a newly restructured sales team and a focus on our target market segments ***has led us to sell 35,000 new***

*members already*. We have 150,000 lives in the current finalist stage for 1/1/23, and a current pipeline of nearly 1 million members and growing.

24.     Further, during the Q&A portion of the 2022 Earnings Call, in response to an analyst question regarding "what are the expectations for . . . calendar 2023, fiscal '24 of th[e PBM] selling season opening up at the end of this year", Defendant Donigan responded:

Well, as I said, we are very early in the 2023 season for employer business, and we are in the 2024 season for health plan business. So health plans have a longer lead time for implementation. *So just in the past few months, we've sold 35,000 new members, and have barely gotten started*. And that's against a total of 55,000 new members the prior year. Our pipeline is almost $1 million -- I am sorry 1 million members right now and that is growing on a weekly basis. *We're in the finals for 150,000 additional members right now as we speak. And as I mentioned earlier, we're closing 35% of the business when we're in the final position*. And the sales season really doesn't really start to heat up until around July, August timeframe and then employers make decisions generally as late into the November timeframe. The health plan cycle is just getting started. That pipeline will grow during 2023 and that business will largely go -- not all, but largely go into effect in '24. So early days, but I think very compelling and exciting stats so far.

25.     On April 25, 2022, Rite Aid filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the year ended February 26, 2022 (the "2021 10-K"). In providing an overview of the Company, the 2021 10-K stated, in relevant part:

*Pharmacy Services Segment*—Elixir, our mid-market national pharmacy benefits manager ("PBM"), provides a suite of PBM offerings including technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication and pharmacy discount programs. Elixir also provides prescription discount programs and Medicare Part D insurance offerings for individuals and groups. Elixir provides services to various clients across its different lines of business, including major health plans, commercial employers, labor groups and state and local governments, representing over 2 million covered lives, including approximately 0.7 million covered lives through our Medicare Part D insurance offerings. Elixir continues to focus its efforts and offerings to its target market of small to mid-market employers, labor unions and regional health plans, including provider-led health plans and government sponsored Medicaid and Medicare plans.

Elixir is an integral component of our strategy and we believe that Elixir will become a differentiated market leader by lowering total healthcare costs through consumer engagement. We are modernizing our technology platforms,

enhancing our clinical programs, and launching our new specialty offering across our book of business. For our markets that overlap with Rite Aid and Bartell stores, we can provide highly curated clinical offerings that not only lowers costs, but also engage members in our stores with our pharmacists.

26.     Further, in discussing the Company's strategy, the 2021 10-K stated, in relevant part:

> [W]e believe Elixir has become well-positioned to be a growth driver in the coming years. We have improved our pricing positioning through strong network contracts and our new rebate aggregator.  The new pricing positioning is enabling us to deliver a unique and compelling value proposition. Our Elixir Savings cash discount business continues to grow in both EBITDA and revenue. We have identified meaningful EBITDA opportunity by improving our contracts, gaining access to more limited distribution drugs and growing volume from PBM clients and other parties.

27.     Appended to the 2021 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2022 by Defendants Donigan and Schroeder, attesting that "[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

28.     On May 12, 2022, Schroeder and Byron Purcell (Vice President, Investor Relations and Treasurer) gave a slide presentation to the National Group Management Trade Relations Committee. Slide 13 stated that "Elixir has improved its ability to bid competitively resulting in new business wins and positive feedback from pharmacy consultants." Under a headline reading "2023 Selling Season – Early Results," the slide represented the Elixir had signed up 35,000 new lives, was in the finalist stage for an additional 150,000 lives, and had a "pipeline of 1 [million] lives and growing."

29.     On June 10, 2022, Rite Aid filed a definitive proxy statement on Form DEFC14A with the SEC in connection with the Company's 2022 annual meeting of stockholders (the "June

10, 2022 Proxy Statement"). In a letter to shareholders contained in that filing, Defendant Donigan stated, in relevant part:

> Our Elixir account and sales teams are gaining momentum, and we are executing more efficiently by consolidating functions. And the market is noticing—we have added 34,000 individuals covered by Elixir's PBM services since January 1, 2022, with many more in the pipeline. And we just won the renewal of our largest health plan client in a very competitive bidding process.

30. Further, in discussing the Company's business strategy and performance in fiscal year 2022, the June 10, 2022 Proxy Statement stated, in relevant part, "Rite Aid's RxEvolution strategy was originally announced in March 2020, with a focus on fundamentally changing our role in health care and becoming the industry leader in whole health through three main pillars: 1) Unlocking the value of our pharmacists; 2) Renewing our retail and digital experience; and 3) ***Establishing Elixir as a clearly differentiated market leader***." (Emphasis added.)

