### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE RITE AID CORPORATION SECURITIES LITIGATION | Case No. 2:22-cv-04201-KBH |
| | CLASS ACTION |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **AMENDED COMPLAINT** |

Lead Plaintiff Steven L. Diamond ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, confidential interviews of former employees, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Rite Aid Corporation ("Rite Aid" or the "Company"), analysts' reports and advisories about the Company, information obtained from interviews with knowledgeable individuals, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Rite Aid securities between December 21, 2021 and September 28, 2022, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to

1

pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Rite Aid, through its subsidiaries, operates a chain of retail drugstores in the U.S. The Company operates through two segments, Retail Pharmacy and Pharmacy Services. The Pharmacy Services segment provides an integrated suite of pharmacy benefit management ("PBM") offerings through the Company's Elixir subsidiary. This includes technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication, and pharmacy discount programs. Elixir also provides Medicare Part D insurance offerings for individuals and groups through its Elixir Insurance subsidiary. Through Elixir Insurance, Elixir also insured approximately 700,000 seniors enrolled in Medicare Part D during the Class Period.

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) despite representations to the contrary, the number of net new members (*i.e.*, "lives") that the Elixir PBM business services was in material decline; (ii) Rite Aid was notified that it would be losing large clients that made up a substantial portion of the Elixir's covered lives; (iii) the carrying value that Rite Aid had recorded for Goodwill at Elixir was no longer justified and could not be sustained; and (iv) as a result, the Company's public statements were materially false and/or misleading at all relevant times.

4.      During the Class Period, Defendants boasted to investors that sales at Elixir's PBM were strong, that it was a "growth story," that it was retaining 95% of the prior year's covered

lives, that it currently had a sales pipeline of "nearly 1 million members and growing," that it had competitive pricing, and that it had already ramped up its sales team.  For example, on April 14, 2022, Defendant Heyward Donigan ("Donigan"), who was at all relevant times the Company's Chief Executive Officer ("CEO"), said that "better pricing with a newly restructured sales team and a focus on our target market segments has led us to sell 35,000 new members already.  We have 150,000 lives in the current finalist through 1/1 2023 and a current pipeline of nearly 1 million members and growing."  Donigan also boasted that they were "on target" to sell 300,000 new members for the benefit year beginning 1/1/23.

5.    However, Defendants failed to disclose that Elixir was then experiencing a dramatic decline in its number of covered lives, both because of the loss of major clients, and because its selling season for new members was dramatically weaker than touted to investors.  By January or February of 2022, Rite Aid was informed that it would be losing its largest health plan client, Virginia Premier Health Plan ("Virginia Premier"), effective January 1, 2023.  Virginia Premier was a major client, representing 15% of Elixir's total covered lives, and its loss was a major hit for Elixir.  In addition to concealing this significant adverse development, Defendants manipulated figures about purported "new lives" covered throughout the Class Period to hide that Elixir was contracting rather than growing, and misrepresented to investors that its ramped up sales team was winning new lives.  In truth, its sales team was largely inexperienced, mired in attrition, and struggling to retain even existing clients.

6.    In Rite Aid's June 10, 2022 Proxy Statement, Defendant Donigan stated, "[o]ur Elixir account and sales teams are gaining momentum, and we are executing more efficiently by consolidating functions.  And the market is noticing—we have added 34,000 individuals covered by Elixir's PBM services since January 1, 2022, with many more in the pipeline."

7.    Less than two weeks later, on June 23, 2022, Defendant Donigan bragged that the new lives sold figure had ballooned to 80,000.  Regarding Elixir's PBM business, Donigan claimed, "[o]ur strong network contracts, new rebate capabilities, innovative clinical services and expertise in government programs have enabled us to add 80,000 new lives for January 1, 2023 start date.  These are more new lives than we sold last year.  And additionally, the selling season is still in progress, and we've got close to 1 million lives remaining in the pipeline for January 1, 2023."  On the same call, Elixir's Chief Operating Officer ("COO"), Defendant Chris DuPaul ("DuPaul"), advised that "we've had a pretty strong start to our selling season, particularly on the health plan side," and "we're feeling really good about where our lives are headed going into [1/1/23]..."

8.    Defendants continued to make false and misleading statements throughout the Summer of 2022 regarding the success of its Elixir subsidiary and sales team.

9.    On September 29, 2022, however, Rite Aid admitted that its claims of Elixir's growth were untrue, and that, as a consequence, it would record a $252.2 million charge for the impairment of goodwill related to Elixir.  On an earnings call held later in the day, Rite Aid's Chief Financial Officer ("CFO"), Matt Schroeder ("Schroeder"), explained that the large impairment charge was related to Elixir based on "an update to our estimate of lives for 2023 based on the latest selling season," and that Rite Aid "expected[ed] lives *to go down*."

10.    On this news, Rite Aid's stock price fell $1.97 per share, or 28.02%, to close at $5.06 per share on September 29, 2022.  On a December 21, 2022 earnings call, Elixir's COO, Defendant DuPaul attributed poor sales to an inexperienced sales and underwriting team, and said "the past [ph] year was very much a rebuilding year for us,"—in stark contrast to management's touting Elixir as a "growth story" just weeks earlier.

4

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members suffered substantial damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Rite Aid is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

15.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

16.     Plaintiff, as set forth in his previously-filed Certification, ECF No. 3-5, acquired Rite Aid securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

17.     Defendant Rite Aid is a Delaware corporation with principal executive offices located at 1200 Intrepid Avenue, 2nd Floor, Philadelphia, Pennsylvania 19112.  Rite Aid's

common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the trading symbol "RAD."

18.     Defendant Donigan served as Rite Aid's President and CEO at all relevant times. Donigan made the false and/or misleading statements identified in Paragraphs 38, 40, 47, 49, 53, 55, 64, 68, 71, 75, 77, 81, 83, and 85.

19.     Defendant Schroeder served as Rite Aid's Executive Vice President and CFO at all relevant times. Defendant Schroeder made the false and/or misleading statements identified in Paragraphs 51, 53, 55, 62, 79, and 81.

20.     Defendant DuPaul served as Elixir's COO at all relevant times. Defendant DuPaul made the false and/or misleading statements identified in Paragraph 73.

21.     Defendants Donigan, Schroeder, and DuPaul are sometimes referred to herein as the "Individual Defendants."

22.     The Individual Defendants possessed the power and authority to control the contents of Rite Aid's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Rite Aid's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their day-to-day control over Rite Aid, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading. In addition, as alleged herein, the Individual Defendants had intricate knowledge of the workings of the Company's Elixir subsidiary and the

selling season for Elixir's PBM.  The Individual Defendants are thus liable for the false statements and omissions pleaded herein.

23.    Rite Aid and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24.    Rite Aid, through its subsidiaries, operates a chain of retail drugstores and provides PBM services in the U.S.  The Company was founded in 1962 as "Thrift D Discount Center" in Lancaster, Pennsylvania, and debuted as a public company under the name "Rite Aid" in 1968.  Since 1970, the Company's stock has traded on the NYSE.

