**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE RITE AID CORPORATION SECURITIES LITIGATION | Case No. 2:22-cv-04201-KBH |
| | <u>CLASS ACTION</u> |
| | <u>ORAL ARGUMENT REQUESTED</u> |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | **Lead Plaintiff's Opposition to Individual Defendants' Motion to Dismiss** |

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ..................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ............................................................................................................ 1

STATEMENT OF RELEVANT FACTS ......................................................................... 2

ARGUMENT .................................................................................................................... 7

   I.   Applicable Pleading Standards Do Not Favor Dismissal ...................................... 7

       A.  Standards on Fed. R. Civ. P. 12(b)(6) Motions To Dismiss .................................. 7

       B.  Individual Defendants' Alternative Factual Narratives Raise Issues For The Jury, Not Pleading Defects ........................................................................................... 9

   II.  The Complaint Alleges §10(b) Violations Regarding Elixir ............................... 11

       A.  The Complaint Sufficiently Identifies Material Misrepresentations and Omissions ............................................................................................................. 11

           1.  False and Misleading Statements About Retaining 95% of Existing Business ....................................................................................................... 11

           2.  False Statements And Omissions About Retaining Its "Largest Client" 15

           3.  False Statements That Elixir Had Grown During The Selling Season ...16

           4.  False Statements About Elixir's Sales Team .......................................... 17

           5.  False Statements About The Loss Of Bright Health .............................. 18

       B.  The Complaint Raises A Strong Inference Of Scienter ....................................... 18

           1.  Individual Defendants Held Themselves Out As Having Knowledge Of Facts They Misrepresented ................................................................ 18

           2.  Individual Defendants Knew Information Contradicting Their Public Statements ................................................................................................ 20

           3.  Core Operations Doctrine Supports An Inference Of Scienter ............... 22

i

4.  Temporal Proximity Supports A Strong Inference of Scienter...............23

C.  Plaintiff Has Adequately Pled Loss Causation .......................................................23

III.    THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY................................25

CONCLUSION.................................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alberici v. Recro Pharma, Inc.*,
　2020 U.S. Dist. LEXIS 27535 (E.D. Pa. Feb. 14, 2020) ........................................................24

*Aldridge v. A.T. Cross Corp.*,
　284 F.3d 72 (1st Cir. 2002)...................................................................................................20

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*,
　532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................15, 19, 20, 22

*Ark. Pub. Emple. Ret. Sys. v. GT Solar Int'l, Inc.*,
　2009 LEXIS 93820 (D.N.H. Oct. 7, 2009) ......................................................................15, 16

*Aviva Partners, LLC v. Exide Techs.*,
　2007 LEXIS 17347 (D.N.J. March 13, 2007)........................................................................21

*Bell Atl. Corp. v. Twombly*,
　550 U.S. 544 (2007)...............................................................................................................7

*Belmont v. MB Inv. Partners, Inc.*,
　708 F.3d 470 (3d Cir. 2013)..................................................................................................25

*Bing Li v. Aeterna Zentaris, Inc.*,
　2016 U.S. Dist. LEXIS 26772 (D.N.J. Mar. 2, 2016).............................................................25

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
　2019 U.S. Dist. LEXIS 127587 (D.N.J. July 31, 2019)..........................................................22

*City of Edinburgh Council v. Pfizer, Inc.*,
　754 F.3d 159 (3d Cir. 2014)..................................................................................................12

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
　450 F. Supp. 3d 379 (S.D.N.Y. 2020)...................................................................................18

*Conroy v. Leone*,
　316 F. App'x 140 (3d Cir. 2009)...........................................................................................14

*Del. Cty. Emps. Ret. Sys. v. AdaptHealth Corp.*,
　606 F. Supp. 3d 124 (E.D. Pa. 2022) ...............................................................................23, 25

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005)...........................................................................................................2, 23

*Employees Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc.*,

2020 U.S. Dist. LEXIS 99287 (D.N.J. June 5, 2020) .......................................................13, 16

*EP Medsystems, Inc. v. EchoCath, Inc.*,
  235 F.3d 865 (3d Cir. 2000)...........................................................................................24

*Fan v. StoneMor Partners LP*,
  927 F.3d 710 (3d Cir. 2019)...........................................................................................12

*Fleisher v. Standard Ins. Co.*,
  679 F.3d 116 (3d Cir. 2012).............................................................................................8

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) .............................................................................20

*Hall v. Johnson & Johnson*,
  2019 U.S. Dist. LEXIS 221513 (D.N.J. Dec. 27, 2019) ..............................................9, 19

*Howard v. Arconic Inc.*,
  2021 U.S. Dist. LEXIS 116935 (W.D. Pa. June 23, 2021)..............................................14

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004)...........................................................................................12

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)......................................................................................16, 18

*In re Aetna Inc. Sec. Litig.*,
  34 F. Supp. 2d 935 (E.D. Pa. 1999) .............................................................................12, 13

*In re Akorn Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .............................................................................13

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  U.S. Dist. LEXIS 131562 (D.N.J. Aug. 6, 2019)...........................................................22

*In re ATI Techs., Inc., Sec. Litig.*,
  216 F. Supp. 2d 418 (E.D. Pa. 2002) ........................................................................16, 17

*In re BioScrip, Inc.*,
  2015 U.S. Dist. LEXIS 73484 (S.D.N.Y. June 5, 2015)..................................................14

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)..........................................................................................8, 9

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) .............................................................................11, 20

*In re CBT Grp. PLC Sec. Litig.*,

2001 U.S. Dist. LEXIS 27343 (N.D. Cal. Dec. 28, 2001) ........................................................18

*In re Celgene Corp. Sec. Litig.*,
2019 U.S. Dist. LEXIS 218141 (D.N.J. Dec. 19, 2019) ..............................................13, 16, 17

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) .......................................................................................10

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
2018 U.S. Dist. LEXIS 137591 (D.N.J. Aug. 8, 2018)...........................................................12

*In re Daou Sys. Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................................21

*In re Donald J. Trump Casino Sec. Litig.*,
7 F.3d 357 (3d Cir.1993)....................................................................................................14

*In re Emerson Radio Corp. Sec. Litig.*,
2005 U.S. Dist. LEXIS 49811 (D.N.J. Dec. 19, 2005) ...........................................................13

*In re Enzymotec Sec. Litig.*,
2015 U.S. Dist. LEXIS 167403 (D.N.J. Dec. 14, 2015) ....................................................10, 14

*In re EQT Corp. Sec. Litig.*,
504 F. Supp. 3d 474 (W.D. Pa. 2020)...............................................................................16, 18

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 U.S. Dist. LEXIS 171110 (S.D.N.Y. Dec. 2, 2013) .......................................................16

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
2020 U.S. Dist. LEXIS 51666 (E.D. Pa. Mar. 24, 2020)........................................................18

*In re Lucent Techs., Inc. Sec. Litig.*,
217 F. Supp. 2d 529 (D.N.J. 2002) ......................................................................................16

*In re PTC Therapeutics, Inc., Sec. Litig.*,
2017 U.S. Dist. LEXIS 137930 (D.N.J. Aug. 28, 2017).......................................................8, 20

*In re RAIT Fin. Tr. Sec. Litig.*,
2008 U.S. Dist. LEXIS 103549 (E.D. Pa. Dec. 22, 2008) .......................................................22

*In re Splunk Inc. Sec. Litig.*,
592 F. Supp. 3d 919 (N.D. Cal. 2022) ..................................................................................18

