UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

STEVEN L. DIAMOND, ET AL,          : Case No.: 2:22-cv-04201-KBH
                                   :
          Plaintiff(S),            :
                                   :
          v.                       :
                                   : Philadelphia, PA
HEYWARD DONIGAN ET AL.,            : December 4, 2024
                                   : 10:07 a.m.
          Defendant(s).            :
                                   :
--------------------------------x

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE KELLEY BRISBON HODGE,
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:        GENC ARIFI, ESQ.
                          JOSHUA B. SILVERMAN, ESQ.
                          Pomerantz LLP
                          10 South LaSalle Street
                          Suite 3505
                          Chicago, IL  60603

For the Individual
Defendants:               DANA M. SESHENS, ESQ.
                          ANDREW YAPHE, ESQ.
                          David Polk & Wardwell LLP
                          450 Lexington Avenue
                          New York, NY  10017

For the Individual        ANDREW M. ERDLEN, ESQ.
Defendants:               Hangley Aronchick Segal Pudlin &
                           Schiller
                          One Logan Square
                          27th Floor
                          Philadelphia, PA  19103


Court Reporter/ESR:       RICHARD C. THIEME
                          Clerk's Office
                          U.S. District Court

Transcription Service:    Burke Court Reporting, LLC
                          1044 Route 23 North, Suite 206
                          Wayne, NJ 07470
                          (973) 692-0660

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.

INDEX

MOTION TO DISMISS                                                    PAGE

Argument

 by Ms. Seshens                                                      8

 by Mr. Arifi                                                        28

 by Ms. Seshens                                                      47

 by Mr. Arifi                                                        58

MOTION TO DISMISS                                                    PAGE

4

P R O C E E D I N G S

(10:07 a.m.)

(Call to Court)

THE COURT:  Good morning, everyone.  You all may be seated.

THE CLERK:  This morning, Case No. 22-cv-4201, Page v. Rite Aid.

THE COURT:  Good morning, counsel.

MR. ARIFI:  Good morning, Your Honor.

MR. SILVERMAN:  Good morning.

THE COURT:  I would like to have each of you introduce yourself to me if you don't mind and I would ask for the defense to begin and then the plaintiff's counsel just in light of the fact that you are movants today.  So defense.

MS. SESHENS:  Thank you, Your Honor, good morning.  Dana Seshens, Davis Polk & Wardwell LLP on behalf of the individual defendants.

MR. YAPHE:  Good morning, Andre Yaphe also at Davis Polk also on behalf of the individual defendants.

MR. ERDELEN:  Good morning, Your Honor, Andrew Erdlen from Hangley Aronchick also on behalf of the individual defendants.

THE COURT:  Good morning.

MR. ARIFI:  Good morning, Your Honor, Gnec Arifi, Pomerantz LLP on behalf of the plaintiff, Steven L. Diamond.

MR. SILVERMAN:  Good morning, Your Honor, Josh Silverman of Pomerantz LLP on behalf of the lead plaintiff.

THE COURT:  Good to see you all this morning.

We are here today for the argument, oral argument on the motion to dismiss that was filed in this case.  I know that this matter has been pending for -- well, it was filed back in October of 2022, it's been pending for some time because there was a stay in place because at one point in time Rite Aid Corporation was a party to this matter.  Rite Aid Corporation is no longer a party to this matter as of August the 26th of 2024, when they were terminated from this action.

So I know that the individual defendants, to which defense counsel articulated their representation of are the only remaining defendants in this case.  And I believe that there are three if I'm correct, Heyward Donigan, Matt Schroeder, Chris Dupaul, let me correct that and make sure I'm not missing -- I believe that is it.  Am I correct, counsel?

MS. SESHENS:  Yes, that's correct, Your Honor.

THE COURT:  Okay.  And the motions that were filed in this I believe I'm looking at ECF 36, which is the MTD that was filed on October the 2nd of 2023 and then the response.  That's ECF 39 filed on 12/1 and then the reply to that response filed, it's ECF 40 on 1/12, 2024.  Those things were not addressed because we had a stay in place in light of the now former defendant Rite Aid and a matter that was going on in bankruptcy

court.  And that having been concluded, the stay therein was lifted in the end of the summer back probably I believe in August once the matter in bankruptcy court had concluded and we are here today as a result of addressing the filing on the motion to dismiss that had been filed some time ago.

I would like to hear from the movant first and then hear from the respondent, from plaintiff, thereafter.  I have read, actually when it was initially filed, the particular arguments and memorandums and then reacquainted myself with them again more recently in light of the lapse of time.  But I would like for you -- so I have familiarity very much with what it is that's the basis of the arguments.  But I'm not going to restrict your time at all.

I would ask you though to try to be concise in terms of what it is that you want to highlight for me as the particularized points of interest in light of this particular cause of action.  I know that we are dealing with, in short, securities fraud and we're dealing with alleged violations under Section 10(b) and Section 28 of the SEC Act and Rule 10(b)(5).

So with that, I believe from my clerk that the defense lead arguer is going to be Ms. Seshens.

MS. SESHENS:  That's correct.

THE COURT:  And then I believe that Mr. Arifi is going to be arguing on behalf of the plaintiff.

So if I do inject questions throughout, I try not to, but sometimes questions come to top of mind, so I may inject them.  Otherwise, I will go ahead and reserve my questions to the end.  But if I do present a question, I'd ask for both sides to be prepared, because it may be not for counsel who's arguing in front of me, but it may actually be for you, plaintiff's counsel, if defense is arguing or vice versa, just depending on what the argument is presented to me in that moment and what I would like to know in that moment about that specific issue.

With that, Ms. Seshens, you're welcome to stand at the table, come to the podium or whatever is your pleasure.

MS. SESHENS:  Thank you, Your Honor.  If you don't mind, I'll just take a moment and move my things up to the podium, because I think that blocks, because I'm so short by the --

THE COURT:  I share with you in the height restrictedness.

MS. SESHENS:  It will forever be a challenge I think.

THE COURT:  With podiums specifically I will say that.

MS. SESHENS:  Yes.  And before I begin, Your Honor, we do have a slide deck that I'm not going to argue from, it's really a resource --

THE COURT:  Okay.

MS. SESHENS:  -- for everybody, it is just a summary of the briefing and we have copies for everyone because the briefing is a lot and it's somewhat dense.  I say that having drafted much of it, but it's a tool for you and your chambers --

THE COURT:  You're welcome to approach.

MS. SESHENS:  -- and plaintiff's counsel.

THE COURT:  Yes.  Thank you very much.

(Pause)

MS. SESHENS:  Okay.  May it please the Court, Dana Seshens, Davis Polk & Wardwell LLP on behalf of the individual defendants.

Your Honor, this case involves a complaint that really is in search of a securities fraud theory.  It has shifted from the time that it was filed to the time that we are arguing now.

The complaint as filed included numerous allegations about alleged misstatements and omissions concerning new lives that Rite Aid was obtaining during a particular selling season, that occurred in 2022 for the effective season of January 1, 2023.

And the allegations in that complaint largely focused on a failure to disclose that Rite Aid, and Elixir, it's pharmacy benefit manager, PBM was losing lives.

In the briefing, defendants made clear that Rite Aid

repeatedly and clearly disclosed that it was losing lives over time. And plaintiffs then shifted their theory, in their opposition, to no longer challenge those statements about new lives that were being won during the particular selling season.

So there is a whole plethora of allegations in the amended complaint that are no longer in play. And what remains is a handful at most of alleged misstatements and omissions that relate to a variety of sort of targeted issues that I'll address in more detail shortly, but it is a subset really of the complaint that we started with.

The complaint also searches for a theory of fraud. I see the cogent allegations of scienter that are required under the PSLRA which I'll touch upon also in a moment is just missing. The entire thrust of the allegations of scienter are about one single point, that the alleged -- that the individual defendants purportedly knew about the loss of a particular client, at a particular point in time, and did not disclose it.