31. In addition, in discuss the Company's leadership team growth and strategy execution, the June 10, 2022 Proxy Statement stated, in relevant part:

> At Elixir, our full-service PBM, we entered into an agreement with Prime Therapeutics to drive improved rebate economics for our customers, which is an important step in enhancing Elixir's competitive position in the marketplace. Elixir has been purposely built and owns all the assets needed to optimize the full pharmacy care experience, including:
> - An industry leading adjudication platform, offering flexibility, efficiency and data privacy protection;
> - Accredited mail and specialty pharmacies, creating an exceptional member experience, waste reduction and cost savings; and
> - Prescription discount programs for uninsured and under-insured and Medicare Part D plans for individuals, associations and groups.
>
> Elixir's accreditation demonstrates that it is delivering excellent quality results for our customers. Elixir has received a specialty pharmacy certification from Accreditation Commission for Health Care (ACHC) and accreditation for digital pharmacy by National Association of Boards of Pharmacy (NABP). Elixir was one of only two PBMs to earn all four core PBM accreditations by the Utilization Review Accreditation Commission (URAC): Pharmacy Benefit Management, Drug Therapy Management, Specialty Pharmacy and Mail Service and one of only three PBMs to hold the Health Information Products Certification for Pharmacy

Benefit Information and Utilization Management from National Committee for Quality Assurance (NCQA). Elixir has also shown strong results in medical cost avoidance by driving improved medication adherence. Our Specialty Pharmacy's net promotor score is 82, which is eight points higher than the national average. Finally, strong growth at our Elixir Savings showcases the continued need of cash card businesses to grow using our state of the art platform and analytics.

32.     Finally, in discussing the Company's 2022 fiscal year key business highlights, the

June 10, 2022 Proxy Statement stated, in relevant part:

In fiscal year 2022, Rite Aid continued to position the Company for future growth, particularly as we moved to a post-COVID environment. The company's strategy continued to evolve as we concentrated on the progression at Elixir, unlocking the value of our pharmacists, and the renewal of our retail and digital experience. Thanks to the hard work and dedication of our retail pharmacists, the Company was able to handle the increased volumes attributed to COVID-19 vaccines and testing. Our pharmacists administered 3.6 million COVID-19 tests and 14.4 million COVID-19 vaccines as part of their dedication to the communities we serve. In addition, Elixir announced an agreement with a new national rebate aggregation partner to drive improved value and formalized their go-to-market strategy for the 2023 calendar selling season. ***The combination of these initiatives has given Elixir 34,000 early win lives and a finalist rate up 14% over last year***. "Lives" refers to the number of people covered by Elixir's pharmacy benefit management. Elixir has also shown strong results in medical cost avoidance by driving improved medication adherence. Our Specialty Pharmacy's net promotor score is 82, which is eight points higher than the national average. Finally, strong growth at our Elixir Savings showcases the continued need of cash card businesses to grow using our state of the art platform and analytics.

33.     On June 23, 2022, Rite Aid issued a press release announcing the Company's Q1

fiscal 2023 results.  The press release stated, in relevant part:

"We continue to make strides on our journey to transform Rite Aid and define the modern pharmacy. In the first quarter we increased our non-COVID prescriptions, reduced SG&A, ***built momentum at Elixir*** and delivered solid results across the business. The entire Rite Aid team looks forward to advancing our pharmacists' role in improving health outcomes," said Heyward Donigan, president and CEO.

34.     That same day, Rite Aid hosted a conference call with investors and analysts to

discuss the Company's first quarter 2023 financial results (the "Q1 2023 Earnings Call").  During

the scripted portion of the Q1 2023 Earnings Call, Defendant Donigan stated, *inter alia*:

[With respect to] the PBM services business[,] [o]ur strong network contracts, new rebate capabilities, innovative clinical services and expertise in government programs *have enabled us to add 80,000 new lives for January 1, 2023 start date. These are more new lives than we sold last year. And additionally, the selling season is still in progress, and we've got close to 1 million lives remaining in the pipeline for January 1, 2023*.

35.     During the Q&A portion of the Q1 2023 Earnings Call, Defendant DuPaul had the

following exchange with an analyst regarding Elixir:

[Analyst]

[Y]ou mentioned the 80,000 additional lives for Elixir that you've attained, and there's still 1 million potentially that you're going to be getting? I guess, what's your degree of confidence in that additional potential million. What percent might be reasonable that you would attain of those? And then if there has been anything else in terms of losses of lives, I'm trying to think about next 2023, that calendar year, how Elixir is shaking out.