25.    The Company operates through two segments—Retail Pharmacy and Pharmacy Services.  The Pharmacy Services segment, Elixir, provides an integrated suite of PBM offerings, including technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication, and pharmacy discount programs.  Through Elixir Insurance, Elixir also insures seniors enrolled in Medicare Part D.

26.    Rite Aid entered the PBM business in 2015 when it acquired EnvisionRx.  EnvisionRx operated two PBM subsidiaries: EnvisionRx, based out of Ohio, and MedTrakRx, based out of Kansas City.  MedTrakRx relied on a traditional spread-based PBM pricing system for small to mid-sized self-insured employers.  In contrast, EnvisionRx used a transparent, pass-through pricing model in which 100% of rebates, discounts, and incentives were credited at the point of sale to customers, and earned money mostly through a flat monthly management fee.  In 2020, Rite Aid merged the operations of EnvisionRx and MedTrakRx, and rebranded under the name "Elixir."

27.    PBMs are third-party companies that manage prescription drug benefits on behalf of health insurers, Medicare Part D drug plans, large employers, and other payers.  By negotiating with drug manufacturers and pharmacies to control drug spending, PBMs have a significant behind-the-scenes impact in determining total drug costs for insurers, shaping patients' access to medications, and determining how much pharmacies are paid.  The three largest PBMs are CVS Caremark, Express Scripts (owned by Cigna), and OptumRx (owned by United Healthcare).  As of 2020, the three largest PBMs made up nearly 80% of the total market.  Those three largest PBMs, combined with the next three largest, Humana Pharmacy Solutions, MedImpact Healthcare Systems ("MedImpact"), and Prime Therapeutics, make up more than 95% of the PBM market. PBMs contract with pharmacies to negotiate discounts and rebates and develop and maintain a list of drugs, called a "formulary." There are currently around 70 companies offering PBM services in the United States.  Many of these companies, including Elixir, focus on smaller employers and regional health plans.  However, larger PBMs also compete for these same customers, and have an advantage when negotiating rebates and discounts from drug manufacturers.[1] According to a report by S&P Global, "large vertically integrated PBMs should continue to leverage their scale and vast services to maintain market share. … We continue to expect subscale PBMs are at greater risk of losing clients to larger competitors."[2]

28.    CW1, began working for Elixir's predecessor MedTrakRx in March 2012.  CW1 originally worked for MedTrakRx as a financial analyst, then as a pricing manager.  CW1 reported

---

[1] *See* https://www.managedhealthcareexecutive.com/view/in-land-of-giants-smaller-pbms-find-a-niche

[2] *See Pharmacy Benefit Managers In 2020: Less Regulatory Overhang, More Consolidation*, S&P GLOBAL RATINGS (Jan. 21, 2020), available at https://www.spglobal.com/ratings/en/research/articles/200121-pharmacy-benefit-managers-in-2020-less-regulatory-overhang-more-consolidation-11312596

8

to MedTrakRx's Chief Financial Officer Scott Holland, and later its Vice President Associate General Counsel Mitch Kempker. According to CW1, MedTrakRx was allowed to function independently of EnvisionRx until 2019 when CEO Donigan sought to integrate the operations of MedTrakRx and EnvisionRx. Once MedTrakRx and EnvisionRx integrated, CW1 worked for Elixir until March 2021 as a Director of Financial Planning and Analysis, reporting to Vice President of Finance Joshua Sobitz. According to CW1, the MedTrakRx legacy entity saw senior employees leave due to the integration that formed Elixir.

29.     CW2 served as an implementation project manager at Elixir from August 2017 to August 2018, an account executive of operations from August 2018 to April 2020, and then as vice president of operations from April 2020 to March 2022. CW2 reported to the Senior Vice President of Growth and Retention Susan Thomas, and Chief Medical Officer H. Kelley Riley, both of whom reported to Donigan. CW2 reported that the Company would know it was losing a client in advance because the client would provide notice of its intention to terminate its relationship with Elixir and that CW2, among other employees, would have to prepare for that client's departure. According to CW2, Elixir struggled to land and retain large clients because of pricing.

30.     In the years leading up to the Class Period, Elixir suffered substantial client losses. For example, during 2020, Elixir lost the PBM business of Boston Medical Center HealthNet Plan, which accounted for approximately 200,000 covered lives.

31.     At the end of fiscal year 2021 (which ended in February 2021), Rite Aid reported that Elixir had 3.25 million covered lives in its Elixir segment and $7.97 billion in revenue generated from Elixir, and an adjusted EBITDA of $157.77 million.

32.     Rite Aid represents in its SEC filings that Elixir targets small to mid-market employers, labor unions, and regional health plans.  However, as of its April 27, 2021 annual report filed on Form 10-K (for Fiscal Year 2021), Elixir's business was concentrated in a limited number of clients, with its "top five customers accounting for 59.7%" of revenue.

33.     By no later than early 2021, Rite Aid was notified that Elixir would be losing the PBM business of Bright Health Group, Inc., ("Bright Health"), a healthcare plan of approximately 400,000 covered lives.

34.     During 2021, Elixir also was notified that it lost the PBM business of Cerner's health plan, which had approximately 30,000 lives, and had been the largest client of MedTrakRx. CW3 worked for Elixir from November 2020 to December 2022 as a Product Configuration Analyst and a Product Readiness Specialist.  CW3 had previously worked as a Data Analyst for MedTrakRx – which was merged into Elixir – from March 2019 to November 2020.  CW3's duties revolved around IT and involved file intake, fielding IT questions from clients and Elixir account managers, working with developers and the system administration team to handle file automation, generating reports, and dealing with accounting invoices.  CW3 reported to Manager Katie McCann, who reported to Director of Product Operations Brittany Tyjeski, who in turn reported to CW4, discussed in Paragraph 44.  CW3 confirmed that Elixir lost Cerner in 2021, which switched its PBM business to MedImpact.  MedImpact is a larger competitor of Elixir, and one of the six largest PBMs that make up over 95% of market share.

35.      In response to these setbacks, on June 24, 2021, Donigan promised to "make investments in Elixir, including expanding our sales and underwriting teams."

36.     On a September 23, 2021 earnings call, Donigan emphasized that Elixir had hired "a new Head of Pricing and Underwriting,"  and underscored that Elixir was "ramping up our sales

team to get ready for the '23 sales cycle."  In its 10-Q filed on October 6, 2021, the Company emphasized as a "strategic initiative" for the Company, it had made "investments in talent in sales, underwriting, and operations at Elixir."

37.     Donigan and Schroeder stressed their personal involvement in Elixir's supposed turnaround.  For example, Donigan said at a Credit Suisse Healthcare Conference on November 10, 2021:  "*I have been running the day to day operations at Elixir for the last 8 months, and so has Matt [Schroeder]*."