*In re Suprema Specialties, Inc. Sec*. Litig.,
438 F.3d 256 (3d Cir. 2006)................................................................................................11

*In re Urban Outfitters, Inc. Sec. Litig.*,

v

103 F. Supp. 3d 635 (E.D. Pa. 2015) ............................................................................24, 25

*In re ViroPharma Inc. Sec. Litig.*,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) .......................................................................................20

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..........................................................................................2, 8, 20, 23

*Jackson v. Microchip Tech., Inc.*,
   2020 U.S. Dist. LEXIS 42041 (D. Ariz. Mar. 11, 2020) ........................................................22

*Jaroslawicz v. M&T Bank Corp.*,
   962 F.3d 701 (3d Cir. 2020)....................................................................................................12

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ................................................................................................10

*Marra v. Tel-Save Holdings, Inc.*,
   U.S. Dist. LEXIS 7303 (E.D. Pa. May 18, 1999) ...................................................................10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)...................................................................................................................7

*McCabe v Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007)...............................................................................................23, 24

*McDermid v. Inovio Pharm., Inc.*,
   520 F. Supp. 3d 652 (E.D. Pa. 2021) .....................................................................................13

*Medtronic Ave, Inc. v. Bos. Sci. Corp.*,
   2001 U.S. Dist. LEXIS 9056 (D. Del. Mar. 30, 2001) ............................................................8

*Monk v. Johnson & Johnson*,
   2011 U.S. Dist. LEXIS 145554 (D.N.J. Dec. 19, 2011) .........................................................22

*New Orleans Emps. Celestica, Inc.*,
   455 F. App'x 10, 14–15 (2d Cir. 2011)  ..............................................................................20

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015)............................................................................................................14, 15

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)....................................................................................................12

*Ratz v. Photomedex*,
   2014 U.S. Dist. LEXIS 194439 (E.D. Pa. Sep. 12, 2014) ......................................................10

*Scheller v. Nutanix, Inc.*,

2020 U.S. Dist. LEXIS 166813 (N.D. Cal. Sep. 11, 2020) ....................................................22

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*,
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ...................................................................................19

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000).................................................................................................14

*Stratechuk v. Bd. of Educ.*,
  200 F. App'x 91 (3d Cir. 2006) .............................................................................................9

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
  2022 U.S. Dist. LEXIS 227020 (D.N.J. Dec. 16, 2022) ....................................................12, 15

*Szaloczy v. Kone Elevators & Escalators*,
  2021 U.S. Dist. LEXIS 121998 (D.N.J. June 29, 2021) .........................................................15

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007)................................................................................................................8

*Tomaszewski v. Trevena, Inc.*,
  482 F. Supp. 3d 317 (E.D. Pa. 2020) ...................................................................................20

*U.S. ex rel. Wilkins v. United Health Grp., Inc.*,
  659 F.3d 295 (3d Cir. 2011)....................................................................................................8

*Vanderhoef v. China Auto Logistics, Inc.*,
  2021 U.S. Dist. LEXIS 142466 (D.N.J. July 30, 2021)..........................................................25

*Wallace v. Intralinks*,
  2013 U.S. Dist. LEXIS 65958 (S.D.N.Y. May 8, 2013)..........................................................15

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017)..................................................................................................12

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 U.S. Dist. LEXIS 77495 (E.D. Pa. June 16, 2015) .......................................................12

**Rules**

Fed. R. Civ. P. 8.....................................................................................................................23

Fed. R. Civ. P. 9(b) ..................................................................................................................8

Fed. R. Civ. P. 12(b)(6).........................................................................................................7, 9

**Statutes**

15 U.S.C. §78u-4(b)(2) .................................................................................................8, 18

SEC Rule 10b-5 ...........................................................................................................11, 12

Section 10(b) of the Securities Exchange Act of 1934 ..........................................1, 8, 11

Private Securities Litigation Reform Act ...................................................8, 12, 17, 18

Lead Plaintiff Steven L. Diamond ("Plaintiff") hereby opposes Individual Defendants'[1]

motion to dismiss (ECF No. 36) as follows:

### INTRODUCTION

The Complaint alleges straightforward violations of Section 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") arising from false and misleading statements and

omissions concerning Rite Aid's Elixir subsidiary. Elixir provided Pharmacy Benefits

Management ("PBM") services to health insurers, Medicare Part D drug plans, large employers,

and other payers. ¶27.[2] Individual Defendants assured investors that the Company had made the

investments that had already transformed Elixir into a growing segment, ¶¶36, 64-65, that Elixir

was then retaining 95% of its existing clients, ¶¶4, 47, 73, that it was then experiencing its best

PBM selling season in several years, ¶73, and that a previous large client loss was simply the result

of industry consolidation, rather than pricing concerns. ¶¶33, 40-41.

None of this was true. By February 2022, Elixir and Individual Defendants were informed

that Elixir's largest client, Virginia Premier, had already decided to leave. ¶¶5, 43, 54, 93. Because

this loss amounted to 300,000 covered lives, or 15% of Elixir's then-existing covered lives, Elixir

---

[1] The "Individual Defendants" are former Rite Aid CEO Heyward Donigan ("Donigan), former Rite Aid CFO Matt Schroeder ("Schroeder"), and Elixir COO Chris DuPaul ("DuPaul"). On October 15, 2023, Defendant Rite Aid (the "Company") filed for bankruptcy protection in the United States Court for the District of New Jersey. *See* Suggestion of Bankruptcy, ECF No. 37. As a result, the claims against the Company are stayed pending resolution of the bankruptcy petition. However, the claims against the Individual Defendants are not stayed. *See* ECF No. 37. Accordingly, this memoranda of law responds only to the Individual Defendants' Motion to Dismiss.

[2] Citations to "¶" or "¶¶" refer to the numbered paragraphs in the Amended Complaint ("Complaint"). ECF No. 35. The term "Class Period" refers to December 21, 2021 to September 28, 2022, both dates inclusive. References to "MTD" are to the numbered pages of the Memorandum of Law in Support of Defendants' Motion to Dismiss. ECF No. 36-2. All emphasis is added and internal citations omitted, unless otherwise indicated.

could not possibly retain the 95% of existing covered lives that Individual Defendants misrepresented to investors. ¶¶47-48, 73-74. Individual Defendants later admitted that their statements touting their "strong seasoned sales" team were false. ¶¶38, 99. Elixir was also struggling to retain large clients who had better options with larger PBMs at cheaper prices. ¶¶29, 33. Individual Defendants continued to tout their "growth story" until just a few weeks before they admitted that they were taking a $252.2 million impairment, which they directly attributed to the loss of covered lives in Elixir. ¶¶85, 87.

The Complaint pleads Individual Defendants' misrepresentations and omissions with the requisite degree of particularity. For each, it identifies the maker of the statement, when and where each statement was made, the content of the statement (and for omissions, the content of the omitted information), and the reasons why each statement was materially false or misleading when made. ¶¶38-41, 47-86. Further, the Complaint alleges facts strongly demonstrating that Individual Defendants either knew statements were false and misleading when made or were reckless as to the truth of their communications with investors. *See, e.g.*, ¶¶93-102. At the pleading stage, nothing more is required. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009).

Finally, the Complaint easily satisfies the standard for pleading loss causation. It gives "some indication of the loss and the causal connection that the plaintiff has in mind," *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005), specifically connecting the revelation of the truth with a sharp decline in stock price. ¶88.