And from allegations that they knew of that information and didn't disclose it, plaintiff attempts to allege scienter, which is a very high bar of intent to deceive investors. And there are no other allegations of scienter in this complaint. All of the allegations about core operations, access to information, senior roles in the company, knowledge of the business, all get to the same place. Those are insufficient under Third Circuit case law about scienter in any

event, but when you take them altogether, they all point to one thing and it's solely the allegations that the defendants allegedly knew that they had lost Virginia Premier.

That allegation alone, even if you accept all of their allegations are true is inadequate to plead scienter under the PSLRA.  And that is an independent straight forward basis to dismiss this complaint with prejudice.

So just to take a step back and frame the argument for today and I will heed Your Honor's guidance.  I'm going to try to be focused, but if there's something I don't address that you want to hear about, certainly please let me know.

But obviously this case is not the standard case that's governed by the Federal Rules of Civil Procedure in the sense that we're not in a Rule 8 world, we're not even really in a Rule 9(b) world, we're in a private securities litigation Reform Act world, which is exacting and it has a high bar for pleading, both alleged misstatements and omissions with particularity.

And the real distinction between 9(b) and the PSLRA is state of mind has to be pled with specificity.  And as I've already eluded to, that particular piece is certainly missing here, although we submit obviously it's all insufficient.  But when one thinks about the purpose of the PSLRA it is to curb these types of cases and to ensure that those that get to discovery are the ones where you've got the particularized

allegations of alleged misstatements and omissions and critically particularized allegations of a deceptive state of mind of an intentional wrongdoing. And as I noted, we would submit that that is missing here.

It seems Your Honor I know has read the papers, so I'm not going to spend a lot of time on the factual background and predicates here, but again, if there are questions about those certainly let me know.

Defendants have moved on three bases, failure to plead an alleged material misstatement or omission, failure to plead scienter, and failure to plead loss causation. I will address those in turn, but again, highlighting just some of the key points.

In terms of the alleged misstatements and omissions and plaintiff's failures there, as I noted, and I think as plaintiff has made clear in the opposition brief, there are only five alleged misstatements and omissions remaining. And one -- when one reads through those and really analyzes them, I think the focal point is the alleged misstatements about the so called retention rate. And that is, there's two statements, to the effect that the company was on track to have a 95 percent retention rate of the business for the 2023 selling season. And those two paragraphs are 47 and 73 of the amended complaint.

Now, critically what is missing for plaintiff in

connection with these particular allegations is the entire statement that they're alleging was false and misleading. They focus and they focus exclusively on the portion of the statement in paragraph 47 that says where referencing Rite Aid or Elixir, we're on track to retain 95 percent of our business for the 2023 selling season. And they contend -- I'm sorry, he, it's a singular plaintiff, he contends that that statement was false and misleading because it failed to disclose that at that time Rite Aid had lost its then largest PBM customer Elixir -- I'm sorry, Virginia Premier and the covered lives that Virginia Premier brought to the table.

But when one looks at the statement that Ms. Donigan actually made, it was qualified. And she said, after accounting for previously known losses, due to health plan consolidation, we're on track to retain 95 percent of our business for the 2023 selling season. And the complaint is devoid of any allegations explaining how the entire statement is false or misleading. And that is a pleading defect that renders these statements not actionable.

And so that is something that is just not in there and that is something that they -- we've not seen or heard any argument to the effect in the opposition. It is just completely missing from those statements.

Relatedly, and the briefing addresses this at great length, but I do want to emphasize it. Rite Aid had no duty to

disclose the loss of Virginia Premier.  And plaintiff has not identified one.  As the Court undoubtedly is aware, there are three bases to impose that duty.  Two, plaintiff concedes are not in play.  There's no statutory duty and there's no allegations of insider trading.

The third is where the plaintiff focuses.  And that is that the argument is that Rite Aid had a duty to disclose the loss of Virginia Premier because it spoke about client retention.  But Rite Aid never made a statement that it was retaining Virginia Premier or any other particular client.  And, in fact, in its risk disclosures that we cite to in our papers, Rite Aid disclosed that it had a concentration of its revenue base in a small number of large customers and the loss of any one of those would cause a negative impact on revenue rather, and Rite Aid's financial performance.

And none of that imposes a duty to disclose the loss of a particular client at a particular point in time.  There is no statement, as I noted, about retention of Virginia Premier or retention of any particular client.  The statement is about when we account for certain losses we're on track and I'll come back to the on track piece in a moment.

And I think the City of Edinburgh v Pfizer case that we cite in our papers is particularly instructive on this point because there was a set of disclosures in that case that the plaintiffs allege were false and misleading about a phase 2

trial, clinical trial.

THE COURT:  Uh-huh.

MS. SESHENS:  And there was a reference to the phase 2 clinical trial in a disclosure in a statement as a factor that gave rise to moving to phase 3.  And after the phase 3 trials failed and the stock price dropped, Pfizer got sued and made the argument, well, we didn't have a duty to disclose anything about the phase 2 trials, we just gave it as a factor for why we moved to phase 3.  There was a bunch of factors.

And the Court agreed, the Court said you never, you Pfizer never qualified or characterized or gave anything about the quality of the phase 2 study that would have required you to disclose that the phase 2 study didn't go so well.  There was a whole host of reasons why they moved to phase 3 that were sort of not related to the quality of the phase 2 results.  And there was just no statement about the quality of phase 2 that was misleading, that would then have required Pfizer to say more or to say it didn't go well.  It was just a point they made and the point was really we're going to phase 3.

And the Court there in that case said there was no duty to disclose.  And we would submit that this same rationale and reasoning applies to the duty to disclose Virginia Premier.

Similarly, an additional case I would just identify for the Court because I think we'll hear this from the plaintiff, is that somehow the risk disclosure is inadequate

because it didn't disclose an actual risk that had come to pass. And on that point, I would just identify the Williams v Globus case that we cite in our papers and note for the Court that the risk that's identified is the risk to the financial performance, the risk that revenue would decline and the risk that the financial performance would be harmed. And that's exactly what the Globus, the Williams v Globus case said there was an allegation that the defendant failed to disclose that it had terminated a distributor at the time of the termination.

And the defendant argued, we had no duty to do that. The plaintiff said, well, your risk disclosure said that was a big risk and it could have been. But it had already happened. And the Court said, no, the risk that was identified was harm to the financial performance. There was no duty to disclose the vendor -- the distributor termination at the time that it happened.

The last point I would make on this, Your Honor, and then I will move on is simply that plaintiff seems to contend that these statements about retention rate put in play the number of covered lives that Elixir was servicing or gaining for a particular -- for the particular selling season. And we would submit, Your Honor, that that is not a plausible read of those retention rate statements. They are talking about retaining current business, it says retention of our business. They are not making statements in the retention rate statements

16

about the overall number of net lives, where they've landed, the covered lives in general.  That information is all disclosed.

So to say that the retention rate statements are false and misleading because we put covered lives in general in play, I would submit is a disconnect between what's actually said and any sort of, you know, duty that related to that.  In fact, the covered lives issue is out there in all of the 10-K's and they don't dispute that.

The only other point I would add and we briefed this extensively so I'm not going to spend a ton of time on it, is just that these on track statements, the expectation that we're going to hit some target are protected as forward looking statements, they are statements that are looking ahead to some goal that is an objective in the future.  And as we've briefed, we would submit those are protected under the PSLRA's safe harbor and we cited a number of cases in our papers for that proposition.

In terms of the other alleged misstatements and omissions, I will touch on them briefly.  I think they're largely --

THE COURT:  Counsel, before you move forward --

MS. SESHENS:  Yes.

THE COURT:  -- let me ask one question with paragraph 47 that you referenced.

MS. SESHENS:  Yes, of course.