* * *

[Defendant] DuPaul

Thank you for the question. Just to clarify a bit, taking you down through the numbers. The 1 million lives that Heyward referenced are the lives that we still have active in our pipeline inside of our target markets. So those are -- that's a business that is up for bid right now for [1/1/23]. So out of that 1 million, we expect to win a portion of those. Where we are right now in terms of our new life count for next year, I think in our last earnings call, we've talked about -- we've set a goal to try and win 300,000 new live

*At the time, we've had a pretty strong start to our selling season, particularly on the health plan side*. As we've moved into more of the commercial book, that slowed a bit. As we've seen more clients sticking with incumbents. That said, we are still expecting to have the strongest selling season that we've had in several years at Elixir. And so we feel really good about where our life count is headed. Our retention rate is still expected to come in right around 95%. And we did retain our largest client, MCS, earlier in the year. *So we're feeling really good about where our lives are headed going into [1/1/23]*, and that's sort of how we get there.

36.     On June 30, 2022, Rite Aid issued a press release entitled, "Elixir Launches

Specialty Generic Enhancement that Leads to Thousands in Annual Savings for Plan Sponsors and

Members."  The press release stated, in relevant part:

Elixir [. . .] announced the launch of a specialty generic medication enhancement to its managed copay solutions effective June 1, 2022. The enhancement allows members to receive generic versions of certain specialty medications at a $0 copay and has the potential to provide an average savings of up to $40,000 annually.

"As specialty drug costs continue to climb and account for a significant amount of drug spend, Elixir is continually looking for innovative solutions for our clients," said Marly Arbuckle, RPh, CSP, senior director, specialty solutions and strategy for Elixir. "With this specialty generic program, Elixir members will have access to an expanded list of FDA-approved specialty generic medications at no cost to them, while enhancing our ability to drive optimum savings for the plan."

Arbuckle explained that Elixir created a list of specialty generic drugs that are eligible to receive a $0 copay that is continually updated. When determining what generic drugs to include on the list, all financial aspects are considered, factoring in such things as rebates and discounts, ensuring the drugs on the list are the most cost-effective option.

This enhancement is being added to Elixir's existing managed copay solutions, which tracks copay assistance from manufacturers that is applied to specialty prescriptions, giving members the benefit of assistance to afford branded specialty medications and ensuring clients do not begin bearing the majority of the medication cost before the deductible is actually achieved. In 2021, this program delivered over $25 million in savings.[]

"Many people aren't aware that there are specialty generic drugs available, especially with all of the television ads for the brand versions. Additionally, copay assistance available for most branded specialty drug products often disincentives members from selecting lower-costing generic options on their own. However, utilization of specialty generics can save plan sponsors up to 30% per claim," Arbuckle said. "Our specialty generic solution allows both the plan and member to save on drug costs, while still receiving the benefit of the potentially life-saving drug. Additionally, these cost savings help to increase member adherence to specialty medications, which can limit expenses from healthcare complications."

37.     At Rite Aid's Annual Stockholders Meeting on July 27, 2022, Defendant Donigan

stated concerning FY 2022:

Our momentum has continued into the first quarter of fiscal year 2023. As the financial benefit from COVID vaccines did normalize, I'm pleased with our progress in returning the business to overall a portfolio growth company and instead of the primary sort of COVID environment that we've been dealing with over the last two years. In quarter one, we had non COVID acute prescription growth of 11.9% and we achieved revenues of $6 billion and adjusted EBITDA of $100.1 million. We also reduced retail SGNA expenses by $40 million. We closed 87

unprofitable stores ahead of schedule *and sold 80,000 new lives at Elixir for 01/01/2023, which is above all of last year's selling season with much of this year's season still to go*. This is just a summary of some of our accomplishments, but now I'd like to talk about our current strategy and our plans to grow.

38.     The statements referenced in ¶¶ 23-37 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) despite representations to the contrary the number of new members (i.e., "lives") that the Elixir PBM services business was adding during the selling season ending on January 1, 2023 was in material decline; (ii) Rite Aid was likely to recognize a significant charge for the impairment of goodwill related to Elixir due to a decrease in "lives" covered by Elixir's PBM services business; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

39.     On September 29, 2022, Rite Aid announced its financial results for the second quarter of 2023, including, among other items, a $252.2 million charge for the impairment of goodwill related to the Company's Elixir subsidiary.   On an earnings call held later in the day, Defendant Schroeder explained that the large impairment charge was triggered by an update in Rite Aid's estimate of lives covered by Elixir for 2023 based on the latest selling season. Specifically, Defendant Schroeder stated, in relevant part:

> Second quarter net loss was $331.3 million or $6.07 per share compared to last year's second quarter net loss of $100.3 million or $1.86 per share. The increase in net loss in the current quarter is due primarily to a charge of $252.2 million or $4.62 per share for the impairment of goodwill related to Elixir. Net loss was also impacted by higher facility exit and impairment charges driven by the company's previously announced store closures. These items were partially offset by a gain on

sale leasebacks of two of our distribution centers and certain stores and a gain on debt retirement resulting from the bond tender offer that we completed this quarter.