**<u>Defendants begin to make material misrepresentations and omissions to investors</u>**

38.     The Class Period begins on December 21, 2021, when Rite Aid hosted a conference call with investors and analysts to discuss the Company's Third Quarter for Fiscal Year 2022. During the scripted portion of the call, Defendant Donigan touted Elixir's hire of Defendant DuPaul and progress in building up its sales and underwriting team:

**<u>Heyward Donigan</u>:**

In addition to Chris, we've recently recruited seasoned healthcare executives across key functional areas within Elixir and brought on a new CFO, who has significant healthcare experience.  *And we have recently assembled a very strong seasoned sales team aligned to all of our key target market segments.  These new hires are critical to Elixir.[3]*

39.     The statements identified in Paragraph 38 above were false and/or misleading when made because: (a) as Rite Aid would later admit, Elixir did not have a "strong" or "seasoned" sales team; (b) Elixir did not then have an effective underwriting function; and (c) Elixir's sales team was not "aligned to all of [its] key target market segments," but was then losing clients both in its large health plan segment and in smaller and mid-market employers, in large part due to its inexperienced sales team and inferior pricing.

---

[3] All emphasis herein is added unless otherwise indicated.

40.    Donigan also minimized Elixir's loss of the Bright Health PBM business on the December 21, 2021 earnings call, falsely attributing it to industry consolidation: "this is unfortunate is [sic] one of our health plan clients, who was growing very rapidly, got merged with another health plan and they did a rollup RFP, that we -- they went with the other incumbent, which is one of the risks that we have when we get these health plan clients, because so many of these health plans are getting rolled up right now and especially, in the government programs business." Bright Health switched its PBM business from Elixir to competitor MedImpact, effective January 1, 2022, although it had informed Rite Aid that it was switching well before the Class Period.

41.    The statements identified in Paragraph 40 above were false and/or misleading when made because Bright Health left Elixir due to pricing and service quality, not industry consolidation.  As the CEO of Bright Health, Mike Mikan, subsequently explained: "we were able to renegotiate ancillary and pharmacy contracts, reduce out of network rates, optimize existing contract structures, more closely manage high cost cases, and improve our specialty provider network."

42.    By withholding these critical adverse facts, and portraying a falsely unbalanced view of Elixir's operations and prospects, Donigan was able to boost Rite Aid's stock price, lifting shares from a prior day's close of $12.40 to close at $15.05 on December 21, 2021.

43.    In the beginning of 2022, Virginia Premier was Elixir's largest remaining health plan client, which serves over 300,000 members.[4]  Virginia Premier, which serves Medicare and

---

[4] *See Virginia Premier: 2023 Credentialing Program Description*, at 2 ("Founded in 1995 as a Medicaid HMO, Virginia Premier is a nonprofit managed care organization in the Commonwealth, now serving more than 300,000 members statewide.")  https://www.virginiapremier.com/wp-content/uploads/Cardinal-Care-Cred-Program-Description-2023.pdf

Medicaid lives, had been using Elixir as its PBM for both its Medicaid and Medicare services.[5] Elixir also served another large health plan client, MCS Classicare, ("MCS") which is an HMO with a Medicare contract and a contract with the Puerto Rico Medicaid program. Rite Aid's MCS contract covered just over 204,667 lives—approximately 95,000 fewer members than Rite Aid had covered at Virginia Premier.[6] As alleged herein and corroborated by multiple confidential witnesses in Paragraph 93, Rite Aid became aware no later than January or February 2022 that it had lost the Virginia Premier business and Virginia Premier would switch to another PBM effective January 1, 2023. *See* Paragraphs 5, 44-45, 93.[7]

44.    According to CW4, MCS became Elixir's largest client because of attrition, meaning the loss of larger clients. CW4 worked at Elixir from 2019 to July 2022. CW4 joined Elixir in 2019 as a consultant to then-EnvisionRx CEO Ben Bulkley and became a full-time Elixir

---

[5] *See Virginia Premier Medicare Pharmacy Benefits*, Updated 10/1/2022, ("Virginia Premier's prescription drug benefit is administered by Elixir.") available at https://web.archive.org/web/20221003153228/https://www.virginiapremier.com/members/medica re-pharmacy-benefits/ (captured October 3, 2022 on The Wayback Machine, a digital archive available on the Internet that allows users to view the layout and content of a particular webpage in the past even if the webpage has changed or is later removed); *see also Virginia Premier: Pharmacy Benefits for Medicaid Members*, ("Virginia Premier's prescription drug benefit is administered by Elixir Solutions (formerly known as Envision Rx)") available at https://web.archive.org/web/20221215094705/https://www.virginiapremier.com/mem bers/medicaid/pharmacy/ (captured December 15, 2022)

[6] MCS Healthcare Holdings also includes MCS Life Insurance Company, which services individual and commercial medical plans to 210,146 covered lives. *See* https://web.archive.org/web/20220328051814/https://mcs.com.pr/en/Pages/about-us/corporate-profile.aspx. (captured March 28, 2022). Throughout 2022, MCS Life Insurance used PharmPix, Corp. as its PBM. *See* https://mcs.com.pr/en/PDFs/EHB/2021PDL.pdf

[7] On December 2, 2022, Virginia Premier disseminated a press release stating that it would be switching its PBM, effective January 1, 2023. On December 21, 2022, Rite Aid disclosed that it was then projecting a loss of 700,000 covered Elixir lives beginning in the calendar year 2023. Rite Aid attributed the loss to the loss of a large client and a previously planned reduction in Elixir Insurance coverage.

employee in May 2020, taking on the role of Vice President, Product Strategy and Management. CW4 was the General Manager at Elixir in charge of implementing the Laker Software as a Service ("SaaS") platform that Elixir used to track the number of covered lives at any one point in time. CW4 was also involved in a range of other areas at Elixir, including experience research and design, product management, product analysis, vendor management, product readiness, and product support. According to CW4, Elixir generally did not close deals at a 35% rate, even in situations where it reached the finalist stage.

45.     CW5 served in financial planning and analysis for Elixir from May 2016 to April 2022, first as a manager from May 2016 to November 2018, then as director from November 2018 to June 2020, and then as senior director from June 2020 to April 2022. CW5 worked out of the former EnvisionRx office in Twinsburg, Ohio. According to CW5, large health plans typically would provide notice to Elixir 18 months in advance of the contract's termination date because the large number of covered lives involved required a longer amount of time to transition claims data and information to the new PBM. CW5 confirmed that Elixir had lost several large clients, including Virginia Premier and Boston Medical Center HealthNet Plan, which Elixir's Account Management Team reported to CW5 due to CW5's position. CW5 was aware of Virginia Premier's departure before CW5 left the Company in April, 2022.

46.     PBM selling seasons for smaller employer plans generally run from April to September, while the needle-moving large health plans, such as Virginia Premier, are sold over a year in advance. For example, on April 14, 2022, Donigan explained: "We're very early in the 2023 season for employer business, and we are in the 2024 season for health plan business." Elixir reported in April 2022 that it had just over 2 million covered lives in its PBM business, including 0.7 million covered lives through its Medicare Part D insurance offering.

47.    On April 14, 2022, Rite Aid hosted a conference call with investors and analysts to discuss the Company's Q4 and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook.  During the scripted portion of the call, Defendant Donigan touted Elixir's purported sales and retention:

**<u>Heyward Donigan</u>:**

[W]e will grow Elixir, we are on target to sell 300,000 new members for 1/1/ 2023.