STATEMENT OF RELEVANT FACTS

*Rite Aid and its Elixir Business.* Rite Aid operates a chain of retail drugstores and provides PBM services in the United States under its "Elixir" brand. ¶¶24-26. PBMs are third-party companies that manage and negotiate prescription drug benefits on behalf of health insurers,

2

Medicare Part D drug plans, large employers, and other payers. ¶27. During the Class Period, Elixir trailed behind larger PBMs. ¶27.

Elixir operated two PBM subsidiaries, EnvisionRx and MedTrakRx, and the Company sought to integrate the two subsidiaries in the years leading up to the Class Period. ¶26. According to Confidential Witness ("CW") 1, a Director of Financial Planning and Analysis, the MedTrakRx entity saw senior employees leave due to the integration. ¶28. Despite claiming to focus on smaller mid-market employers and labor unions, Elixir's business was highly concentrated in a limited number of customers—its top five customers accounted for nearly 60% of its revenue. ¶32.

A key performance metric for Elixir was the number of members it covered, *i.e.*, the number of "covered lives." ¶¶3, 66. In the years leading up to the Class Period, Elixir's covered lives had declined. ¶¶30-34. Most significantly, by no later than early 2021, Elixir was notified that it lost Bright Health Group, Inc., ("Bright Health"), a healthcare plan of approximately 400,000 covered lives. ¶33. Bright Health switched to a larger PBM competitor, MedImpact, due to pricing concerns. ¶¶33, 40-41. According to CW2, a former Elixir Vice President of Operations, Elixir struggled to land and retain large clients because of pricing. ¶29. On an earnings call on December 21, 2021, Donigan stated that Bright Health switched because of industry consolidation, rather than pricing. ¶¶33, 40-41.

***The Supposed Turnaround in Elixir***. Donigan promised in June 2021 to "make investments in Elixir, including expanding our sales and underwriting teams." ¶35. Donigan said in September 2021 that Elixir had hired a new Head of Pricing and Underwriting, and that Elixir was "ramping up" Elixir's sales team for the 2023 sales cycle. ¶36. On November 10, 2021, Donigan stressed that she had been running the day-to-day operations of Elixir "for the 8 months, and so has Matt [Schroeder]." ¶¶37, 99. Donigan said in a December 2021, earnings call that these

investments had already been made in the leadup to the 2023 selling season: "we have recently assembled a very strong seasoned sales team aligned to all of our key target market segments." ¶38.

*Elixir's 2023 PBM Sales Cycle*. Large health plans select their PBM provider approximately a year in advance of the coverage year. ¶¶46, 98. For smaller employer plans, the selling season runs from April to September of the preceding year. ¶46. For example, the selling season for the coverage year beginning January 1, 2023, large health plan PBM services were sold by February 2022, and smaller employer plan PBM services were sold between April and September, 2022. ¶¶43-46. As of February 26, 2022, the Company reported that it had just over 2 million covered lives in Elixir's PBM business. ¶46.

*Elixir loses its largest client.* Elixir's two largest clients entering 2022 were both health plans. ¶43. Virginia Premier was Elixir's largest client and accounted for 300,000 lives—15% of Elixir's covered lives. ¶¶5, 43, 54. Virginia Premier notified the Company that it was leaving Elixir by February 2022, effective January 1, 2023. ¶43. CW5, a former director in financial planning and analysis, confirmed that large health plans such as Virginia Premier would provide over a year's notice to the incumbent when switching PBMs, and that CW5 was aware that Virginia Premier was leaving Elixir before CW5 left the Company in April 2022. ¶45. Elixir's next largest client, MCS, accounted for approximately 205,000 lives. ¶¶43-44.

*Individual Defendants tout that Elixir was then growing, while omitting that it had lost its largest client.* Despite being informed of Virginia Premier's departure, Donigan represented on an April 14, 2022 earnings call that Elixir was then "on track to retain 95% of our business"—a mathematical impossibility—and then "on target to sell 300,000 new members" in the current 2023

4

selling season. ¶47. By April 2022, the 2023 large health plan selling season had already ended, and the smaller employer plan selling season was already well underway. ¶46.

On that same call, Donigan touted: (a) that Elixir had "150,000 lives in the current finalist stage through 1/1/2023 and a current pipeline of nearly 1 million members and growing"; (b) that when it reaches the finalist stage, it usually closed deals 35% of the time; and (c) that it had already sold 35,000 new members effective January 1, 2023. ¶47. According to CW4, a Vice President, Product Strategy and Management, Elixir generally did not close 35% of deals, even in situations where it reached the finalist stage. ¶44.

In its Form 10-K dated April 25, 2022, Schroeder and Donigan downplayed as a mere hypothetical "risk" that a loss of a major client could adversely affect revenue. ¶53. The 10-K did not disclose that Elixir had *already* lost its largest client. Nor did it disclose the uncertainty from deploying an inexperienced sales team, or the downward trend in covered lives Elixir was then observing. ¶¶53-56, 59.

On May 12, 2022, Schroeder claimed that Elixir had improved its ability to "bid competitively" and repeated that Elixir had already sold 35,000 new lives, had 150,000 additional lives in the finalist stage, and had a "pipeline of 1 [million] lives and growing." ¶62. In the Company's May 20, 2022 shareholder letter, Donigan said Elixir had sold 34,000 new members, and retained its largest health plan client, when in fact it had already lost Virginia Premier and its 300,000 lives. ¶¶64-65. The June 10, 2022 Proxy Statement repeated these same assertions. ¶68. On a June 23, 2022 earning call, Donigan ramped up her Elixir sales claims, boasting that Elixir had then sold 80,000 new lives, and said Elixir had "close to 1 million lives remaining in the pipeline for January 1, 2023." ¶71. On that same call, DuPaul falsely confirmed that Elixir would retain 95% of its business. ¶73. DuPaul told investors to expect "the strongest selling season that

5

we've had in several years at Elixir." ¶73. On that same call, Donigan continued to tout Elixir as a "growth story" when she knew or recklessly disregarded that Elixir was already in decline for its most important growth metric—covered lives. ¶75. Individual Defendants boasted of their "goal" of selling 300,000 new members, while omitting that they had *already lost 300,000 members* through the loss of Virginia Premier alone. ¶¶73-76.

On June 24, 2022, Donigan told Yahoo Finance that Elixir "sold 80,000 lives just this year, and it's just the beginning of the [small employer plan] sales season" and that Elixir was then "showing strong growth." ¶77. On July 6, 2022, Rite Aid filed a Quarterly Report on Form 10-Q, which Defendant Schroeder signed. ¶79. Like the 2022 Form 10-K, this filing omitted to disclose the uncertainties Elixir faced with an inexperienced sales team, its uncertain ability to retain large clients, and downward trends Elixir was then observing in customer lives and retention. ¶79. Donigan and Schroeder both attested to the accuracy of this filing. ¶81.

At Rite Aid's annual shareholder meeting on July 27, 2022, Donigan repeated the misrepresentation that they had "sold 80,000 new lives at Elixir for 01/01/2023, which is above all of last year's selling season with much of this year's season still to go." ¶83. On August 24, 2022, Donigan continued again to misleadingly tout Elixir as "winning business." ¶85.