THE COURT:  Reading that paragraph, it begins with that Rite Aid hosted the conference call with investors and analysts to discuss the company's quarter four and full fiscal year 2022 financial results and full fiscal year 2023 outlook. During the scripted portion of the call, that's what I'm kind of focused on, this scripted portion of the call, is this in essence prepared language that is therefore done in preparation for this meeting and is conveyed by, at this point Mr. Donigan, based on his role in the corporation, to those investors and analysts so that they are up to date and given an update as to what's going on within the company for quarter four.

So it is a written, when it's scripted, it is actually a written out kind of statement of this is where we are and this is what we want you to know.  Am I correct?

MS. SESHENS:  Yes, that's correct, Your Honor.

THE COURT:  Okay.  And the allegation or at least the argument that's presented is during this scripted call, and my question would be, was the loss of Virginia Premier, had that already taken place during this scripted call?

MS. SESHENS:  The allegations in the complaint are that the loss had happened before then, yes.

THE COURT:  Okay.  That is what's alleged.  And Virginia Premier was not the sole client obviously of, you know, the company, but do you know how many clients they

actually had, that Rite Aid had?

MS. SESHENS:  I don't know as of that point in time, Your Honor.

THE COURT:  Okay.  But this particular client comprised, was a percentage 15 percent of the covered lives, let's say --

MS. SESHENS:  I unfortunately --

THE COURT:  -- if I'm using that language correctly?

MS. SESHENS:  You are.

THE COURT:  Okay.

MS. SESHENS:  I don't know, Your Honor.

THE COURT:  Okay.

MS. SESHENS:  I don't know that they disclosed allocations along those lines.  I do know that the complaint alleges that it was 300,000 covered lives but I've admittedly not gone through to do the math to see if we could figure that out.

THE COURT:  That's okay.  I just wanted to kind of get an understanding of the significance or percentage of these covered lives or what this particular client, Virginia Premier, represented insofar as the total business of the company.  And understanding this scripted portion of the call, if this is something that was prepared in advance, then it would be conveyed to the investors and analysts so it was thought out, it wasn't an unprepared or kind of off the top of one's head

type of report out as to what was going on.  You can continue.

MS. SESHENS:  Okay.  Thank you, Your Honor.  And that's correct.  And as Your Honor undoubtedly knows during these conference calls there's a scripted portion and then analysts do ask questions.  This is, as Your Honor noted correctly from the scripted portion.

One small point, just because I think she would appreciate it is Ms. Donigan is actually a woman.

THE COURT:  Oh, I apologize.

MS. SESHENS:  No, no, it's fine.  I thought it was a man for many, many months until I met her.  So that is correct. She made those statements as part of the scripted portion of the call.

Okay.  so in terms of the other alleged misstatements and omissions, as I said we really touched on those largely in our complaint -- in our briefing rather.  Just a few points of emphasis, particularly on the allegations concerning statements about a growth story or a sales team strength.  The point I would highlight I think it's when the growth story statements are read in context, it is quite clear that Ms. Donigan and others were talking about the company at large and in response to analysts' questions, that were asking, are you trying to grow, are you in a shrink mode.  And when she's responding, the complaint snips out, you know, the sentence that she says about

Elixir, but she's responding about all aspects of the business and where they're looking to grow and how they're growing.

And in context, those statements are not misrepresentations about the growth at Elixir. That is clearly disclosed where they are on covered lives, but they are general statements of the status of the business at large. And as we have briefed extensively, the growth story allegations and the sales team are really non-actionable corporate puffery. And in that regard, I would just identify the In Re Avanta case as one that in particular discounted statements, that's a Third Circuit case, as inactionable for a positive portrayal of the business that had accurate statements of presents of facts, so current performance, for example, we've sold 80,000 lives thus far in the selling season, that's accurate. It's part of our growth story, that's the puffery piece, and the Avanta case held that quite clearly.

In that case, for example, the defendant touted the experience management team, its expertise, its goal of expanding a distribution channel. And the Third Circuit said that's all not actionable.

In terms of the remaining alleged misstatements and omissions, I think we'll let our paper stand on those. That's the alleged loss of Bright Health and alleged misstatement about the loss of the largest client, which based on their own

allegations was true at the time that this statement was made.

And I'd like to shift, unless Your Honor has any other questions --

THE COURT:  I do not.

MS. SESHENS:  -- to scienter.  And I think as the Court knows, that's the real distinction between a sort of ordinary course fraud case and this one.  And there's really quite clear case law in the Third Circuit about the standard for pleading scienter.  And those include, as is laid out in our brief, but I do want to highlight them because I think that they're critically important here, that the allegations of scienter must be alleged with particularity as to each defendant.  So there's no group pleading of scienter, there's no collective scienter.  As to each defendant, and as I'll get to in a moment, this complaint is woefully deficient in that regard.

In addition, there have to be allegations that give rise to a cogent and compelling inference of fraudulent intent and the inference has to be at least as compelling as any inference of non-fraudulent intent.  And there again, we think this complaint is woefully deficient.

And under the Third Circuit case law, generally speaking, a plaintiff can plead scienter through a couple of different means.  There's the motive and opportunity prong and

then there's conscientious misbehavior and recklessness.  And oftentimes, Courts will separate those out.  There are times admittedly when you read the cases when they put it altogether.  It doesn't matter from our perspective here, the complaint fails to plead scienter.  Whether you're looking at the two prongs individually or taking them together.

And just to start in terms of the scienter pleadings, there are no allegations of motive here, none.  To the extent the complaint tries to suggest that Ms. Donigan or anyone else was motivated to increase the stock price, that kind of allegation has been widely rejected by the Third Circuit and district courts in this circuit repeatedly.  Because that is a generic motive that anybody running a public corporation has and if that were sufficient for motive, everybody -- lots of people get sued, but everybody would get sued for securities fraud.  And the GSC case in the Third Circuit makes that quite clear.

In the same vein, there are no allegations of any concrete benefit to any of the individual benefits to -- for engaging in this purported fraud.  Nothing, they did not get a bonus, they did not get some special comp, they did not get a promotion, there was nothing that is concrete or tangible that is alleged that they either received or stood to receive by engaging in this conduct.

So on that prong, there's nothing.  So that shifts us

23

to the extent we're looking at it in a pronged paradigm, that shifts us to allegations of conscious misbehavior or recklessness. And the case law tells us that if there are no allegations of motive or personal benefit, the corresponding allegations of conscious misbehavior must be greater. And here again, that is where we really, really are lacking.

In particular, as I noted, the allegations as to each of the individuals are incredibly sparse. There's basically no allegations as to Mr. DuPaul and Mr. Schroeder. They are alleged to simply be in senior positions and to have purportedly had access to information about the alleged loss of Virginia Premier. That is it.

As to Ms. Donigan, there are some additional allegations I'll address in a moment about her acknowledging these facts in a townhall. But for the reasons I will get to, we actually think that undercuts the inference of scienter.

But in terms of thinking about the allegations of conscious misbehavior and recklessness holistically, we cited a case in our papers called Turnofsky v electroCore where the Court rejected basically all of the same allegations of scienter that the plaintiff advances here. Ironically, that case had to do with disclosures also about, in some respects, covered lives.

But the Court there said that these allegations of core operations being in a position of knowledge, access to

information were insufficient. And the reason for that, and it applies here to, and this is throughout the case law, is the allegations have to be particular. What did people have -- what information did they not know that they should have known. What did people tell them? What specific documents, what core information at the company was there that would have rendered their statements false and misleading?

As I started with, the only allegation of omitted information is this alleged loss of Virginia Premier. And that is what all of the allegations of scienter speak to. But in the Turnofsky case, the Court said it just -- it doesn't get you there, there's simply just not enough.

The plaintiff alleges a lot of -- has a lot of confidential witnesses, CWs as they're called.

THE COURT: Uh-huh.

MS. SESHENS: I think there's five or six. I lost a little bit of track, but a number of confidential witnesses in the complaint. And as we've made the point in our papers, those witnesses again all make the same point, which is the company knew notice was provided about the alleged loss of Virginia Premier.