A few words on the impairment charge at Elixir. We've begun the process of developing the operating budget for fiscal 2024. While we are at the beginning of this process and have several months of work ahead of us, there are certain factors that we've noted that caused a triggering event for the assessment of goodwill impairment under generally accepted accounting principles. These factors include an update to our estimate of lives for 2023 based on the latest selling season, the Elixir Insurance bid results, and other business factors. The impairment was recorded based upon an update of our valuation related to fiscal 2024 and future years. As I said, we have much work to do to build out our detailed plan for fiscal 2024 and are not prepared to give any additional color on the fiscal 2024 outlook at this time.

* * *

I think from a pure number standpoint . . . the best I can probably comment on for fiscal 2024, and then we got a lot more work to do to build out. The plan is I would expect a step down in lives in fiscal 2024, given the results of the selling season combined with the loss of the client that we talked about. We're still finalizing our ultimate live estimates, though. So it'd be premature for me to give you an exact number. I do expect the benefits we're getting from network management to continue at a minimum into fiscal 2024. I think we have some opportunities outside our book to grow in the specialty business. ***But clearly, from a pure lives standpoint, we would expect to be down, and that's what drove the goodwill impairment that we took***.

* * *

***The goodwill impairment for Elixir is really driven by a triggering event from a change in our estimate of lives for next year. And we've been open about the fact that we expect lives to go down***. And so that is what drove the impairment on the goodwill for Elixir.

40.     On this news, Rite Aid's stock price fell $1.97 per share, or 28.02%, to close at

$5.06 per share on September 29, 2022.

41.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline

in the market value of the Company's securities, Plaintiff and other Class members have suffered

significant losses and damages.

14

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Rite Aid securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rite Aid securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rite Aid or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

44.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

45.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Rite Aid;

- whether the Individual Defendants caused Rite Aid to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Rite Aid securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

48.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Rite Aid securities are traded in an efficient market;

16

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Rite Aid securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

49.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

50.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

51.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

52.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under

which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Rite Aid securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Rite Aid securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

54.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rite Aid securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Rite Aid's finances and business prospects.

55.     By virtue of their positions at Rite Aid, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

56.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Rite Aid, the Individual Defendants had knowledge of the details of Rite Aid's internal affairs.

57.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Rite Aid.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rite Aid's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Rite Aid securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Rite Aid's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Rite Aid securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

58.    During the Class Period, Rite Aid securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Rite Aid securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired

said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Rite Aid securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Rite Aid securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

59.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

61.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.     During the Class Period, the Individual Defendants participated in the operation and management of Rite Aid, and conducted and participated, directly and indirectly, in the conduct of Rite Aid's business affairs.  Because of their senior positions, they knew the adverse non-public information about Rite Aid's misstatement of income and expenses and false financial statements.

63.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Rite Aid's financial condition and results of operations, and to correct promptly any public statements issued by Rite Aid which had become materially false or misleading.

64.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Rite Aid disseminated in the marketplace during the Class Period concerning Rite Aid's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Rite Aid to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Rite Aid within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rite Aid securities.

65.     Each of the Individual Defendants, therefore, acted as a controlling person of Rite Aid.  By reason of their senior management positions and/or being directors of Rite Aid, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Rite Aid to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Rite Aid and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

66.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Rite Aid.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  October 19, 2022                              Respectfully submitted,

                                                      **THE ROSEN LAW FIRM, P.A.**

                                                      */s/ Jacob A. Goldberg*
                                                      Jacob A. Goldberg
                                                      Gonen Haklay
                                                      100 Greenwood Avenue, Suite 440
                                                      Jenkintown, PA 19046
                                                      Telephone: (215) 600-2817
                                                      Facsimile: (212) 202-3827
                                                      jgoldberg@rosenlegal.com
                                                      ghaklay@rosenlegal.com

                                                      POMERANTZ LLP
                                                      Jeremy A. Lieberman
                                                      (*pro hac vice application forthcoming*)
                                                      J. Alexander Hood II
                                                      (*pro hac vice application forthcoming*)
                                                      600 Third Avenue, 20th Floor
                                                      New York, New York 10016
                                                      Telephone: (212) 661-1100
                                                      Facsimile: (917) 463-1044
                                                      jalieberman@pomlaw.com
                                                      ahood@pomlaw.com

WOHL & FRUCHTER LLP
Joshua E. Fruchter
(*pro hac vice application forthcoming*)
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*