So, as you know, the first step to achieving net growth is retaining the business we already have.  ***After accounting for previously known losses due [to] health plan consolidation, we're on track to retain 95% of our business for the 2023 selling season***, and I'm excited to share that we recently renewed, in a very competitive situation, our largest Medicare advantage client with the three-year contract.  So, the next step is to win new business, and to do that we have to first be competitive on price.  That's the price of entry.  We're doing that through strong network pricing and our new rebate aggregator.  Now, we're getting to the finalist position on a regular basis, where we are presenting a unique and compelling value proposition.  Our results have shown that once we get to finalists, we are winning deals 35% of the time.

***While we are very early in the selling season, better pricing with a newly restructured sales team and a focus on our target market segments has led us to sell 35,000 new members already.  We have 150,000 lives in the current finalist stage through 1/1/2023 and a current pipeline of nearly 1 million members and growing.***

48.    The statements identified in Paragraph 47 above were false and/or misleading when made because: (a) the statement omits that Rite Aid was failing to retain large clients; (b) the statements omitted to disclose that these "lives" that it had already sold were not net new lives and did not account for the lost lives, including from major clients that it could not offset, such as Virginia Premier; (c) they did not disclose that Elixir lacked the sales, pricing and underwriting capability to convert a meaningful share of either the 150,000 lives it represented was in the finalist stage or the 1 million lives it stated were still in the pipeline; (d) its sales pipeline was not then, "growing" but rather dwindling due to increasing competition from larger players in the PBM

market and an inexperienced sales team; (e) Elixir was not on track to retain 95% of its business for 2023, having already lost its largest PBM health plan customer, Virginia Premier; and (f) the previously disclosed loss of Bright Health was not due to "health plan consolidation," but rather Elixir's inferior pricing and service quality.

49.     On the same call, Donigan made the following additional false and/or misleading statements about Elixir's "core competency" in growing the number of health plan clients:

**Heyward Donigan**:

As I noted earlier, we just renewed our largest Medicare advantage client and have won a number of new Medicare advantage plans, health plans for 2023. ***Much of our success as Elixir has been in this growing healthcare segment, and is a core competency that sets us apart. Our knowledge and expertise of firm managing our own Elixir Insurance business has positioned us as a leader in managing Medicare advantage plans, and we continue to be focused and committed to supporting the growth of those clients.***

50.     The statements identified in Paragraph 49 above were false and/or misleading when made because: (a) Elixir was not growing its health plan clients, but was instead massively losing large clients, such as Bright Health and Virginia Premier at this time; and (b) its knowledge and expertise were not "set[ing it] apart, but instead they were losing clients to larger competitors.

51.     On the same April 14, 2022 earnings call, CFO Schroeder made the following additional false and/or misleading statements regarding the loss of Bright Health during fiscal year 2022, brushing it off as "industry consolidation":

**Matt Schroeder**:

I'll now shift to our Pharmacy Services Segment, Elixir***. For our fourth quarter, Elixir saw revenues decreased $176 million or 9.4% to $1.7 billion due primarily to a planned decrease in Elixir insurance membership and a previously announced client loss that was driven by industry consolidation***. Elixir's fourth quarter adjusted EBITDA was $3.7 million versus last year's fourth quarter adjusted EBITDA of $35.2 million. This was due to a decline in revenues, an increase in the medical loss ratio at Elixir insurance and a write-off of accounts receivable related to our decision to exit a line of business.

52.    The statements identified in Paragraph 51 above were false and/or misleading when made because: (a) as confirmed by Bright Health's CEO, Bright Health abandoned Elixir for another PBM because of pricing and service quality, not "industry consolidation"; and (b) the statements failed to disclose that Elixir was broadly losing clients, and that revenue declines were not limited to one instance of industry consolidation and a planned decrease in Elixir Insurance membership.  *See* Paragraphs 27-36, 44-46.

53.    On April 25, 2022, Rite Aid filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operating results for the fiscal year-ending February 26, 2022 (the "2022 10-K").  Defendants Donigan and Schroeder signed the 2022 10-K.  In discussing the Company's risk factors, Rite Aid downplayed as a mere hypothetical "risk" that a loss of a major client could adversely affect revenue:

> ***A substantial portion of our Pharmacy Services [PBM] segment revenue is currently generated from a limited number of customers, and, if there is a loss of a major customer, our revenue will decrease and our business and prospects could be adversely impacted.***
>
> A substantial portion of our Pharmacy Services segment revenue is currently generated from a limited number of customers. ***While we are not limited in the number of customers with which we can do business and results may vary over time, our top five customers accounted for 60.7%, which includes 2.3% related to a previously disclosed client loss, 59.7% and 53.2% of our Pharmacy Services segment revenue during fiscal 2022, 2021 and 2020, respectively***. The largest payor, CMS, represented 41.1%, 36.6% and 27.4% of Pharmacy Services segment revenue during fiscal 2022, 2021 and 2020, respectively.  We expect that a limited number of customers will continue to account for a significant percentage of our Pharmacy Services segment revenue, and the loss of all or a portion of a major customer could decrease our revenue and harm our business.

54.    The statements identified in Paragraph 53 above were false and/or misleading when made because they failed to disclose that: (a) Rite Aid had already been informed that it lost a major client, Virginia Premier, which accounted for 15% of its covered lives; (b) the loss of

Virginia Premier effective January 1, 2023 and other clients already ensured that revenue would drop off absent massive new customers; and (c) as a result, the potential "risk" referenced had already occurred at the time of publication.

55.     Appended to the 2022 10-K as an exhibit was a signed certification pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Donigan and Schroeder, attesting that "[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

56.     The statements identified in Paragraph 55 above were false and/or misleading when made because they failed to disclose that: (a) Rite Aid omitted material client losses in its Elixir unit in the 2022 10-K; and (b) as a result, the financial conditions of the Company were not fairly presented in the filing.

57.     SEC Regulation S-K required Defendants to describe in the 2022 10-K and other periodic SEC filings during the Class Period, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material impact … on net sales or revenues or income from continuing operations."   17 C.F.R. § 229.303(b)(2)(ii) ("Item 303") (2021). "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations."  SEC Release Nos. 33-8056; 34-45321; FR-61.

58.     The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition ... with particular emphasis on the registrant's prospects for the future."   S.E.C. Release No. 6835, 1989 WL

1092885, at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

59.     In its 2022 10-K and the other periodic Class Period SEC filings identified herein, Defendants omitted to disclose in violation of Item 303: (a) the sales and underwriting uncertainty Elixir faced from deploying an inexperienced sales team; (b) the uncertainty regarding Elixir's ability to retain its large clients; and (c) the downward trend Elixir was observing (i) due its failure to retain some of its largest clients and (ii) its inability to procure sufficient new covered lives to offset the covered lives it had already lost.  Defendants' decision to conceal this adverse information is the antithesis of "giv[ing] the investor[s] an opportunity to look at the company through the eyes of management ..."  S.E.C. Release No. 6835, 1989 WL 1092885, at *3, *17.