*Corroborating facts show Individual Defendants concealed knowledge about the loss of large clients while touting investors about sales gains.* Elixir tracked its covered lives and sales efforts in an enterprise software called Laker, to which Individual Defendants had access. ¶¶44, 101. CW2 confirmed that Rite Aid was internally aware it had lost Virginia Premier as a client before CW2 left the Company in March 2022, which CW2 knew about because of CW2's role in leading the implementation of clients. ¶93. CW5 corroborated that the loss of Virginia Premier was internally known before CW5 left in April 2022. ¶93. CW3, a former Product Configuration

6

Analyst and a Product Readiness Specialist, attended Elixir's quarterly employee town hall meetings, and confirmed that Elixir's sales cycle and covered lives were discussed at those meetings by Donigan and senior management. ¶¶34, 94. Donigan and the other C-Suite Executives attended these meetings. ¶96. According to CW6, a Director of Product Analysis and Vendor Solutions, CEO Donigan acknowledged the big losses in Bright Health and Virginia Premier at these internal meetings. ¶95. One such meeting occurred in July, 2022. ¶95. CW3 corroborated that Donigan admitted at these meetings that Elixir had "hit stumbling blocks" and was not going to be able to hit its projections, either for the number of covered lives or revenue. ¶96.

*Individual Defendants finally admit that Elixir was declining.* On September 29, 2022, Individual Defendants admitted that their rosy claims of Elixir's achieved growth were untrue, and that, as a consequence, the Company would record a $252.2 million impairment charge related to Elixir. Schroeder explained that the charge was related to "an update to our estimate of lives for 2023 based on the latest selling season," and that he "expected[ed] lives to go down." ¶¶9, 87-88. On a December 21, 2022 earnings call, DuPaul admitted that his team lacked a full sales staff and had a new commercial team, stating "the past year was very much a rebuilding year for [Elixir]," informing investors that his June 23, 2022 guidance to "expect[] to have the strongest selling season that we've had in several years at Elixir" was untrue. ¶¶99-100.

ARGUMENT

## I.    Applicable Pleading Standards Do Not Favor Dismissal

### A.  Standards on Fed. R. Civ. P. 12(b)(6) Motions To Dismiss

A plaintiff "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion determines not whether the

7

plaintiff "will ultimately prevail" but whether that party is "entitled to offer evidence to support the claims." *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). Courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 120 (3d Cir. 2012).

For Section 10(b) claims, the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b) impose two additional pleading standards. First, misrepresentations must be alleged with particularity. *See Avaya,* 564 F.3d at 252-53. This does not call for an "exhaustive cataloging of facts," but only allegations sufficient to "provide assurance that plaintiff has investigated the alleged fraud and reasonably believes that a wrong has occurred." *Medtronic Ave, Inc. v. Bos. Sci. Corp.*, 2001 U.S. Dist. LEXIS 9056, at *5 (D. Del. Mar. 30, 2001). Particularity rules are relaxed where, as here, factual information is peculiarly within the defendants' knowledge or control. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).

Second, the PSLRA requires that a plaintiff allege facts supporting a strong inference of scienter, *see* 15 U.S.C. §78u-4(b)(2), though the inference need not be "irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Instead, a complaint alleges a strong inference of scienter so long as a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Scienter may be established either by showing conscious misbehavior or recklessness, and can be satisfied by circumstantial evidence. *In re PTC Therapeutics, Inc., Sec. Litig.*, 2017 U.S. Dist. LEXIS 137930, at *39-40 (D.N.J. Aug. 28, 2017).

**B. Individual Defendants' Alternative Factual Narratives Raise Issues For The Jury, Not Pleading Defects**

"A district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings" and is "required to credit plaintiffs' allegations, rather than defendant' responses." *Burlington*, 114 F.3d at 1421, 1426. A Rule 12(b)(6) motion is not the place to examine extraneous documents or test alternative narratives to "create a defense to the Complaint's otherwise well-pled allegations." *See Hall v. Johnson & Johnson*, 2019 U.S. Dist. LEXIS 221513, at *32 (D.N.J. Dec. 27, 2019).

Individual Defendants attempt to skirt these prohibitions by raising documents that are neither "integral to or explicitly relied upon in the complaint." *Burlington*, 114 F.3d at 1426. But unreferenced documents cannot be deemed incorporated by reference because they relate to a similar topic to the pleading, unless a plaintiff expressly relies on the document. *Stratechuk v. Bd. of Educ.*, 200 F. App'x 91, 94 (3d Cir. 2006). For example, Individual Defendants attach Exhibit A—a document that is not cited in the Complaint at all, and is certainly not integral to the Complaint—to weave a factual counter-narrative and contradict the Complaint's well-pled allegations. *See* MTD at 5, 10. Even worse, the strained inference they ask the Court to adopt as a matter of law (that statements about 2020 and 2021 coverage years would lead investors to temper expectations about the actual words they used to falsely tout a later turnaround) makes no sense and would be exposed as facetious upon cross-examination.[3] At any rate, Exhibit A cannot be considered here. *Burlington*, 114 F.3d at 1426; *Stratechuk*, 200 F. App'x at 94. Moreover, even

---

[3] Similarly, Individual Defendants claim their Exhibit D informed the market that Elixir "expected decrease[s] in membership in [its] PBM business." *See* MTD at 5. But, that quote refers to a fiscal quarter which **ended** on August 28, 2021, and says nothing about the coverage period described by the Class Period misrepresentations. *See* Ex. D. Likewise, none of the extraneous documents referenced addresses false Class Period claims that between December 2021 and September 2022, Elixir was **then** growing, and **then** retaining 95% of its members.

at trial, its relevance is minimal: the law does not require investors to hunt through extraneous records to ascertain whether a defendant's statement is true or false. Misrepresentations and omissions "by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public." *Ratz v. Photomedex*, 2014 U.S. Dist. LEXIS 194439, at \*3 (E.D. Pa. Sep. 12, 2014).

Nor can judicial notice excuse Individual Defendants' attempt to foray impermissibly into factual disputes. Judicial notice of publicly available SEC forms like Exs. A, C, G, H, J, and N cannot extend to considering the truth of their contents or of disputed facts asserted therein. *See In re Cendant Corp. Litig*., 60 F. Supp. 2d 354, 365 (D.N.J. 1999); *Khoja v. Orexigen Therapeutics, Inc.,* 899 F.3d 988, 1000-08 (9th Cir. 2018).[4]

Individual Defendants claim that Exhibits A, C, D, G, and N modified the plain meaning of the false statements made to investors that are cited in the Complaint. But whether those extraneous documents were sufficient to alter the plain meaning of Individual Defendants' actual Class Period statements is a jury question. The impact of a defendant's statements to investors may only be considered on a motion to dismiss if the adequacy of the disclosure is "so obvious that reasonable minds [could] not differ are these issues appropriately resolved as a matter of law." *Marra v. Tel-Save Holdings, Inc*., U.S. Dist. LEXIS 7303, at \*17 (E.D. Pa. May 18, 1999); *see also In re Enzymotec Sec. Litig*., 2015 U.S. Dist. LEXIS 167403, at \*51 (D.N.J. Dec. 14, 2015) (declining to consider whether all material information had been disclosed at the motion to dismiss stage).

---

[4] Plaintiff takes no position on the Individual Defendants' submission of the other documents relied upon as part of the moving allegations of the Complaint, except to note that the Individual Defendants do not dispute that their statements are accurately reproduced in the Complaint.

## II.     The Complaint Alleges §10(b) Violations Regarding Elixir

Under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant (falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *In re Suprema Specialties, Inc. Sec*. Litig., 438 F.3d 256, 275 (3d Cir. 2006). Individual Defendants only challenge falsity, scienter and loss causation. Their arguments are each without merit.