And to Your Honor's point earlier, those allegations temporally say that the company was aware by January, February, March, clearly before that April 14th, 2022 statement that we were just talking about. And again, those are their

allegations.  But that is the extent of it.

None of these CWs is alleged to have spoken with an individual defendant, have worked with an individual defendant, have observed their state of mind.  And so again, all those allegations go to is alleged knowledge in some general sense by the company, not even the particular individuals that the company was on notice.

The one point I would just add to that, Your Honor, is that the notice of the loss was notice as alleged for January 1, 2023.  So purportedly notice came in about a year earlier.  But the lives themselves weren't going to run off the books for another -- under their allegations, nine to ten months.

In terms, though, of the CWs there is -- case law is legion in the Third Circuit about the need to have the CWs really give you that kind of crystallized particularized story here.  And again, we would submit that that is lacking.

The one other point I wanted to make on scienter and this is, without going through the cases in great detail, the plaintiff cites a number of cases that he claims support his position that the allegations of scienter are sufficient.

And when one reads those cases, the allegations of scienter there are ten fold of what we have here.  They are not you knew a piece of information and you didn't disclose it.  They are you engaged in a scheme, for example, in the -- I

think it's the Campbell Soup case, where the CEO and CFO were directing people not to take certain actions so that they could then, you know, move revenue in a way that would enhance the financial performance.

And similarly, they cite this Aldredge case where there was an allegation of concealing price protection measures and then engaging in accounting machinations to cover it all up. These are schemes that are alleged in these cases. We don't have that here. We have a single fact. And even if we accept their allegations --

THE COURT: But, counsel, a scheme is not required.

MS. SESHENS: A scheme is not required --

THE COURT: You're not saying that.

MS. SESHENS: -- Your Honor.

THE COURT: Okay.

MS. SESHENS: To be sure.

THE COURT: A single act could be sufficient depending on its gravity, correct?

MS. SESHENS: That is correct. I would certainly agree with that. I would submit, however, this single -- it's not even an act, it's sort of a piece of information in the ether, we would submit is simply not sufficient under the Third Circuit's scienter case law.

And then, Your Honor, I think I'm going to let our arguments on loss causation stand as they're pled, you know,

argued in the briefing.  That's a fairly succinct argument, but I'm of course happy to address any questions.

And then the only other point that the plaintiff raised that I've not addressed, if Your Honor has questions, is the incorporation by reference and judicial notice point, which I think we've taken care of in the briefing, but if Your Honor did have questions on that, I'd be happy to address them as well.

THE COURT:  No, that is fine.  I know -- give me one moment.

MS. SESHENS:  Of course.

(Pause)

THE COURT:  The only question I will ask you now and it'll be the same question that I'll also have for the plaintiff as well, so you can be prepared to respond if you concur or have a different perspective on this.  But my question is, with Rite Aid being terminated as a party from this case and moving forward, does it alter the posture of the case at all that the Court needs to be made aware?  Is there anything that is distinct or different in terms of your arguments and things of that nature, in light of the fact that Rite Aid is no longer a party to this case and we're only addressing the individualized defendants.

MS. SESHENS:  So from our perspective, no, Your Honor.  I think in order -- the individual defendants are named

on the 20(a) claim, but in order to find liability under 20(a) Your Honor would have to, you know, adjudicate the underlying 10(b) claim.  And so I think the way that generally works is that Rite Aid would be involved but not a defendant with liability or exposure in the case.

THE COURT:  Understood.  Thank you very much, counsel.

MS. SESHENS:  Okay.  Thank you, Your Honor.

THE COURT:  And thank you for your materials that you provided in terms of demonstrative aid.  It is helpful.

MS. SESHENS:  Great.

MR. ARIFI:  Your Honor, may I also --

THE COURT:  Yes, you may, absolutely, yes.

(Pause)

THE COURT:  Mr. Arifi, you can begin whenever you are ready.

MR. ARIFI:  Good morning, Your Honor, Genc Arifi on behalf of lead plaintiff, Steven Diamond.

Your Honor, I'd like to address the actual claims we allege in the amended complaint.  This case is simply about whether defendants told the truth about the facts that were known at that time.

At the time that defendants made those statements they knew facts to the contrary.  They misrepresented that Elixir retained 95 percent of its business.  They

misrepresented that Elixir retained its largest client.  They misrepresented that Elixir's sales season was a growth story. They misrepresented that Elixir's sales teams were very strong and finally, they misrepresented that Elixir's loss of Bright Health was due to a benign reason, that of industry consolidation.

However, as the complaint's allegations make clear, that's not the truth.  With mathematical certainty, the complaint's allegations establish that Elixir did not retain 95 percent of its business, that Virginia Premier was its largest client with 300,000 lives and it was not retained.  And c) Elixir's season could not be a growth story because it had lost more lives than it had won.  And that's based on their -- the way defendant Donigan herself stated that the growth was calculated at Elixir.

Also we know that -- also the complaint allegations establish that defendant's own post class admissions, establish that the sales team had critical failures throughout the class period.  And that Elixir had lost Bright Health because of internal failures at Elixir, not due to industry consolidation.

I'll begin by addressing the first set of statements that 95 percent retainment, and Your Honor, I'd like to point your attention to our demonstrative on page 2.  On April 14th, 2022, and I know counsel touched on this statement a bit, Donigan stated and I quote, so as you know, the first step to

achieving net growth is retaining the business we have already won.

So by Donigan's own admission she's taking into account the clients and their covered lives that they retained and in conjunction with the new lives and then coming out and saying whether there's growth or not.  That's not our take.  That's what defendant Donigan has stated.

We also have in paragraph 73, DuPaul also stating that -- and let's go back to 47 for a second.  She follows that up by stating, after accounting for previously known losses --

THE COURT:  Counsel, your paragraph 47 which was what defense counsel was arguing during her presentation, am I correct, that's where you would like for me to focus --

MR. ARIFI:  Correct.

THE COURT:  -- at this point?

Okay.  I just want to make sure I'm with you, where you are.  Go ahead.

MR. ARIFI:  Of course.  And following that first sentence, she follows with, after accounting for previously known losses due to health plan consolidation, we're on track to retain 95 percent of our business for the 2023 selling season.

So let's take -- there's two ideas there.  First, we know that Donigan is stating that after accounting for losing Bright Life, they're still on track to retain 95 percent of

their business, meaning the covered lives.

Well, Your Honor, it's a simple numbers game.  Our complaint establishes that Virginia Premier accounted for 300,000 lives.  Our complaint establishes that through Rite Aid's own SEC filings, they had 2 million covered lives.  Simple math leads us to conclude that the 300,000 lives accounted for 15 percent of the total covered lives at Elixir.

So it would be mathematically impossible to retain 95 percent of its business if it lost -- if it already lost 15 percent of its business at that time.

I'd also like to address counsel's argument regarding the duty to disclose and we cite the Third Circuit case in In Re Adams.  That stands for a simple proposition.  When a defendant chooses to speak on a subject, they must do so honestly.

Here, defendants decided to speak about the retention rate and retention of clients, so they were bound to disclose the fact that Virginia Premier constituted 15 percent of its covered lives and it would cease being a client in 2023.

And, of course, defendant's cases on this point are inapposite.  They cite the City of Edinburg but that's inapposite because there the defendants did not choose to speak -- did not speak to prior clinical trial results, whether accurately or inaccurately.

Here we have multiple statements.  We've retained 95

percent, we've -- and we've lost our largest client. I know defendant's counsel stated there was no statements about losing the largest client, but that's not correct. In our complaint we cite to statements made by individual defendants where they say, we've retained our largest client, MCS Classicare.

THE COURT: Show me who made those statements. Show me in your brief those particular statements.

MR. ARIFI: Sure.

THE COURT: And to which particular defendant.

MR. ARIFI: Sure. And I'd direct the Court's attention to paragraph 73 where DuPaul stated, our retention rate is still expected to come in right around 95 percent and we did retain our largest client MCS earlier in the year.

THE COURT: And you said that's paragraph 73, correct?