60.     Item 303 affirmatively required the Defendants to disclose these uncertainties with a high degree of specificity to comply with Regulation S-K's rigorous disclosure requirements.  Because Rite Aid had already lost Virginia Premier (as well as Bright Health, Cerner, and other large clients), it knew that this was likely to adversely affect the Company's present or future business expectations, and, in fact, had a negative impact on those expectations, yet Defendants failed to disclose these uncertainties and trends when touting Elixir's potential in their SEC filings.

61.     On May 4, 2022, Virginia Premier confirmed to its members that it would be switching health plans from Elixir to Express Scripts.[8]

---

[8] Virginia Premier is owned by Sentara Healthcare, which at this time had transitioned its PBM contracts to Express Scripts, for an effective date of January 1, 2023.  For example, Optima Health,

62.     On May 12, 2022, Schroeder gave a presentation to the National Group Management Trade Relations Committee.  Slide 13 stated that "Elixir has improved its ability to bid competitively resulting in new business wins and positive feedback from pharmacy consultants."  Under a headline reading "2023 Selling Season – Early Results," the slide represented the Elixir had signed up 35,000 new lives, was in the finalist stage for an additional 150,000 lives, and had a "pipeline of 1 [million] lives and growing."

63.     These statements identified in Paragraph 62 above were false and/or misleading when made because they failed to disclose: (a) Elixir was then losing customers on a net basis, thus more than offsetting any "new business wins"; (b) its sales team lacked the experience or capability to effectively convert a hypothetical "pipeline" into signed deals; and (c) the pipeline was not then "growing" but instead Elixir was then losing clients.

64.     On May 20, 2022, Rite Aid filed with the SEC its 2022 Notice of Annual Meeting of Stockholders and Proxy Statement/ Preliminary on Schedule 14A.  In this filing, Donigan made the following false and/or misleading statement regarding Elixir's sales team:

**Heyward Donigan**:

*Our Elixir account and sales teams are gaining momentum, and we are executing more efficiently by consolidating functions.  And the market is noticing—we have added 34,000 individuals covered by Elixir's PBM services since January 1, 2022, with many more in the pipeline.  And we just won the renewal of our largest health plan client in a very competitive bidding process.*

65.     These statements identified in Paragraph 64 above were false and/or misleading when made because: (a) Elixir sales were then losing momentum, not "gaining momentum"; (b)

---

which is also owned by Sentara, announced on July 6, 2022 that it was switching its PBM plan to Express Scripts as well.  *See* https://web.archive.org/web/20220820000652/https://www.optimah ealth.com/brokers/updates/exciting-vendor-changes (announcement dated July 6, 2022.  This webpage was captured on August 20, 2022).

Elixir had not added 34,000 individuals to its covered lives because any additions were more than offset by customer lives it had already lost, leading to a net loss in lives at the time of the statement; (c) the Company had not achieved "renewal of [its] largest health plan client" because Virginia Premier was then its largest health plan client, and Virginia Premier had already informed Rite Aid that it would not renew at year-end and would switch to a larger competitor; and (d) by touting the success of retaining one large health plan client while concealing the loss of another large health client, Defendants misled investors about the performance of Elixir's business.

66.    Also in this filing, Rite Aid made the following false and/or misleading statement regarding its financial performance:

> In addition, Elixir announced an agreement with a new national rebate aggregation partner to drive improved value and formalized their go-to-market strategy for the 2023 calendar selling season. ***The combination of these initiatives has given Elixir 34,000 early win lives and a finalist rate up 14% over last year.*** "Lives" refers to the number of people covered by Elixir's pharmacy benefit management. Elixir has also shown strong results in medical cost avoidance by driving improved medication adherence. Our Specialty Pharmacy's net promotor score is 82, which is eight points higher than the national average. Finally, strong growth at our Elixir Savings showcases the continued need of cash card businesses to grow using our state of the art platform and analytics.

67.    These statements identified in Paragraph 66 above were false and/or misleading when made because: (a) Elixir's supposed gain of 34,000 individuals was more than offset by customer lives it had already lost, leading to a net loss in lives at the time of the statement; and (b) Rite Aid failed to disclose that its inexperienced sales team and inferior pricing were hampering its sales efforts.

68.    On June 10, 2022, Rite Aid filed with the SEC a definitive proxy statement on Form DEFC14A (the "June 10, 2022 Proxy Statement"). In a letter to shareholders contained in that filing, Defendant Donigan repeated the same misrepresentations contained in the preliminary

proxy statement identified in Paragraph 64. The statements were false and/or misleading when made for the same reasons identified in Paragraph 65.

69.     The June 10, 2022 Proxy Statement also contained the same false and/or misleading statements regarding the Company's financial performance identified in Paragraph 66. The statements were false and/or misleading when made for the same reasons identified in Paragraph 67.

70.     Journalists also reacted favorably to Elixir's supposed turnaround. During the Class Period, Elixir was upheld as Rite Aid's "main growth driver" and journalists noted that the company had been going through a "going through a transformative reorganization" which made it a potential acquisition target.[9]  Indeed a June 14, 2022 *Fortune Magazine* article noted that "the PBM has carved its own niche by focusing on midsize employers with less than 1,000 staff, a market that bigger players find too small to bother with." The article noted that the growth could lead to a possible sale. Throughout the Class Period, analysts noted the sales potential of Elixir.

71.     On June 23, 2022 Rite Aid hosted a conference call with investors and analysts to discuss the Company's first quarter 2023 financial results (the "Q1 2023 Earnings Call"). During the scripted portion of the Q1 2023 Earnings Call, Defendant Donigan stated, *inter alia*:

<u>**Heyward Donigan**</u>:

[With respect to] the PBM services business[,] [o]ur strong network contracts, new rebate capabilities, innovative clinical services and expertise in government programs **have enabled us to add 80,000 new lives for January 1, 2023 start date. These are more new lives than we sold last year. And additionally, the selling season is still in progress, and we've got close to 1 million lives remaining in the pipeline for January 1, 2023**.

---

[9] *See, e.g.*, https://www.marketbeat.com/originals/could-rite-aid-be-an-acquisition-target-again/.

72.    These statements identified in Paragraph 71 above were false and/or misleading when made because they failed to disclose: (a) that Elixir had lost customer lives, not added 80,000; and (b) that Elixir's inexperienced sales team and inferior pricing were then impeding its ability to convert the "1 million lives remaining in the pipeline."

73.    During the Q&A portion of the Q1 2023 Earnings Call, Defendant DuPaul had the following exchange with an analyst regarding Elixir:

**Q- William Reuter (Analyst):**

… The second question is you mentioned the 80,000 additional lives for Elixir that you've attained, and there's still 1 million potentially that you're going to be getting? I guess, what's your degree of confidence in that additional potential million. What percent might be reasonable that you would attain of those? And then if there has been anything else in terms of losses of lives, I'm trying to think about next 2023, that calendar year, how Elixir is shaking out.

**A- Chris DuPaul:**

Thank you for the question.  Just to clarify a bit, taking you down through the numbers.  The 1 million lives that Heyward referenced are the lives that we still have active in our pipeline inside of our target markets.  So those are -- that's a business that is up for bid right now for 1/1/23.  So out of that 1 million, we expect to win a portion of those.  Where we are right now in terms of our new life count for next year, I think in our last earnings call, we've talked about -- we've set a goal to try and win 300,000 new lives.