### A. The Complaint Sufficiently Identifies Material Misrepresentations and Omissions

#### 1.  False and Misleading Statements About Retaining 95% of Existing Business

The Individual Defendants' statements about Elixir's then retaining business were false and misleading when made. *See In re Campbell Soup Co. Sec. Litig*., 145 F. Supp. 2d 574, 598 (D.N.J. 2001). On April 14, 2022, Donigan said that Elixir was on track to retain 95% of existing business for the 2023 selling season when in fact it had already lost 300,000 lives from Virginia Premier. ¶47. DuPaul doubled down on this misrepresentation, stating "we feel really good about where our life count is headed. ***Our retention rate is still expected to come in right around 95%***" and in the next sentence said, "we did retain our ***largest client, MCS***, earlier in the year." ¶73. But there was no mathematical possibility that Elixir could retain 95% of its business when it had already lost Virginia Premier, which represented 15% of Elixir's covered lives by itself.[5]

Individual Defendants had a duty to disclose the loss of Virginia Premier. First, they were required to disclose the unfavorable impact it would have on revenue under Regulation S-K Item

---

[5] Because Plaintiff alleges these statements were misleading when made, the Individual Defendants' attempt to label them as "fraud by hindsight" fails. *Compare* MTD at 11 *with Campbell Soup*., 145 F. Supp. 2d at 598.

303. *Strougo v. Mallinckrodt Pub. Ltd*. Co., 2022 U.S. Dist. LEXIS 227020, at *31 n.12 (D.N.J. Dec. 16, 2022).[6] Second, they ***decided*** to speak on the issue of client retention, and therefore had an obligation to do so honestly. *See, e.g*., *In re Adams Golf, Inc. Sec. Litig*., 381 F.3d 267, 275-278 (3d Cir. 2004); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp*, 2015 U.S. Dist. LEXIS 77495, at *15 (E.D. Pa. June 16, 2015); *In re Cognizant Tech. Sols. Corp. Sec. Litig*., 2018 U.S. Dist. LEXIS 137591, at *49-50 (D.N.J. Aug. 8, 2018). Individual Defendants' citation to *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174-75 (3d Cir. 2014) is inapposite because there the defendants did not speak to prior clinical trial results, accurately or inaccurately. Here, Individual Defendants explicitly put the number of covered lives in play and made affirmative misrepresentations regarding them.[7]

Nor can these statements be brushed off as protected forward-looking statements that are immunized by the PSLRA safe harbor. *See* MTD at 17. The safe harbor does not apply to present

---

[6] The Individual Defendants further cite to *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) as support for the proposition that "The Third Circuit has made clear that "a violation of [Item 303's] reporting requirements does not automatically give rise to a material omission under Rule 10b–5." MTD at 14. But as subsequent decisions make clear, ***material violations of Reg S-K can be actionable omissions***. See *Jaroslawicz v. M&T Bank Corp.,* 962 F.3d 701, 711 & n.10 (3d Cir. 2020); *Strougo*, 2022 U.S. Dist. LEXIS 227020, at *32. That the Item 303 standard for materiality differs is of no consequence; here, the omitted truth was highly material under any standard. Moreover, disputes regarding materiality must proceed to the merits unless so obvious that reasonable minds cannot differ, *In re Aetna Inc. Sec. Litig*., 34 F. Supp. 2d 935, 945-46 (E.D. Pa. 1999), which is not the case here.

[7] Individual Defendants' citations about disclosing the mere possibility of losing clients are misplaced. MTD at 11. In *Fan v. StoneMor Partners LP,* 927 F.3d 710 (3d Cir. 2019), the defendants explicitly disclosed the source for their dividend cash. *See id.* at 716. Here, the Individual Defendants did not disclose Elixir's loss of 300,000 lives from its largest client. *Williams v. Globus Med., Inc*., 869 F.3d 235, 239 (3d Cir. 2017) lacked allegations that the company knew the sales impact of terminating a distributor. Here, the omission is much simpler and its consequence obvious: the loss of 300,000 lives out of 2 million lives covered in the prior year necessarily meant that the Company had not retained its largest client and could not retain 95% of existing covered lives.

statements of fact, or statements as here, unaccompanied by ***meaningful*** cautionary language. *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 946 (E.D. Pa. 1999). Even if a statement were forward-looking, for the safe harbor to apply, the statement needs to be identified as such and "[t]he cautionary language needs to be ***directly related*** to the alleged misrepresentations." *In re Emerson Radio Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 49811, at \*22-23 (D.N.J. Dec. 19, 2005).

As an initial matter, the statements in question addressed present not future facts. They were about Elixir's current retention of clients in its current selling season, not expectations about a future season. ¶¶47, 73. Elixir already knew that it had lost Virginia Premier. ¶¶5, 43, 54. This fact alone meant Elixir's retention rate was already well below 95%. An "on track" comment is not forward-looking when it refers to something that already occurred, or to a company's "current position vis-à-vis its future objectives." *Celgene,* 2019 U.S. Dist. LEXIS 218141, at \*44-45; *Employees Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc.*, 2020 U.S. Dist. LEXIS 99287, at \*18-19 (D.N.J. June 5, 2020) (statement that company's strategic transformation was "progressing well" was actionable because it contained a present component); *see also McDermid v. Inovio Pharm., Inc.*, 520 F. Supp. 3d 652, 666 (E.D. Pa. 2021) (statement that company was "on track" to manufacture 1 million doses of vaccines not forward-looking when it then lacked the manufacturing capability); *In re Akorn Sec. Litig.*, 240 F. Supp. 3d 802, 817 (N.D. Ill. 2017) ("on track" statements about present facts about integration cost savings). Both Donigan and DuPaul made clear that the 95% retention rate claim was the result of a condition—retaining the largest clients—which was demonstrably false at the time because Rite Aid knew internally that Virginia Health was already lost. ¶¶46-47.

Further, these statements were not accompanied by meaningfully cautionary language. Referenced language about hypothetical risks, *see* ¶¶53-54, is not meaningfully cautionary

language when the risks "had already come to pass." *See In re Enzymotec Sec. Litig*., 2015 U.S. Dist. LEXIS 167403, at *36 (holding disclosures of risks plaintiff alleged had already materialized were not eligible to serve as cautionary language); *In re BioScrip, Inc.,* No. 13-CV-6922 (AJN), 2015 U.S. Dist. LEXIS 73484, at *17 (S.D.N.Y. June 5, 2015) ("statements that PBM Services 'could be materially and adversely affected' or that something 'could have a material and adverse effect on the segment', may be misleading where the pleadings allege the materially adverse event had already come to pass").

Meaningful cautionary language must also be substantive and tailored to the specific predictions made in the allegedly misleading statement. *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371-372 (3d Cir.1993). Rite Aid's disclaimer, by contrast, was mere boilerplate. *See Semerenko v. Cendant Corp*., 223 F.3d 165, 182 (3d Cir. 2000). And,"[n]o amount of general cautionary language can protect a company from failure to disclose ... a risk that has already occurred." *Howard v. Arconic Inc*., 2021 U.S. Dist. LEXIS 116935, at *34-35 (W.D. Pa. June 23, 2021). Here, the referenced language was not tailored, did not disclose the loss of Elixir's largest client or then-existing lack of growth, and was absolutely silent as to the mathematical impossibility of reaching the retention rate touted to investors. Therefore, the safe harbor would not apply even if the statements had been forward-looking.