MR. ARIFI: That's correct.

THE COURT: One moment.

(Pause)

THE COURT: Okay. You may proceed on that.

MR. ARIFI: Of course. And I would also direct the Court's attention back to paragraph 47 where Donigan also hinted at MSC Classicare because she stated that they had renewed a very -- in a very competitive situation, the largest Medicare Advantage client with a three year contract. So that also refers to MSC as the largest client.

But we know that is not true because our allegations also establish that MSC only had 200,000 covered lives. Again, it's not a very complex math problem here. We know that 300,000 is greater than 200,000. So Virginia Premier was its largest client, yet Donigan and the other individual defendants kept on touting that they had retained the largest client, MSC Classicare. That's simply not true, Your Honor.

I'd also like to address the caution --

THE COURT: Counsel, just I want to hear you on that again. You're saying that Ms. Donigan stated and what is in the scripted portion of the call, which is in paragraph 47 that they, meaning I guess Elixir and they have been able to retain their largest client, correct?

MR. ARIFI: That's correct, Your Honor. And you're also correct that these were prepared statements. They were thought out in advance. They went through multiple layers of review, yet as we have alleged here, the statements there are -- were easily verifiable, 300,000 is 15 percent of 2 million. If they knew that they were not going to be renewing Virginia Premier so.

THE COURT: The other question I had then very quickly, are all of these clients considered Medicare Advantage clients or -- because the language here is we have -- I'm excited to share, we've recently renewed in a very competitive situation our largest Medicare Advantage client with a three

year contract.  So are all of the clients categorized as Medicare Advantage clients, meaning Virginia Premier as well as the other client that was noted in addition to MCS Classicare, Bright Health being the other one, or is that language or descriptor just unique to Medicare Advantage clients being the largest client?  Do you understand my question in terms of trying to distinguish the categorization of the clients as a whole as opposed to kind of a term of art, meaning this is a Medicare Advantage client?

MR. ARIFI:  I do, Your Honor.  And we know that there's two types of clients.  There's the health plan clients and the Medicare Advantage clients.

THE COURT:  Okay.

MR. ARIFI:  But it gets very murky, only because and I'll refer you back to paragraph 73, they don't make this distinction between the two.  Because DuPaul stated, our retention rate is still expected to be -- come in right around 95 and we did retain our largest client, MCS.

So according to their own statements, there is no distinction between the different categories, they represent that they lost quote/unquote their largest client.  They don't decipher between the two.

THE COURT:  Okay.  And your statement is that Virginia Premier was their largest client and they lost that client and that the representation by Ms. Donigan in her

statement of the descriptive portion of the call when she was reporting out during the quarterly update meeting that they had in April 2022 that that description or statement by her was not accurate, was misleading in essence as to what the status was.

MR. ARIFI:  That's correct, Your Honor.

THE COURT:  Okay.

MR. ARIFI:  And the facts in the complaint leave no doubt that the Rite Aid Elixir had lost Virginia Premier by the time these statements were made.  First of all, the complaint alleges that the large health plan sales occurred at least a year in advance.  We have CW-5 who was aware that Virginia Premier had been lost by the time that they had left the company in April of 2022.

We also have allegations to establish that CW-2 corroborating CW-5's testimony, also said that the loss was known before CW-2 left in March of 2022.  So it had to have happened by then.  And those are in paragraphs 29 and 45.

Our complaint allegations also establish that the covered lies metrics were tabulated internally via the later software and that Donigan and DuPaul had access to the system. And obviously any question about Donigan's knowledge is raised by the fact that she spoke affirmatively about the loss of Virginia Premier internally at the -- in July 2022 meeting.

THE COURT:  So is it your position that based on her role and responsibilities as an officer within this particular

company that she either knew or should have known this particularized information that you're stating was not accurately represented to the investors and analysts in this call?

MR. ARIFI:  That is part of it, Your Honor, and I'll direct your attention to paragraph 37, Donigan was intimately involved in the day to day operations of Elixir and she admitted so.  And I quote, on September 23rd, 2021 she stated, I've been running the day to day operations at Elixir for the last eight months and so has Matt Schroeder.  And that's on paragraph 37.

Now throughout the class period, Ms. Donigan spoke about Elixir and the intimate details at Elixir, as if she was involved, because she was involved.  She never stopped being involved at Elixir and its day to day operations.

Unless the Court has any other questions, I'd like to move on and address the third group of statements.

THE COURT:  I don't.  That's fine.

MR. ARIFI:  The third group of statements, Your Honor, relate to the growth season.  And again, as we established, Donigan and the other metrics at Elixir, growth equals retain clients, plus new clients.

And looking past defendant's arguments today, the lives and the retention rate metrics are clearly and inextricably linked.  So any time Donigan's talking about

growth, she's taking -- necessarily taking into account the client retention rate metrics in conjunction with the new lives and concluding that was growth.  But at that point, Virginia Premier had not renewed and it represented 300,000 lives, meaning that Elixir was 300 lives in the hole for -- at that time.  And for any growth story to be true, it would need to obtain 301,000 new lives.

And it's also interesting to note that in our complaint allegations and these statements made by defendants, their goal for the 2023 sales season was to obtain 300,000 new lives, just enough to cover the hole left by Virginia Premier.

I'd also like to point the Court to paragraph 77 where again Donigan stated in an our interview with Jio Finance where she stated, we sold 80,000 lives just this year.  And it's just the beginning of the sales season.  And continuing on with that Elixir was showing strong growth.

So again, these statements were present tense, cited a statistic about lives Elixir had already achieved and they weren't future aspirations.  And again, she's linking the retention of clients with new lives to establish that it was a growth season.  And our allegation -- allegations establish that that was just not the case.

As to the statements regarding Elixir's sales teams, Your Honor, I'd like to direct your attention to paragraph 38 and that was at the very beginning of the class period and

December 21st, 2021.  Here, Donigan stated, and we have recently assembled a very strong seasoned sales team aligned to all of our key market segments.  These new hires are critical to Elixir.

Now, if we compare those to the admissions at the end of the class period where individual defendants admit that, you know, and I quote, the past year was very much a rebuilding year for us.  We went into the season with a relatively new commercial team and we have had several gaps in critical areas, including sales and underwriting.

Through their own admissions, it establishes that the prior statements about their sales teams were false.  And we cite case law that these types of statements about their sales teams, their abilities of sales teams, when defense misrepresent that core ability especially where the whole business relies on going out, selling more lives.  Well, that establishes that these types of statements are actionable.

And as to the Bright Health, Your Honor, I think the complaint allegations also are pretty clear that it wasn't industry consolidation.  The Bright CEO came out and said, hey, we did not have a great -- we didn't have a great relationship at -- with Elixir, their internal teams were lacking.  We didn't like the price we were getting, there's other service issues, that's why we decided to leave.

And, of course, when you contrast that with the

benign reason of well, we lost one client because of a reason completely out of control, industry consolidation, well clearly that's misleading, Your Honor.

THE COURT:  That one client being who?

MR. ARIFI:  Bright Health.

THE COURT:  Okay.

MR. ARIFI:  Because when they're talking about industry consolidation, they're talking about Bright Health.

Moving on to scienter, Your Honor, the complaint's allegations raise a strong inference of scienter in three ways. First off, we have ample allegations establishing that defendants had contemporaneous access to information contradicting the statements to investors.  And that's a classic evidence of scienter, Your Honor.

Our CWs and they are multiple as defendants rightly pointed out, they corroborate one another's testimony.  So this isn't a lone CW stating one fact and it's not corroborated by others.  It's multiple CWs stating the same things that are also supported by other allegations.

For example, on paragraph 101 we allege that there's a software platform that tracked the client details and their representative lives.  Same paragraph, defendants had access to the tracking software.  We know that large clients, such as Virginia Premier, provided advanced notice of up to one year regarding their non-renewal, which would have been reflected in

the Laker software system.

This fact is further corroborated by CW-2 and 5 that they knew that Virginia was not renewing by the latest in February of 2022.  And that's in paragraph 93.