At the time, we've had a pretty strong start to our selling season, particularly on the health plan side.  As we've moved into more of the commercial book, that slowed a bit.  As we've seen more clients sticking with incumbents.  That said, we are still expecting to have the strongest selling season that we've had in several years at Elixir.  And so we feel really good about where our life count is headed.  ***Our retention rate is still expected to come in right around 95%.  And we did retain our largest client, MCS, earlier in the year.***  So we're feeling really good about where our lives are headed going into 1/1 '23, and that's sort of how we get there.

74.    These statements identified in Paragraph 73 above were false and/or misleading when made because: (a) at the time of the statements, it was mathematically impossible for Elixir to achieve a 95% retention rate because it had already lost Virginia Premier, which represented

15% of its existing covered lives; (b) the statements omitted that Elixir had not retained its largest

health plan client, which was Virginia Premier; (c) its selling season was not then off to a "strong

start," but rather was failing miserably due to the loss of Virginia Premier; and (d) Elixir's

internally-known failures were not due to a preference to sticking with incumbents, but rather,

large customers fleeing Rite Aid and an inexperienced sales staff incapable of converting its

pipeline and inferior pricing compared to larger competitors.

75.    On that same June 23, 2022 earnings call, Donigan made the following statement

about Elixir's "growth story" in response to a question from an analyst:

**Q- George Hill**

Yes.  I guess, Matt, my first question is kind of a big picture question, which is that
if you look at the $100 million in EBITDA that the company delivered this quarter,
you take out $30 million to $35 million in the vacs, the business did $65 million.
Of course, there will be a continuing benefit from the vacs but the profitability of
the business basically needs to double every quarter from this quarter to kind of hit
around the midpoint of the guidance. You've talked about some of the embedded
cost cuts.  I guess what I would ask is, could you and Heyward kind of talk through
where you see the growth opportunities versus the cost reductions.  Kind of what
I'm trying to get to is that -- are we -- do we feel like we're back in the growth phase
of the business coming out of the pandemic? Or are we still more than a shrink-to-
grow type outlook?

**A- Heyward Donigan**:

Yes, George, it's Hayward.  Thanks.  I think it's a combination.  We are -- we've
shown that we can grow our scripts, even cycling the significant benefit we got from
vaccines last year.  So our core scripts are up.  And that's just the beginning.  We
haven't even really tapped into yet some of the adherence courtesy refill and
maintenance medication opportunities that we have in front of us.

Also, while front end was flat as the quarter, the front-end sales comps actually
were increasing in the quarter.  So we have seen strong momentum within the
quarter. ***And as I mentioned earlier, we're seeing strong sales results on Elixir.
So we've sold more so far this year than we sold at this time last year.  And our
retention rates are higher.  So that's the growth story.***  And we talked about
specialty mail and some of the other opportunities.  I'll let Matt comment just on
the economics and the SG&A efforts.

76.     These statements identified in Paragraph 75 above were false and/or misleading when made because: (a) they failed to disclose the loss of large clients, including Virginia Premier while touting their "retention rates" as higher; (b) Elixir was not then seeing "strong sales results" and new lives were more than offset by large losses; (c) Elixir was not a "growth story" as measured by its most vital metric, covered lives; and (d) the claim that they "sold more so far" than the same time as last year omitted the large number of covered lives Defendants knew were lost from Virginia Premier and other large customers Elixir failed to retain.

77.     On June 24, 2022, Donigan appeared in an interview with Yahoo Finance and made the following false and/or misleading statements about Elixir:

**Brian Cheung (Yahoo Finance)**:

And then, Heyward, is scale an important part of that story? Because it seems like the strategy right now is to make sure that you're streamlining what you have right now. We know that you still have debt that you're handling, although there's no debt due until 2025, but still very much a part of the short-term future for your company. But at the same time, I imagine you want to see more growth in specifically the Elixir, the PBM type of side of your business. So do you have to get bigger just even in terms of total assets to achieve what you're trying to do here?

**A- Heyward Donigan**:

Well, Brian, I think it's a good question. We don't need to buy anything, and that's I'm excited about our $1.7 billion in liquidity because we have plenty of room to invest. We have all the assets we need to scale, and what we do need to do is grow into those assets. So we have exciting opportunities to grow mail-order, pharmacy benefit management business. ***We are showing strong growth, we sold 80,000 lives just this year, and it's just the beginning of the sales season.*** We have a specialty pharmacy that could handle a lot of additional, both limited distribution drugs and volumes, and also our retail pharmacies have capacity to grow as well.

78.     The statements identified in Paragraph 77 above were false and/or misleading when made because: (a) Elixir's PBM business was not then "showing growth"; (b) Elixir did not have "all the assets… need[ed] to scale" but instead was then impeded by an inexperienced sales team,

gaps in underwriting, and inferior pricing; and (c) the Company failed to disclose Elixir's large client losses.

79.    On July 6, 2022, Rite Aid filed a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ending May 28, 2022. Defendant Schroeder signed this Form 10-Q as the Company's Chief Financial Officer.  Like in its 2022 10-K, Rite Aid omitted to disclose: (a) the uncertainty Elixir faced as a result of its decision to deploy an inexperienced sales team in the 2023 sales season and the uncertainty regarding Elixir's ability to retain its large clients; and (b) the downward trends Elixir was observing in customer lives and retention.

80.    The omissions violated Regulation S-K Item 303 for the same reasons as discussed in Paragraphs 59-60, above.

81.    Also appended to this July 6, 2022 Form 10-Q was the signed certification pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Donigan and Schroeder, attesting that "[t]he information contained in the [July 6, 2022 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

82.    The statements identified in Paragraph 81 above were false and/or misleading when made because they failed to disclose that: (a) Rite Aid omitted material client losses in its Elixir unit in this July 6, 2022 Form 10-Q; and (b) as a result, the financial conditions of the Company were not fairly presented in the filing.

83.    At Rite Aid's Annual Stockholders Meeting on July 27, 2022, Defendant Donigan stated the following concerning Elixir's selling season:

**<u>Heyward Donigan</u>**

Our momentum has continued into the first quarter of fiscal year 2023…. In quarter one, we had non COVID acute prescription growth of 11.9% and we achieved

revenues of $6 billion and adjusted EBITDA of $100.1 million.  We also reduced retail SGNA expenses by $40 million.  We closed 87 unprofitable stores ahead of schedule **and sold 80,000 new lives at Elixir for 01/01/2023, which is above all of last year's selling season with much of this year's season still to go**.  This is just a summary of some of our accomplishments, but now I'd like to talk about our current strategy and our plans to grow.

84.     The statements identified in Paragraph 83 above were false and/or misleading when made because they failed to disclose: (a) that Elixir had lost lives overall, not gained 80,000 lives; (b) Elixir's large client losses, including Virginia Premier; and (c) that Elixir's sales progress had already ground near to a halt by that time in the selling season.