A sole undeveloped sentence also incorrectly attempts to characterize the statements as inactionable opinions. MTD at 17. Individual Defendants do not develop this argument, and therefore waive it. *See Conroy v. Leone*, 316 F. App'x 140, 144, n.5 (3d Cir. 2009). But even if developed, it would be legally and factually wrong. Under *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* 575 U.S. 175, (2015), even an opinion statement is misleading if "(1) the opinion is not sincerely held by the speaker; (2) the opinion contains an

embedded or underlying fact that is false; or (3) the opinion omits a fact that renders it misleading to an ordinary investor." *Strougo*, 2022 U.S. Dist. LEXIS 227020, at *26 (citing *Omnicare*, 575 U.S. at 184-85). Here, however: (1) Individual Defendants had knowledge and acknowledged at meetings that they had lost Virginia Premier, therefore they could not have sincerely believed their statements, (2) each statement contains an embedded factual assertion that Elixir had not already lost more than 5% of its existing covered lives, and (3) each statement implies an untrue fact that none of Elixir's large clients had already left. Accordingly, the statements are actionable under *each* of the independent bases of *Omnicare*. Nor do "magic words" like "we expect" immunize the embedded factual misrepresentations. *See Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 211-12 (E.D. Pa. 2021).

### 2. False Statements And Omissions About Retaining Its "Largest Client"

Individual Defendants decline to address Complaint allegations that they made misleading statements about retaining their largest PBM client, which was Virginia Premier. An "argument not raised in an opening brief is waived." *Szaloczy v. Kone Elevators & Escalators*, 2021 U.S. Dist. LEXIS 121998, at *12 (D.N.J. June 29, 2021).

As described above, Virginia Premier was 95,000 lives larger than the next largest client, MCS. ¶¶43-45. Yet, Donigan touted that Elixir had retained its largest client. ¶¶64, 69. DuPaul falsely represented that MCS was Elixir's largest client and was retained, while omitting that the real largest client, Virginia Premier, had already declined to renew. ¶73. Losing the largest customer is clearly material. *See, e.g., Wallace v. Intralinks*, 2013 U.S. Dist. LEXIS 65958, at *20 (S.D.N.Y. May 8, 2013) (failure to disclose the impending loss of largest customer a material omission); *Ark. Pub. Emple. Ret. Sys. v. GT Solar Int'l, Inc.*, 2009 U.S. Dist. LEXIS 93820 at

15

*31-32 (D.N.H. Oct. 7, 2009) (similar); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 U.S. Dist. LEXIS 171110, at *43-45 (S.D.N.Y. Dec. 2, 2013) (similar).

### 3. False Statements That Elixir Had Grown During The Selling Season

The Complaint alleges that Individual Defendants' statements about Elixir's then-experienced growth were false and misleading. ¶¶47, 64, 71, 73, 75, 77, 83, 85. For example, on June 23, 2022 Donigan said "we're seeing strong sales results at Elixir. So we've sold more so far this year than we sold at this time last year. And our retention rates are higher. ***So that's the growth story***." ¶75. On June 24, 2022, Donigan again stated in an interview with Yahoo Finance that "we sold 80,000 lives just this year, and it's just the beginning of the sales season" and that Elixir was "showing strong growth." ¶77. These statements were present-tense and cited a statistic about lives Elixir had supposedly already achieved, not about future aspirations. *See Celgene,* 2019 U.S. Dist. LEXIS 218141, at *44-45; *Conduent Inc.*, 2020 U.S. Dist. LEXIS 99287, at *18-19; *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 545-46 (D.N.J. 2002). Complaint allegations explain with particularity that these statements were false because Elixir was not then showing growth, and did not disclose the large client losses.

These statements cannot be brushed off as mere puffery. "Optimism" does not refer to events that have already occurred, or assertions of present fact. *See In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 493, 499 (W.D. Pa. 2020) (statements "[we] have already captured value" and "development cost continued to improve" and "already showing significant returns" were misleading statements of present fact rather than corporate optimism). Individual Defendants' reliance on *In re Advanta Corp. Sec. Litig.* is misplaced. There, the court simply held that extrapolating rosy projections based on previous earnings was not actionable. 180 F.3d 525, 538 (3d Cir. 1999). And, unlike *In re ATI Techs., Inc., Sec. Litig.,* 216 F. Supp. 2d 418 (E.D. Pa.

2002), the statements in question here were verifiably false. Donigan expressly told investors that Elixir was growing its number of covered lives at the time, when it was not. ¶¶47, 73, 77. This metric is objectively verifiable, because the two inputs determining growth (retained covered lives of existing customers plus new covered lives actually sold for the upcoming coverage year) are objective, measurable, known, and tracked by Individual Defendants internally using the Laker software. ¶¶44, 101.

In addition to the inadequacy of the language cited by Individual Defendants as meaningfully cautionary, *see* pages 13-14, *supra*, certain statements were not accompanied by *any* cautionary language. *See, e.g.*, *Celgene* 2019 U.S. Dist. LEXIS 218141, at *49 (oral statements that did not reference cautionary language not protected by safe harbor). The June 24, 2022 statements were never identified as forward-looking, nor were they accompanied by cautionary language.[8] Defendants similarly do not point to any cautionary language accompanying the August 24, 2022 statements, and therefore the PSLRA safe harbor does not apply. *Compare* ¶85 *with* MTD at 17.

### 4. False Statements About Elixir's Sales Team

Donigan falsely stated Elixir had "assembled a very strong seasoned sales team aligned to all of our key target market segments" ¶38, without disclosing that this team was inexperienced, that the sales team was then undergoing a "rebuilding," ¶99, and that it was not "aligned to all [its] key market segments." ¶99. In truth, Elixir was then both losing large clients and underperforming with new clients. Courts have held that similar statements are actionable. *See,*

---

[8] The Individual Defendants argued in their brief that this statement was accompanied by meaningfully cautionary language. MTD at 17. At trial, the argument will be rejected, as this interview did not include any cautionary language. The June 24, 2022 statement was likewise not protected by the PSLRA safe harbor, because as explained above, the statements were referring to Elixir's current performance. ¶77.

*e.g., In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 939 (N.D. Cal. 2022) ("that [d]efendants' investments in marketing and their sales personnel headcount were sufficient for the company to build adequate pipeline to meet its growth and revenue targets"); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 406 (S.D.N.Y. 2020) (statements touting sales team were misleading when omitting they were largely inexperienced).

### 5. False Statements About The Loss Of Bright Health

Donigan misrepresented that Elixir lost Bright Health for an innocuous reason—industry consolidation. ¶¶33, 40-41. In fact, as the CEO of Bright Health acknowledged, the actual reason was due to a troubling problem at Elixir: uncompetitive pricing. ¶¶40-41. CW2 confirmed that during CW2's tenure, Elixir was failing to retain large clients due to pricing. ¶29. Providing false or incomplete reasons for the loss of a major customer is actionable. *See In re CBT Grp. PLC Sec. Litig.*, 2001 U.S. Dist. LEXIS 27343, at *11-12 (N.D. Cal. Dec. 28, 2001) (falsely attributing the loss of a major customer to a merger, when there were other factors, was misleading).