It's also important to note, and maybe I missed it, but I didn't hear any argument by defense stating that these CWs could not have known what they knew or they didn't challenge their roles or their experience.  All I heard is well, there was some CWs that stated some things, but you should disregard that.  Well, Your Honor, we cite case law that specifically states when there's multiple CWs corroborating the same facts, well the Court should take into account those allegations.  Those are immaterial.

And incredibly, my counterpart argues because Donigan admitted the truth at an internal employee meeting that somehow whitewashes her lack of candor with investors.  It does not, Your Honor.  The difference between the internal and external statements actually establishes her scienter.

Internally she was critical about Elixir.  She was stating that, wow, we are losing our largest client, how are we going to recover from this.  Moving on to the statements to the investors, we know that she's painting a rosy story.  We're retaining 95 percent of our clients, of our recovered lives, it's a growth season.

Clearly there's a difference between what she was

communicating inside and what she chose to communicate to investors on the outside, which was not the truth.

THE COURT: Is there any legal obligation or did the individual defendants have an obligation, statutorily to divulge the loss of Virginia Premier and if so, what supports that and also if so, when would they have been required to do so?

MR. ARIFI: As far as a statutory duty, Your Honor, our position is that there's -- the duty arose because they chose to speak on the fact of client retention and --

THE COURT: Isn't that rather broad and also expected with any type of update in quarterly reports, especially when you're dealing with a business that involves sales?

MR. ARIFI: Well, I'll -- no, Your Honor. I mean, it's one of the set factors. You can have a statutory duty and the other factor would be where the duty arises when they decide to speak on the subject.

Here it's not like Elixir is involved in many different areas where well, if they spoke about this, they should have spoken about that. The key metric here is lives. That's what investors want to know about, it's lives.

Here they put the lives into play, that's the only -- that's their core operation, so they had a duty. It's pretty cut and clear in this case. I understand some other cases where it's a conglomerate and they have their tentacles in many

different industries, that could be an issue.  But here Elixir was only focused on winning lives.  Defense put those statements into issue, thus they had a duty to disclose the truth about that or didn't make statements that rendered those statements true.

THE COURT:  But I guess what I'm saying regardless of whether they had a singular focus or in, you know, situations an entity may have multi-faceted, you know, things that they are focused on or sources of revenue.  Here it is covered lives, that is the business they are involved in.  I guess my question again is, did they have a duty, meaning these individual defendants to divulge the loss of Virginia Premier specifically?  And I think your initial response was because they brought up and were updating investors and analysts on retention, as well as saying it -- presumptively the confidential witnesses say at various points in time, you know, what they were hearing or seeing or observing, that that retention language created the duty.

And I want to make sure I understand that clearly from you, that that is in fact the basis, the full basis or is there something else that substantiates why they had a duty to tell and their omission or failure to tell is in essence the crux of the problem with the fraud in this case, or the alleged fraud in this case.

MR. ARIFI:  Yes, Your Honor.  I wouldn't categorize

it as a -- I would categorize it as it's the chief issue.

THE COURT:  Understood.

MR. ARIFI:  And it's a very -- since we're talking about the core operations, this is what the investors would care about.  And by going out there and putting this into play, they were required to disclose the loss of Virginia Premier.

THE COURT:  Okay.  If Virginia Premier was a -- had 5 percent, let's say numerically of a loss, they had 100,000 as opposed to 300,000 covered lives, would that have made the divulgence any more or less necessary?  And forgive my math if I may be off on that, but.

MR. ARIFI:  Okay.  So if I understand the Court's question is whether the amount of lives --

THE COURT:  Correct.

MR. ARIFI:  -- would matter.

THE COURT:  And I think you're just positioning the amount of lives with obviously the 95 percent projection or the information that was being articulated by the company saying we are, you know, looking at doing 95 percent growth and that's a combination of I guess retained as well as new.  But you can correct me on everything I just said if I'm wrong in that.

So I know it's the 15 percent loss, if it was a lesser amount, would that have mattered as to whether or not they should have divulged?  In other words, does the percentage of loss have any significance to whether or not an entity to

divulge or if the loss is 1 percent or 5 percent or something lower than 15 that it would not have been needed or necessary?

MR. ARIFI:  No, Your Honor.  I think at any point -- and here, it's very fact specific, we have 95 percent affirmative statement and we know that it's 15 percent in actuality.  But I don't think in any -- and in your scenario as well, it would depend on other --

THE COURT:  Okay.

MR. ARIFI:  -- facts.  But as the facts in this case I think it's very cut and dry.  We know 15 percent, they say 95.  That's first grade math, Your Honor.

THE COURT:  Right.  So if they said 85 and we're looking at a 15 percent loss, to the investors and analysts hypothetically while they, you know, may have been concerned in hearing 85 percent or I don't know, they may have been satisfied with hearing 85 percent, you -- your client would not necessarily have felt or your class would not have necessarily felt as misled as they are feeling now.  Because the numbers just aren't adding up.

MR. ARIFI:  That's a very, very, very simplified version here, but I guess it would also depend on --

THE COURT:  And I'm going to concede there may be other things and I'm sorry to interrupt you.

MR. ARIFI:  Sure.

THE COURT:  I will concede there may be other

factors, but just looking at the numbers. So I will let you respond, I'm sorry.

MR. ARIFI: Sure. And just so I'm clear, the Court is asking me if they had disclosed that they lost -- they retained 85 percent --

THE COURT: Uh-huh.

MR. ARIFI: -- and Virginia Premier was that missing piece, would that create a duty for them to disclose that it was Virginia Premier.

THE COURT: Correct. Looking at paragraph 47 if they had said, and not even divulging Virginia Premier, but if the number there was we're on track to retain 85 percent of our business for 2023 selling -- for the 2023 selling season, would that make any difference in the obligation that the officers in this case, the defendants as individual defendants named to divulge the loss of Virginia Premier?

MR. ARIFI: Under those specific exacting facts, I would say that most likely that it could possibly raise a duty.

THE COURT: Okay. Thank you. Continue.

MR. ARIFI: As to the second factor of scienter --

THE COURT: Uh-huh.

MR. ARIFI: -- we know that individual defendants held themselves out as having knowledge of the facts that they misrepresented. Individual defendants held themselves out to investors as having detailed knowledge of Elixir's covered

lives, including the retention rates, the covered lives sold and overall the growth and decline. And those are paragraphs 47, 51, 53, 55, 66, 71, 73, 75, 77, 83 and 85 and 99.

And just going back, we know that Donigan and Schroeder had access to Elixir's business because they were running the day to day as Donigan admitted. This never changed throughout the class period. DuPaul is hired as the COO of Elixir to oversee its operations and was critical to Elixir, according to Donigan.

We also have allegations that establish each individual defendant confirmed his or her personal knowledge in the statements to investors, and we cite to the case of -- from this district, the Endo (phonetic) case, where officers that were speaking as authoritative sources who possessed the information to support their statements, support a scienter.

And also individual defendants held themselves out as experts on questions analysts asked about one, covered lives retained, and two, new lives sold and that further supports scienter.

And we point the Court to the Avia case from the Third Circuit where an analyst focused questions combined with the defendant's executive local physicians and raised a strong inference of scienter.

And, of course, Your Honor, the third basis for scienter, cooperation. There's no question that Elixir's core

operations revolved around the lives that it maintained, sold, retained.  That in and of itself supports scienter and so do each of the basis -- each of the bases in and of themselves are sufficient to establish a strong inference of scienter.

However, when taken together, there's only two plausible inferences of scienter.  Either individual defendants knew they were not telling investors the truth or they were reckless as to the truthfulness of their statements.  And, Your Honor, either one supports scienter in this case.

The last remaining issue is the loss causation and we would stand on our briefing on that issue.

THE COURT:  Thank you.  Thank you, counsel.

MR. ARIFI:  Thank you, Your Honor.