85.     At a Retail Investor Conference on August 24, 2022, during the scripted portion Defendant Donigan continued again to misleadingly tout its PBM as "winning business":

**Heyward Donigan:**

Our strength as a company, including these assets, is our ability to be nimble, innovative and relevant to our target markets.  ***Whether it's our PBM, whom consultants are now saying we are positioned to win and are winning business***, or our specialty pharmacy, we are the 14 largest specialty pharmacy distributor in America.  And we are winning in our specialty pharmacy business, new limited distribution drugs.  And then of course our retail pharmacy whose volumes on script are up across the board.

86.     The statements identified in Paragraph 85 above were false and/or misleading when made because: (a) Elixir was not then "positioned to win" or currently "winning business," but was in fact losing customer lives; (b) the statements omitted that Elixir's sales efforts were impeded by an inexperienced sales force and inferior pricing.

**The Truth Emerges**

87.     On September 29, 2022, Rite Aid announced its financial results for the second quarter of 2023 and disclosed for the first time that Elixir was not only not growing but was performing so poorly that Rite Aid had to record a $252.2 million charge for the impairment of goodwill.  On an earnings call later in the day, Defendant Schroeder explained that the large

impairment charge was triggered by an update in the estimate of covered lives for 2023 based on Elixir's poor performance during the selling season.  Specifically, Defendant Schroeder stated, in relevant part:

> Second quarter net loss was $331.3 million or $6.07 per share compared to last year's second quarter net loss of $100.3 million or $1.86 per share. ***The increase in net loss in the current quarter is due primarily to a charge of $252.2 million or $4.62 per share for the impairment of goodwill related to Elixir.***  Net loss was also impacted by higher facility exit and impairment charges driven by the company's previously announced store closures.  These items were partially offset by a gain on sale leasebacks of two of our distribution centers and certain stores and a gain on debt retirement resulting from the bond tender offer that we completed this quarter.
>
> A few words on the impairment charge at Elixir.  We've begun the process of developing the operating budget for fiscal 2024.  While we are at the beginning of this process and have several months of work ahead of us, there are certain factors that we've noted that caused a triggering event for the assessment of goodwill impairment under generally accepted accounting principles.  These factors include an update to our estimate of lives for 2023 based on the latest selling season, the Elixir Insurance bid results, and other business factors.  The impairment was recorded based upon an update of our valuation related to fiscal 2024 and future years.  As I said, we have much work to do to build out our detailed plan for fiscal 2024 and are not prepared to give any additional color on the fiscal 2024 outlook at this time.
>
> ****
>
> I think from a pure number standpoint ... the best I can probably comment on for fiscal 2024, and then we got a lot more work to do to build out.  The plan is I would expect a step down in lives in fiscal 2024, given the results of the selling season combined with the loss of the client that we talked about.  We're still finalizing our ultimate live estimates, though.  So it'd be premature for me to give you an exact number.  I do expect the benefits we're getting from network management to continue at a minimum into fiscal 2024.  I think we have some opportunities outside our book to grow in the specialty business.  ***But clearly, from a pure lives standpoint, we would expect to be down, and that's what drove the goodwill impairment that we took***.

88.      In reaction to this unexpected news, Rite Aid's stock price fell $1.97 per share, or 28.02% from the previous day's closing price, to close at $5.06 per share on September 29, 2022.

28

89.     On December 21, 2022, Rite Aid disclosed that it was then projecting a loss of 700,000 covered Elixir lives beginning in the calendar year 2023.  Rite Aid attributed the loss to the loss of a large client and a previously planned reduction in Elixir Insurance coverage.

90.     On January 12, 2023, Rite Aid announced that its CEO would be departing, effective immediately.

91.     On May 1, 2023, Rite Aid released its annual report for fiscal year 2023.  In this report, the Company disclosed that its Elixir PBM then served 1.4 million covered lives—down at least 30% from the previous year in which the Company represented to investors that it had "over 2 million" covered lives in its 2022 Form 10-K.

92.     As of July 31, 2023, RAD stock is now trading at $1.64—down nearly 90% since the start of the Class Period.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## ADDITIONAL ALLEGATIONS OF SCIENTER

### A.     Confidential witnesses confirm that large client losses were known internally throughout 2022

93.     As set forth above, CW5 confirmed that Elixir would learn 18 months from the effective date that a large health plan such as Virginia Premier would leave Elixir for another PBM. *See* Paragraph 45.  CW5 was aware of the loss of Virginia Premier before CW5 left the Company in April 2022.  *See id.*  Another witness, CW2 confirmed that Rite Aid lost Virginia Premier as a client before CW2 left the company in March 2022, which CW2 knew about because of CW2's role leading the implementation of clients.  Therefore, Defendants knew of the loss by January or February 2022, at the latest, and when making each of the Class Period statements alleged herein beginning in April 2022.

94.     Another witness, CW3, attended Elixir's quarterly town hall meetings, and confirmed that Elixir's sales cycle and covered lives were discussed at those meetings by Donigan and senior management.

95.     CW6 worked at Elixir from November 2020 to September 2022.  CW6 first joined as a Senior Manager of Product Management, a role in which CW6 helped implement product roadmaps and enhancements for internal programs and then in March 2022, CW6 was promoted to the position of Director of Product Analysis and Vendor Solutions, in which CW6 oversaw product management strategy and execution. CW6 reported to CW4 initially, and then later reported to Vice President of Product Engineering and Delivery, Anuj Agrawal. CW6 confirmed that Elixir lost large clients during 2022, and that these losses were discussed at quarterly town hall meetings, where Donigan and other "C-panel" leaders spoke during these meetings hosted via Vimeo.  The town hall meetings were open to the Company's employees.  Plaintiff has independently corroborated that a link was posted on Vimeo's website dated July 13, 2022, although the video was not saved or available.  According to CW6, in 2022, Donigan acknowledged the big losses in Bright Health and Virginia Premier, at these meetings.

96.     CW3 also confirmed the accounts of CW6 that Donigan and other senior leaders participated in quarterly Elixir-specific meetings over Zoom or Vimeo, which included PowerPoint slides with information on the expected growth of covered lives, new clients, financial metrics like EBITA or EBITDA and other data.  CW3 confirmed the account of CW6 that Donigan admitted at these meetings that Elixir had "hit stumbling blocks" and was not going to be able to hit its projections, either for the number of covered lives or revenue.  CW3 believes this meeting occurred in the middle of 2022.  On information and belief, based on the inactive link that remains on Vimeo, Plaintiff believes CW3 was referring to the July 13, 2022 meeting.

**B. Defendants' own statements claim knowledge of the misrepresented matters**

97.     Defendant Donigan spearheaded and took personal responsibility for the supposed turnaround of Elixir in 2021. As she boasted at the November 10, 2021 Credit Suisse Healthcare Conference: "I have been running the day to day operations at Elixir for the last 8 months, and so has Matt [CFO Schroeder]." Chris DuPaul worked on Elixir exclusively after his arrival at Rite Aid in December 2021, and all three held themselves out to investors as having actual knowledge about Elixir, its covered lives, and the then-current performance of its sales efforts.