### B. The Complaint Raises A Strong Inference Of Scienter

Detailed Complaint allegations satisfy the PSLRA requirement to allege facts that give rise to a strong inference that the defendant acted with the required state of mind. 15 U.S.C. §78u-4(b)(2). Scienter can include "either reckless or conscious behavior." *See Advanta*, 180 F.3d at 534-35. It can be alleged based on a defendant's "mere access to information in contradiction to their public statements." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 U.S. Dist. LEXIS 51666, at *37 (E.D. Pa. Mar. 24, 2020). Motive is not required; rather, the inquiry is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *EQT*, 504 F. Supp. 3d at 497.

### 1. Individual Defendants Held Themselves Out As Having Knowledge Of Facts They Misrepresented

18

Individual Defendants held themselves out to investors as having detailed knowledge of Elixir's covered lives, including retention rates, new lives sold, and overall growth/decline. ¶¶47, 51, 53, 55, 66, 71, 73, 75, 77, 83, 85, 99.

Donigan stated that she and Schroeder had access to Elixir's business and financial information because they were "running the day to day operations at Elixir for the last 8 months" while DuPaul had access because he was specifically hired to oversee Elixir's operations and was "critical to Elixir." ¶¶37, 38, 97. *See Energy Transfer*, 532 F. Supp. 3d at 228 (finding strong inference of scienter where CEO "was closely involved with the project" and reasoning "that his misleading statements were therefore made with scienter."); *SEB Inv. Mgmt. AB v. Endo Int'l*, PLC, 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018) (individual defendants' senior positions, "the information available to them, and their public statements, there is a strong and compelling inference they were aware of the adverse surveillance data.").

Each Individual Defendant confirmed his or her personal knowledge in statements to investors. ¶¶47, 51, 53, 55, 66, 71, 73, 75, 77, 83, 85, 99; *Endo Int'l*, 351 F. Supp. 3d at 906 (that "officers were speaking as authoritative sources who possessed the information to support their statements" supported scienter); *Hall*, 2019 U.S. Dist. LEXIS 221513, at *77-78. Donigan repeatedly touted Elixir's selling season, which she said was "on track to retain 95% of [its] business for the 2023 selling season" ¶47, and that Elixir had "just won the renewal of [its] largest health plan client." ¶64; *see also* ¶¶71, 75, 77, 83, 85 (similar). Likewise, DuPaul stated that Elixir's retention rate was "right around 95% [ ] [a]nd we did retain our largest client, MCS, earlier this year." ¶73. Schroeder represented that Elixir lost its client Bright Health due to "industry consolidation," that Elixir had improved its ability to "bid competitively," that it had already sold 35,000 new lives, and attested to the accuracy of Rite Aid's SEC filings. ¶¶51, 53, 55, 62, 79, 81.

19

Further, that Individual Defendants held themselves out as experts on questions analysts asked about: (1) lives retained and (2) new lives sold, further supports an inference of scienter. *See, e.g.*, ¶¶73 ("has there been anything else in terms of losses of lives"), 77 (questioning Elixir's growth); *see Avaya*, 564 F.3d at 270 (analyst's focused questions combined with defendant's executive level position and state of company's business raised as strong inference of scienter); *PTC*, 2017 U.S. Dist. LEXIS 137930, at *44 (repeated statements to investors and analysts implied executives knew subjects about which they spoke, undermining any inference that misrepresentations were inadvertent); *New Orleans Emps. Celestica, Inc.*, 455 F. App'x 10, 14-15 (2d Cir. 2011) (finding scienter where misrepresentations concerned subject analysts often asked about). Having claimed to possess detailed knowledge about Elixir's covered lives, only two plausible inferences can be drawn. Either Individual Defendants knew they were not telling investors the whole truth, or were reckless as to the truthfulness of their statements; either supports scienter. *Energy Transfer*, 532 F. Supp. 3d at 228; *Tomaszewski v. Trevena, Inc.*, 482 F. Supp. 3d 317, 332-35 (E.D. Pa. 2020).

### 2. Individual Defendants Knew Information Contradicting Their Public Statements

Individual Defendants' contemporaneous access to information contradicting their statements to investors is classic evidence of scienter. *See Campbell Soup.*, 145 F. Supp. 2d 574, at 599; *see also In re ViroPharma Inc. Sec. Litig.*, 21 F. Supp. 3d 458, 473 (E.D. Pa. 2014); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 349 (E.D. Pa. 2014); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002) (same).

The above is corroborated by CWs that demonstrate that Individual Defendants were aware no later than February 2022 that Elixir had lost Virginia Premier and its 300,000 covered lives. ¶¶43-45, 93-96. *See ViroPharma*, 21 F. Supp. 3d at 473 (CW's account supports scienter where

20

he has personal knowledge in combination with corroborative nature of other allegations). Plaintiff details each CW's history at Elixir and his or her personal knowledge of the facts alleged, ¶¶28-29, 34, 44-45, 95-96, which Individual Defendants fail to address.

As CWs confirmed, Individual Defendants had access to Laker, the software system used to track covered lives, and claimed to understand the covered lives data when speaking with investors and analysts. ¶¶44, 47, 66, 71, 73, 75, 77, 85, 99, 101. CW4 specifically oversaw the implementation of the Laker software, and confirmed that it tracked Elixir's clients and the number of covered lives. ¶¶44, 101. According to CW2 and CW5, large clients provided substantially advanced notice of their intention to terminate their relationship with Elixir. ¶¶45, 93. CW2 and CW5 confirmed that they knew Elixir had lost Virginia Premier before they left the Company in March and April 2022, respectively. *Id.* CW3 and CW6 both corroborate that on or about July 13, 2022, (i) the Company held a remote quarterly employee town hall meeting; (ii) which Individual Defendants were present; and (iii) where Individual Defendants discussed the number or covered lives and the loss of large clients, including Virginia Premier. ¶¶94-96. These repeated confirmations of internal knowledge of concealed facts establish a strong inference of scienter. *See In re Daou Sys. Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005) (multiple mutually consistent accounts strengthen the inference of scienter); *Aviva Partners, LLC v. Exide Techs.*, 2007 U.S. Dist. LEXIS 17347, at \*38 (D.N.J. March 13, 2007) (scienter alleged based "primarily on confidential sources from various ... divisions, who corroborate one another's assertions").

Individual Defendants concede that Donigan acknowledged the loss of Virginia Premier at a quarterly, employees-only town hall meeting on July 13, 2022, where Schroeder and DuPaul were also present. MTD at 21. That the Individual Defendants were candid internally but hid the truth externally can only suggest that they knew or were reckless in deceiving investors. *See*

21

*Jackson v. Microchip Tech., Inc.*, 2020 U.S. Dist. LEXIS 42041, at \*32 (D. Ariz. Mar. 11, 2020) (adverse information discussed at private employee meetings indicative of scienter); *Scheller v. Nutanix, Inc.*, 2020 U.S. Dist. LEXIS 166813, at \*30-31 (N.D. Cal. Sep. 11, 2020) (loss of large client revenue discussed at employee-only meeting supports scienter); *Monk v. Johnson & Johnson*, 2011 U.S. Dist. LEXIS 145554, at \*47-48 (D.N.J. Dec. 19, 2011) (similar).