MS. SESHENS:  Your Honor?

THE COURT:  Yes.

MS. SESHENS:  Would it be possible to address some of the points that counsel made?

THE COURT:  Yes, yes.  I was going to give you an opportunity to do so.

MS. SESHENS:  That's great, thank you.  I realize I didn't ask at the beginning --

THE COURT:  No.

MS. SESHENS:  -- for which I apologize.

Okay.  All right.  Thank you, Your Honor.  Just I will be as brief as I can be.

In addressing just some of the points that counsel raised and I want to start where counsel started and where Your Honor was focused on this alleged duty to foreclose Virginia Premier.  And I want to take us back to paragraph 47 again.

Which counsel seems to, and I should say plaintiff really is arguing that this is some mathematical exercise and by basic math alone, one concludes that there was a duty to disclose here.

And the point I made in the opening, the point that we make in our brief is not addressed or accounted for by plaintiff's argument.  And that is that Ms. Donigan's statement, which was not we're at 95 percent or we're going to -- you know, we're guaranteeing it, but we're on track for it was qualified by saying, after counting for previously known losses due to health plan consolidation.  And there are no allegations about why or that statement in total which is how it must be analyzed and considered was false or misleading. They just excise the portion they want to focus on, and do some math around it to say that it's also misleading because there was the alleged loss of Virginia Premier.

And we would submit, Your Honor, that under the PSLRA they have to address, the plaintiff has to address, sorry, the statement as a whole.  And those allegations are completely lacking.  There is nothing about how that portion of the statement affects the alleged falsity.

THE COURT:  How are they -- counsel, are they on track for 95 percent if they know they've lost 15 percent and they're stating that they've accounted for previously known losses, presumably the known loss of Virginia Premier at the time that this statement is made?

MS. SESHENS:  So I am -- unfortunately I don't know how to answer that --

THE COURT:  Okay.

MS. SESHENS:  -- factually but at this stage of the case I would submit, Your Honor, that it doesn't matter.  It's the plaintiff's burden to plead that the statement is false, materially false and misleading under the PSLRA.  And they've not done that with respect to what I would call the qualifier.  And I totally appreciate Your Honor's question, I'm sorry it's a factual one I can't address but I --

THE COURT:  And I understand.  It was a little rhetorical even when I said it in my mind, but rhetorical meaning I anticipated you would not be able to answer it, but I wanted to see what your response would be nonetheless.

MS. SESHENS:  Totally understood and I guess one of the great things about being the Court is that you can ask any question you would like.

I do think though that the factual piece if we ever get there is for a different stage of the case, but the pleading burden aspect of this is the point that we focus on

now, and that burden falls entirely to the plaintiff.  And with respect to that statement, which is I really think the whole crux of their case, they have failed to plead anything about that aspect of the statement.

Counsel raised the In Re Adams case and undoubtedly the Court will read it, but it is completely different from this.  Those are allegations that before the defendant there IPO'd, it had issued a press release saying that it was aware that its golf clubs were being sold by discount distributors and then its registration statement it said that it had exclusive distribution through non-discount distributors.

And the allegations were those that those statements were false and misleading.  They didn't disclose that their business was being affected by a purported gray market.  But there, there were actual allegations prior to the registration statement that the company acknowledged and then went out and made statements to the contrary.  But the decision itself is actually about materiality, which is not in play here and the district court there had dismissed on materiality grounds and the Third Circuit reversed on that basis.  So that is a different set of arguments than the ones we're dealing with here.

Just a few points, Your Honor, on the other alleged misstatements and omissions.  I did not get into this in my opening remarks, because I do think it's covered in the papers

but counsel raised some of these points.  So I just want to respond briefly.

On the allegations that are in paragraph 43 a little bit or 47 rather a little bit and I think it's --

THE COURT:  73?

MS. SESHENS:  73, thank you, Your Honor.  I was going to say 75.  About the retention of MCS as the largest client, I think those arguments are somewhat ironic.  Plaintiff's whole case is that prior to any statement about retaining the largest client, Virginia Premier had told Rite Aid that it was leaving, that they were going elsewhere.

And so by plaintiff's own allegations, Virginia Premier was no longer going to be a client as of the time those statements were made.  MCS was the large -- the then largest client.  So plaintiff can't really have it both ways.

If the theory is Virginia Premier was -- had notified Rite Aid, everybody at Rite Aid knew Virginia Premier wasn't a client before April 2022, to then go out and say we retained our largest client MCS, which then was the largest client is actually true.  And so they are trying to have it both ways in that regard and we would submit that plaintiff cannot do that.

Relatedly, I touched on this in my opening remarks, but paragraph 75 is one of these growth story allegations that plaintiff is focused on.  We heard from counsel quite a bit about how these growth story statements were all about covered

lives and therefore, somehow misleading. And I think paragraph 75 illustrates quite clearly how and why that's not the case. And if one reads the question that is being posed and then Ms. Donigan's answer, she runs through, you know -- the question is, do we feel like we're back in the growth phase of the business coming out of the pandemic or are we still more, I think it should say in, but it says then, a shrink to grow outlook.

And then she gives a two paragraph answer that says I think it's a combination. And she talks about growing prescriptions. She talks about front end sales and then she says, as I mentioned earlier, we're seeing strong sales results on Elixir. So we've sold more so far this year than we sold at this time last year and our retention rates are higher. So that's the growth story.

But the growth story is all of that, it's not specific to the Elixir component. But even if it were, there's no allegation that these statements in that paragraph are materially false and misleading. They're not challenging, plaintiff is not challenging the statements that we've sold more so far this year than we sold at this time last year and our retention rates are higher than last year. Those statements are not being challenged.

And so the growth story allegations, there's others, but they all fail for the same reasons, that in the context of

what Ms. Donigan was talking about, it was the business at large. And as I noted previously, those statements we view is not actionable for a variety of reasons.

Just quickly on the sales team alleged misstatements, counsel pointed to a statement back in December of 2021 and then claimed that it was false and misleading because of a statement that was made after the class period, closer to the end of 2022. And that's classic fraud by hindsight, putting aside that the sales team statements are non-actionable puffery, but there are no allegations that when the statement was made about the sales team in December of 2021 that those were false and misleading at the time the statements were made, which is what the securities law requires.

Similarly, the cases that plaintiff cites are completely distinguishable and in particular, they rely upon a case called City of Omaha v Evoqua Technologies where basically the company made affirmative statements about its hiring and retention policies, that they were geared towards bringing in experienced people. They made disclosures about it and that they were making an investment in the same, when behind the scenes they had a plan in place where they were siphoning off the most experienced and most expensive of their sales team. And so the contradiction there was what the -- and that was contemporaneous. That had happened before they made those statements. That is not our facts here.

The last two points I just want to make relate to scienter. Counsel is correct and made the point that we've not challenged whether the CWs had a basis for their alleged knowledge and the like. And that is often a basis of challenge.

The reason we did not do it here is it's irrelevant, because again, all of the CWs do is allege that there was knowledge of a particular fact about the business at a particular point in time. And that's it. That is their whole scienter case.

And so those CWs who had no contact with the individual defendants, didn't work with them, didn't observe them, had nothing to say about their state of mind are really not relevant from our perspective.

The last point I would make is about Ms. Donigan, and I think I said I was going to touch on this in my opening remarks and I realized when I sat down I failed to do so. But there are allegations in the complaint that are different from Mr. DuPaul and Mr. Schroeder, in the sense that she at a townhall meeting allegedly in July of 2022 acknowledged the loss of Virginia Premier and acknowledged that Rite Aid was not going to hit its projections or its targets.

And as we have argued, that undercuts an inference of scienter. That's far from concealing, far from hiding or only disclosing to choice people. She was very open about it, that

was the state of the business.  And critically for plaintiff, I would say fatally for plaintiff, after that point in time, there are only two alleged misstatements that Ms. Donigan purportedly made, they're in paragraphs 83 and 85 and none of them has to do with a retention rate or on target for projections.  They are factual statements about new lives that had been sold and a general puffery statement about winning business.