**C. Temporal proximity shows Defendants' knowledge**

98.     Further, the temporal proximity between these statements and the September 2022 disclosure that Elixir's lives would be declining further supports scienter. As Donigan herself stated, by April 2022, *see* Paragraph 46, *supra*, Rite Aid was already in the 2024 calendar season health plan sales cycle. Therefore, she was already on notice that large health care provider Virginia Premier would be leaving Elixir effective 2023. On November 9, 2022, at a Credit Suisse Healthcare Conference, Defendant Schroeder admitted that the company had only sold "almost 100,000 lives" at Elixir during the selling season, meaning that Elixir sold almost no lives after June 23, 2022, when it reported that it had sold "80,000 lives just this year, and it's just the beginning of the sales season."

**D. Defendants' admissions show they knew the truth**

99.     Further, Defendants' admissions after the impairment further support an inference of scienter. On December 21, 2022, DuPaul admitted knowing that Elixir's sales team was inexperienced and there were gaps in its underwriting capabilities:

**<u>Q- Karru Martinson (Jefferies)</u>**

Good morning.  So when we look at that 700,000 life loss here at the start of the new year, what is Elixir going to be standing at? And kind of what's the opportunity you get part of those lives back in terms of live served?

**A - Chris DuPaul**

Yes. So as we move into 1/1 of this year, right now, we are coming in roughly around 2.3 million [covered lives].  So we're forecasting that 700,000 life loss, and so you can do the math there.  As we look forward, where I think we have the opportunity to gain that back.  If you have to look at both sides of the business, you've got to look at the PBM side, in terms of our services and as Heyward mentioned, we're actively building our pipeline.  We're looking forward to the upcoming selling season.  **The past year was very much a rebuilding year for us.  We went into the season with a relatively new commercial team, and we had several gaps in critical areas, including sales and underwriting.**  And so, as we move into the 2024 selling season, we filled many of those gaps, and we've also matured as a team.

100.    DuPaul's admission above stands in stark contrast to his June 23, 2022 statement that he was "expecting to have the strongest selling season that we've had in several years at Elixir" and Donigan's statement from December 21, 2021 that it had assembled a "very strong seasoned sales team aligned to all of our key target market segments."   Donigan, Schroeder, and DuPaul repeatedly made false statements to investors about Elixir's supposed "growth" and sales pipeline during the Class Period as alleged in detail above, and concealed material facts from investors that rendered their Class Period statements false and/or misleading when made.

**E.  Defendants had access to information contradicting their public statements**

101.    As set forth above, Elixir tracked its covered lives and sales efforts in an enterprise software called Laker, to which the Individual Defendants had access.  *See* Paragraph 44.  And, Defendants' repeated claims to know about covered lives, *see, e.g.,* Paragraphs 47, 66, 71, 73, 75, 77, 85, 99, confirm that each had access to that information.

### F.  Core operations

102.    Elixir was a core operation of Rite Aid, and its best hope for growth.  Given the importance of Elixir to Rite Aid, each Defendant's intricate workings with Elixir, as well as Donigan's representation that growing healthcare clients was a "core competency that sets us apart," and Defendants' statements representing that they had such knowledge of Elixir's sales, it would be absurd to assume they were unaware that Elixir was losing, not gaining, large customers.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Rite Aid securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

104.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rite Aid securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rite Aid or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

105.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

106.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

107.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Rite Aid;

- whether certain Individual Defendants are control persons of Rite Aid for purposes of Section 20(a) of the Exchange Act;

- whether the Individual Defendants caused Rite Aid to issue false and/or misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and/or misleading financial statements;

- whether the prices of Rite Aid securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since the joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

109.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Rite Aid securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Rite Aid securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

110.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

111.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as the claims alleged herein sound primarily in omission, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

112.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

113.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

114.    During the Class Period, as detailed above, Defendants omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and made material misrepresentations, *inter alia*, (i) concealing large losses of important customers and covered lives at Elixir; (ii) concealing gaps and inexperience in Elixir's sales force and underwriting; (iii) concealing that Elixir had inferior pricing; and (iv) concealing that Rite Aid had recorded and continued to maintain an inflated valuation of Elixir's goodwill, which was impaired throughout the Class Period. Such acts were intended to, and, throughout the Class Period, did deceive the investing public, including Plaintiff and other Class members, artificially inflate and/or maintain an inflated price for Rite Aid securities, and cause Plaintiff and other members of the Class to purchase or otherwise acquire Rite Aid securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

115.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Rite Aid securities. Such reports, filings, releases and statements were

materially false and/or misleading in that they failed to disclose material adverse information and misrepresented the truth about Rite Aid's finances and business prospects.

116.    By virtue of their day-to-day control at Rite Aid, Defendants had actual knowledge of the materially false and/or misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and/or misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

117.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Rite Aid, the Individual Defendants had knowledge of the details of Rite Aid's internal affairs.

118.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Rite Aid. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Rite Aid's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and/or misleading reports, releases and public statements, the market price of Rite Aid securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts

concerning Rite Aid's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Rite Aid securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

119.    During the Class Period, Rite Aid securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and/or misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Rite Aid securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Rite Aid securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Rite Aid securities declined sharply upon the public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

120.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

122.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

123.    During the Class Period, the Individual Defendants participated in the operation and management of Rite Aid, and conducted and participated, directly and indirectly, in the conduct of Rite Aid's business affairs.  Because of their senior roles and day-to-day control, they knew the adverse non-public information about Rite Aid's misstatement of income and expenses and false financial statements.

124.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Rite Aid's financial condition and results of operations, and to correct promptly any public statements issued by Rite Aid that had become materially false or misleading.

125.    Because of their control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Rite Aid disseminated in the marketplace during the Class Period concerning Rite Aid's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Rite Aid to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Rite Aid within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Rite Aid securities.

126.    Each of the Individual Defendants, therefore, acted as a controlling person of Rite Aid.  By reason of their senior management positions and/or being directors of Rite Aid, each of

the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Rite Aid to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Rite Aid and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

127.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Rite Aid.

128.    Each of the other Individual Defendants reported to Defendant Donigan, either directly or indirectly. As CEO, she had the ability to control their day-to-day conduct. As a result, Donigan is also liable pursuant to Section 20(a) of the Exchange Act for the primary violations committed by Schroeder and DuPaul.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  July 31, 2023                                Respectfully submitted,

**POMERANTZ LLP**

By:  /s/ *Brian P. O'Connell*

Joshua B. Silverman   (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: jbsilverman@pomlaw.com
        boconnell@pomlaw.com
        garifi@pomlaw.com

*Counsel for Plaintiff Lead  Steven L.*
*Diamond and Lead Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**

Jacob Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-mail:  jgoldberg@rosenlegal.com

*Liaison Counsel for the Class*

**WOHL & FRUCHTER LLP**

Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
(845) 290-6818
jfruchter@wohlfruchter.com

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 31, 2023, a copy of the foregoing was filed electronically via the

Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by operation of the

Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

Dated:  July 31, 2023

*/s/ Brian P. O'Connell*
Brian P. O'Connell