### 3.   Core Operations Doctrine Supports An Inference Of Scienter

Material misrepresentations concerning core matters of central importance to a company may support an inference of scienter when accompanied by some additional allegation of specific information conveyed to management and related to the fraud. *Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 U.S. Dist. LEXIS 127587, at \*51 (D.N.J. July 31, 2019). The misrepresentations alleged in the Complaint involved one of the two main operating segments of the Company and related to the most important factors relevant to that segment, resulting in a \$252.2 million impairment charge. *Compare* ¶¶9-10, 70, 102 *with In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 U.S. Dist. LEXIS 131562, at \*38-40 (D.N.J. Aug. 6, 2019) (applying core operations doctrine where alleged misrepresentations addressed a "substantial portion" of the defendant company's operations during the class period). A large impairment supports the strong inference of scienter under the core operations doctrine. *See, e.g., In re RAIT Fin. Tr. Sec. Litig.*, 2008 U.S. Dist. LEXIS 103549, at \*51 (E.D. Pa. Dec. 22, 2008) ("the sheer size of the impairment adds to the inference [of scienter]").

Additionally, as set forth in Section II(B)(1), Individual Defendants' admissions of knowledge, taken together with the fact that the misstatements and omissions directly concerned the Company's core operations, support a strong inference of scienter. *See, e.g., Energy Transfer*, 532 F. Supp. 3d at 232-33 (holding that the "core business doctrine has relevance" where "some

22

of the individual Defendants possesses personal knowledge giving rise to a strong inference of scienter").

### 4.  Temporal Proximity Supports A Strong Inference of Scienter

The temporal proximity between the misleading statements and contradictory adverse events further bolsters a strong inference of scienter. *See Avaya*, 564 F.3d at 268 (temporal proximity of misleading statements should be considered in conjunction with other factors evidencing scienter). As late as August 24, 2022, Donigan, Schroeder, and DuPaul repeatedly assured investors that Elixir was growing, portrayed the 2023 selling season as a "growth story," and otherwise covered up the loss of its biggest client. ¶¶47, 49, 51, 53, 64, 71, 73, 75, 77, 83, 85. Just one month after the August statement, the public learned that Elixir was not a growth story but a sinking ship as it had lost its biggest customer and its 300,000 covered lives, thus leading to the impairment charge. ¶¶85, 87. This temporal proximity renders implausible any competing inference that Individual Defendants were unaware of the true facts they concealed.

### C.    Plaintiff Has Adequately Pled Loss Causation

The Complaint easily surpasses the low pleading standard for loss causation. "Plaintiffs need not plead loss causation with particularity" but that "[a] short and plain statement showing that they are entitled to relief that will satisfy Rule 8 standards will suffice." *Del. Cty. Emps. Ret. Sys. v. AdaptHealth Corp*., 606 F. Supp. 3d 124, 137 (E.D. Pa. 2022). Alleging loss causation "should not prove burdensome" and a complaint need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms.*, 544 U.S. at 347; *see also AdaptHealth*, 606 F. Supp. 3d at 137.[9] Loss causation arguments are generally

---

[9] The "substantial factor" test Defendants rely on in pages 24-25 of their brief from *McCabe v Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007), is inapplicable at the pleading stage. *See McCabe* at n.4 (explaining that the pleading stage necessitates "a different approach to the loss causation requirement than here on summary judgment, where discovery has taken place.").

inappropriate in a motion to dismiss. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000); *Alberici v. Recro Pharma, Inc.*, 2020 U.S. Dist. LEXIS 27535, at *38 (E.D. Pa. Feb. 14, 2020).

Here, the Complaint causally ties the revelation of Individual Defendants' false statements with a sharp decline in Rite Aid's stock price. *See* ¶87. Schroeder admitted that the "charge of $252.2 million … [was] related to Elixir" and specifically, that "***from a pure lives standpoint*** … ***that's what drove the goodwill impairment we took***." *Id*. This drop in covered lives was driven both by the Company's poor performance during the April-September smaller employer selling season, and by the loss of Virginia Premier much earlier, which Individual Defendants did not disclose while trumpeting their "growth story." ¶¶38, 43-47, 49, 51, 53, 64, 66, 71, 73, 75, 77, 83, 85. Schroeder stated that, "there are certain factors that we've noted that caused a ***triggering event for the assessment of goodwill impairment*** … ***include[ing] an update to our estimate of lives for 2023 based on the latest selling season***." ¶87; *Cf*. MTD at 24 (mischaracterizing Schroeder's statement that "impairment based on 'an update of our valuation related to fiscal 2024 and future years'—not the 2023 selling season"). As a result of the revelation, the Company's stock price dropped 28.02%. ¶88. That is all that the law requires. *See, e.g., In re Urban Outfitters, Inc. Sec. Litig*., 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015).

Individual Defendants improperly attempt to refute the Complaint's well-pleaded loss causation allegations by asserting that there might have been an alternative cause for part of the stock price drop. MTD at 24-25. That is an argument for summary judgment or trial. *McCabe*, 494 F.3d 418, at n.4. Even then, it will fail since "disclosure of the alleged fraud need not be the sole reason for the depreciation of the stock price." *Urban Outfitters*, 103 F. Supp. 3d at 655. If

Individual Defendants have admissible evidence establishing an alternate cause of the Company's stock decline, they must address it at the proper stage.

## III.   THE COMPLAINT ALLEGES CONTROL PERSON LIABILITY

The Complaint adequately pleads that Donigan, Schroeder and DuPaul, were also liable as control persons, ¶125. The Complaint details their day-to-day participation. ¶¶37-38, 97.

Defendants' culpable participation argument is misplaced. "[T]he overwhelming trend in this circuit" is that "culpable participation does not have to be pled in order to survive a motion to dismiss." *Bing Li v. Aeterna Zentaris, Inc.*, 2016 U.S. Dist. LEXIS 26772, at *14 (D.N.J. Mar. 2, 2016); *see also Vanderhoef v. China Auto Logistics, Inc.*, 2021 U.S. Dist. LEXIS 142466, at *15 n.8 (D.N.J. July 30, 2021) (noting culpable participation is not required at the pleading stage). Individual Defendants' reliance on *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013) is unavailing because that court analyzed culpable participation at the summary judgment stage. However, even if pleading was required, the allegations against Individual Defendants relating to their participation in withholding the fact that the Company was losing more lives than it was gaining are sufficient. *See AdaptHealth*, 606 F. Supp. 3d at 141 (culpable participation was adequately pled where complaint alleged that officers "were responsible for disseminating the company's financial information to investors but in doing so left out critical information").

**CONCLUSION**

For the foregoing reasons, the Individual Defendants' motion to dismiss should be denied in its entirety. Should this Court find any infirmity in the Complaint, Plaintiff respectfully requests leave to amend.

Dated:  December 1, 2023                    Respectfully submitted,

**POMERANTZ LLP**

By:  /s/ *Brian P. O'Connell*

Joshua B. Silverman   (*pro hac vice*)
Brian P. O'Connell (*pro hac vice*)
Genc Arifi (*pro hac vice*)
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
E-mail: jbsilverman@pomlaw.com
         boconnell@pomlaw.com
         garifi@pomlaw.com

*Counsel for Plaintiff Lead  Steven L.*
*Diamond and Lead Counsel for the Class*

**THE ROSEN LAW FIRM, P.A.**

Jacob Goldberg
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
E-mail:  jgoldberg@rosenlegal.com

*Liaison Counsel for the Class*

**WOHL & FRUCHTER LLP**

Joshua E. Fruchter
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
(845) 290-6818
jfruchter@wohlfruchter.com

*Additional Counsel for Plaintiff*

26

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

Dated:  December 1, 2023

*/s/ Brian P. O'Connell*
Brian P. O'Connell

27