So that chronology for them completely undercuts any inference of scienter.  Because they have to -- plaintiff has to allege that there was scienter in connection, that an individual defendant had a culpable state of mind in that regard with respect to each statement that is made.  And so she, at that point in time, is talking to the company and talking about these things in a very open way and then after that, there's nothing more that's investor facing until the September disclosure.

THE COURT:  That statement that she makes in the townhall, I wrote down the date generally July 2022 is when it's made.  Is it, which paragraph here in the filing is where that statement is noted?  Is it paragraph 80?

MS. SESHENS:  Apologies, Your Honor, let me find that for you.

THE COURT:  83?

MS. SESHENS:  No, I think it's in the additional

scienter.

MR. ARIFI:  Your Honor, if I may, it would be --

THE COURT:  Yes.

MR. ARIFI:  -- 94 through 96.

THE COURT:  94 through 96?

MS. SESHENS:  Yes.

THE COURT:  Thank you.  Give me a moment.

(Pause)

MS. SESHENS:  And with that, Your Honor, unless the Court has any other questions, that's all I wanted to address.

THE COURT:  Well, I do have one thing and I know paragraph 47 has come up a great deal by both of you in your arguments and I'm definitely looking at that very closely because you've just noted in your argument, that the particularized statement of the, after accounting for previously known losses due to health plan consolidation, we're on track to retain 95 percent of our business for the 2023 selling season, that that's a critical point in this particular litigation.

And this litigation is coming down to words and when words were used and what those words meant and at that specific point in time and what knowledge was known or you can tell it should have been known is something that should be contemplated by the Court in terms of the status of these particular individual defendants and what they should have been aware of

when they make the statements that they have made.

But looking at that, it says, we will grow Elixir, that's a projected future goal statement. We are on target to sell 300,000 new members for 1/1, 2023. That again is a projective hopeful goal statement.

Slash, you know the first step to achieving net growth is retaining the business we already have, again a projected hope and also kind of a definition of what net growth is. Having obtained more by the term net than what you currently have.

After accounting for the previously known losses, and that statement that has been so critical, that is a reflective statement. It is not a hopeful. It is what has already transpired and what is presumptively known.

Then it says what we're on track to do. 95 percent of our business for the 2023 selling season. Is that portion of the statement to you, how would you identify it or define it in your argument?

MS. SESHENS: So I think we have identified it as a mixed statement of present fact and future forward looking projection.

THE COURT: Okay.

MS. SESHENS: And there, we have cited the case law in our brief that says that that -- when they are inextricably linked in that way, they are entitled to protection under the

PSLRA as a forward looking statement.  And we would submit that that is the way to consider and analyze that statement.

THE COURT:  Okay.  But what is clear is that when that statement is made in April 2022, that Virginia Premier has already announced to Elixir and Elixir is aware that they are no longer going to be servicing them and staying with them as a client, correct?

MS. SESHENS:  That is what plaintiffs have alleged in the complaint, yes.

THE COURT:  Okay.  Thank you.  That's the only question that I have.  I appreciate it.

MS. SESHENS:  Thank you very much, Your Honor.

THE COURT:  Counsel, I will ask you the same question and then I'll let you expound on anything else you wish to share.  But really how would you identify that particular statement in light of how I walked through paragraph 47 and Ms. Donigan and me with opposing counsel kind of going through what is a perspective future goal statement and what is a reflective factual has transpired statement and then what the -- how would you identify that we're on track to retain 95 percent of our business for the 2023 selling season, how would you qualify that statement?  And then you can expound on anything else you wish to.

MR. ARIFI:  Thank you, Your Honor.  And Your Honor is correct it's a mixed statement.  There's present facts are

discussed and future aspirations. Just because -- although I will say and we cite case law on this, just because there's the words on track right before the retained 95 percent, that doesn't necessarily make it a future aspiration.

THE COURT: What does it make it then?

MR. ARIFI: Well, Your Honor, as we cite the Selgin (phonetic) case, an on track statement is not forward looking when it refers to something that's already occurred. And here -- has already occurred or to the company's current position vis a vis its future objectives.

Here, the on track is actually referring to and modifying the 95 percent, which we already know that's -- that can't happen. We know that Virginia Premier has already told Elixir that it was not going to be renewing.

So although they tack the on track, the fact is that it's referring to a present known fact that Virginia Premier had already decided to leave Elixir at that time.

THE COURT: Okay. I'm not -- and I will tell you, I'm looking at the two words in between track and 95 percent, which you didn't articulate, but I understand and appreciate your argument. But the we're on track to retain I think to retain is significant in that sense. And -- for both you as well as opposing counsel in the analysis of what is a perspective goal setting type of statement, what is a, you know, reflective summary statement and what may be in essence a

hybrid or a mixed type of statement, but the words to retain are at least significant to this Court. But you can continue.

MR. ARIFI: And -- thank you, Your Honor. And as to the counting for the previously known losses, that's clearly referring to Bright Health as disclosed that they were lost, that's clearly present in itself.

One second.

And just very quickly, defense counsel made the point that Virginia Premier was not a client but our allegations to establish that Virginia Premier was indeed a client through December 31st, 2022 and ceased being a client in January 1st of 2023. So there's no question of whether it was a client during that time --

THE COURT: And I definitely -- I did not hear that. I think what you're stating is true and I didn't hear from opposing counsel that they said they weren't a client, or if so, it may have been for a point in time.

MR. ARIFI: That they lost it.

THE COURT: Oh, that they lost it?

MR. ARIFI: Yes.

THE COURT: Okay.

MR. ARIFI: And so they didn't lose it, they were a client throughout the class period.

THE COURT: Okay.

MR. ARIFI: I have nothing further based on that,

61

Your Honor, thank you.

THE COURT:  Thank you, counsel.

Counsel, I appreciate both of your respective arguments that you made to the Court.  Obviously you've done a great deal of work.  Obviously you both are very knowledgeable about this particular case and too what was stated initially by Ms. Seshens when you approached the podium, yes, it is complex, so there are a lot of things in here and I do appreciate the demonstratives that you provided as well, Mr. Arifi, to kind of guide the Court through this flow chart of highlighting those things that are particularly nuanced and important to your argument.

So thank you in short for how you presented your arguments today.  I will obviously deliberate over what you've provided.  I don't need any additional briefing at this point.  And I will see if within my notes and reviewing them if there's anything that is an outstanding question that I would like for you to both submit on, and if so, I will issue an order doing so or will reach out, you know, from the Court via my chambers, e-mail to notify you as to what I would like for you all to submit.

It may be supplemental cases and if there is a case that comes out and you believe is on point regarding any of the arguments you've presented, you are welcome to e-mail the Court and request leave to submit that case.  I would ask that you do

62

it, you know, sua sponte because it can lead it to a peppering of cases and I like to try to manage it in a way that I don't miss what you're sending to me. And that it's done in a way that's most efficient. But if you do have something that has come through the courts since the filing of these briefs, I will be open to receiving that if it, in fact, somehow illuminates or gives greater clarity to each of your respective arguments. Just let the Court know.

Otherwise on that I don't have anything further. If there isn't any other business or questions for the Court, then I will adjourn us. So I will ask, Ms. Seshens, is there anything further from defendant?

MS. SESHENS: Nothing at this time, Your Honor, thank you for your time and consideration.

THE COURT: Absolutely. Mr. Arifi, is there anything further from the plaintiff?

MR. ARIFI: Nothing for the plaintiff either, thank you.

THE COURT: Thank you very much. You all have a good day. Court's adjourned.

THE CLERK: All rise.

(Proceedings concluded at 11:37 a.m.)

* * * * *

63

CERTIFICATION

I, **Sheila Orms,** Court approved transcriber,

certify that the foregoing is a true and correct transcript

from the official electronic sound recording of the proceedings

in the above-entitled matter.

/s/ *Sheila Orms*

_____

December 11, 2024