## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE RITE AID CORPORATION SECURITIES LITIGATION** | **Case No.  2:22-cv-04201-KBH** |
| | **CLASS ACTION** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

**HODGE, J.**                                                                       **March 31, 2025**

## MEMORANDUM

Lead Plaintiff Steven L. Diamond ("Plaintiff") brings this class action lawsuit individually and on behalf of all other similarly situated individuals against Individual Defendants Heyward Donigan, Matt Schroeder, and Chris DuPaul (collectively, "Defendants" or "Individual Defendants")[1] for violations of the Securities Exchange Act of 1934 ("Exchange Act") between December 21, 2021 and September 28, 2022 ("Class Period"). Heyward Donigan was the Chief Executive Officer ("CEO") of Rite Aid Corporation ("Company") at all relevant times. Matt Schroeder was the Company's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times. Chris DuPaul was the Chief Operating Officer ("COO") of the Company's pharmaceutical services subsidiary, Elixir, at all relevant times. Defendants have filed a Motion to Dismiss the Amended Complaint ("Motion"). (ECF No. 36.) Plaintiff opposes the Motion. (ECF No. 39.)

---

[1]      Plaintiff filed a notice of voluntary dismissal of all claims against Rite Aid Corporation ("Company") on August 26, 2024, following the resolution in a Bankruptcy action, *In Re Rite Aid Corp., et al.*, No. 3:23-bk-18993 (Bankr. D. N.J.). (ECF No. 49.)

After having considered the arguments of the parties in their briefings and oral argument, the Court grants the Defendant's Motion to Dismiss. The basis for the Court's determination is as follows.

## I.    FACTUAL BACKGROUND[2]

This matter concerns the pharmacy services segment of Rite Aid Corporation, Elixir. (ECF No. 35 ¶ 25.) Elixir offers pharmacy benefit management ("PBM") services which includes technology solutions, mail delivery services, specialty pharmacy, network and rebate administration, claims adjudication, and pharmacy discount programs. (ECF No. 35 ¶ 2.) Plaintiff alleges that during the Class Period, Defendants made materially false and/or misleading statements regarding the Company's business, operations, and prospects. (ECF No. 35 ¶ 3.) Primarily, Plaintiff argues that Defendants misled investors when they failed to disclose that Elixir's biggest client, Virginia Premier, would not be renewing their agreement with the Company. (ECF No. 35 ¶ 43; ECF No. 55, at 28–29.)

Elixir retains less than 5% of the total market share in the PBM industry and focuses on smaller employers and regional health plans. (ECF No. 35 ¶ 27.) As a result of Elixir's small market share, it is a relatively non-diverse company, with its top five customers making up 59.7% of its revenue in 2021. (ECF No. 35 ¶ 32.) In the beginning of 2022, Virginia Premier Health Plan ("Virginia Premier") was Elixir's largest customer, serving over 300,000 lives.[3] (ECF No. 35 ¶ 43.) Plaintiff alleges that no later than January or February of 2022, the Company became aware that Virginia Premier was not going to be renewing their agreement.[4] (ECF No. 35 ¶ 43.) After Elixir lost Virginia Premier as a client, Plaintiff alleges that the Company made various statements

---

[2]    The Court adopts the pagination supplied by the CM/ECF docketing system.
[3]    The members, or users, of Elixir are evaluated in terms of "lives." (ECF No. 35 ¶ 3.)
[4]    The Complaint does not note specifically who at Rite Aid became aware of the loss of Virginia Premier, only that Confidential Witnesses corroborate this information. (ECF No. 35 ¶ 43.)

that were false or misleading of which five (5) of the alleged false statements are contested by the Plaintiff in their response to Defendant's motion.[5] In addition, Plaintiff alleges that Defendants failed to disclose the loss of Virginia Premier, despite having a duty to do so.

### Statement 1

First, on April 14, 2022, during a conference call with investors to discuss fourth quarter ("Q4") and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook, then-CEO Donigan said "[a]fter accounting for previously known losses due [to] health plan consolidation, we're on track to retain 95% of our business for the 2023 selling season." (ECF No. 35 ¶ 47; ECF No. 55, at 28–29.) Plaintiff alleges that this statement was untrue and/or misleading because at the time this statement was made, Virginia Premier, who made up 15% of Elixir's business, had already been lost as a client. (ECF No. 35 ¶ 48.) Plaintiff further alleges that Defendants needed to disclose the loss of Virginia Premier on this same call. (ECF No. 35 ¶ 54.)

### Statement 2

Second, Plaintiff alleges that on the same call, Donigan said "I'm excited to share that we recently renewed, in a very competitive situation, our largest Medicare Advantage client with the three-year contract." (ECF No. 35 ¶ 47; ECF No. 55, at 28–29.) Plaintiff alleges that this statement was false and/or misleading because Virginia Premier, Rite-Aid's then-largest Medicare Advantage customer, had not re-signed and was not going to do so. (ECF No. 35 ¶ 48.)

---

[5] While Plaintiff pleads additional statements in their Complaint, Plaintiff has only responded to five statements (which the Court has grouped into categories of statements based on Plaintiff's briefing and oral argument) and one omission noted in this Opinion. Failing to substantively respond to an argument contained within a motion to dismiss constitutes a waiver to those claims or arguments. *See Jacobs v. Mayorkas*, 2021 WL 1979436, at *1 (E.D. Pa. 2021) (citing *Celestial Cmty. Dev. Corp. v. City of Phila.*, 901 F. Supp. 2d 566, 578 (E.D. Pa. 2012); *Cook v. W. Homestead Police Dep't*, 2017 WL 1550190, at *3 (W.D. Pa. May 1, 2017)); *Arcuri v. Cnty. of Montgomery*, 2021 WL 1811576, at *10 (E.D. Pa. May 6, 2021) (holding that failure to substantively respond to defendants' arguments constituted a waiver of those claims). As a result, Defendants' Motion to Dismiss as it relates to any statements not addressed by the Plaintiff are waived. Hence, the Motion to Dismiss as to those waived statements is granted.

3

**Statement 3**

Third, Plaintiff alleges that on a June 23, 2022 earnings call, Donigan stated "we're seeing strong sales results on Elixir. So we've sold more so far this year than we sold at this time last year. And our retention rates are higher. So that's the growth story." (ECF No. 35 ¶ 75; ECF No. 55, at 28–29.) Plaintiff alleges that this statement about a "growth story" was false and/or misleading because Rite Aid failed to disclose the loss of large clients, Elixir was not seeing strong sales results, and Elixir was not a growth story because the number of covered lives was not growing. (ECF No. 35 ¶ 76.)

**Statement 4**

Fourth, during a December 21, 2021 investor and analyst call to discuss third quarter ("Q3") 2022 results, Donigan said "we have recently assembled a very strong seasoned sales team aligned to all of our key target market segments. These new hires are critical to Elixir." (ECF No. 35 ¶ 38; ECF No. 55, at 28–29.) Plaintiff alleges these statements were false and/or misleading because Defendants later admitted that Elixir did not have a strong or seasoned sales team. (ECF No. 35 ¶ 39.)

**Statement 5**

Fifth, and lastly, during a different December 21, 2021 earnings call, Donigan discussed the reasons for a client, Bright Health Group, Inc. ("Bright Health"), leaving Elixir. Donigan said "this is unfortunate is [sic] one of our health plan clients [Bright Health], who was growing very rapidly, got merged with another health plan and they did a rollup RFP, that we -- they went with the other incumbent, which is one of the risks that we have when we get these health plan clients, because so many of these health plans are getting rolled up right now and especially, in the government programs business." (ECF No. 35 ¶ 40.) Plaintiff claims this statement was false

4

because the reason that Bright Health left Elixir was due to pricing and service quality, not industry consolidation, as evidenced by Bright Health's CEO saying, "we were able to renegotiate ancillary and pharmacy contracts, reduce out of network rates, optimize existing contract structures, more closely manage high cost cases, and improve our specialty provider network." (ECF No. 35 ¶ 41.) Plaintiff does not allege when exactly this statement by the Bright Health CEO was made, only that it was made subsequent to Donigan's statement. (ECF No. 35 ¶ 41.)

On September 29, 2022, Rite Aid announced its financial results for the second quarter ("Q2") of 2023 and disclosed that Elixir was performing poorly and had recorded a $252.2 million charge for the impairment of goodwill. (ECF No. 35 ¶ 87.) On that same day, Rite Aid's stock price fell $1.97 per share, a 28.02% drop from its previous day's closing, to $5.06 per share. (ECF No. 35 ¶ 88.)

Plaintiff claims that the Defendants made false statements about the business of Elixir and, as a result, their stock price declined, in violation of securities laws. (*See generally* ECF No. 35.) The Court now considers the Motion to Dismiss Plaintiff's Amended Complaint.

## II.    PROCEDURAL BACKGROUND

Plaintiff filed an Amended Complaint in this case on July 31, 2023. (ECF No. 35.) Defendants filed their Motion to Dismiss the Amended Complaint on October 2, 2023. (ECF No. 36.) Plaintiff responded on December 1, 2023 (ECF No. 39.) Defendant replied on January 12, 2023. (ECF No. 40.) The Court held oral argument on the Motion on December 4, 2024.

## III.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

plausible when the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In deciding whether a complaint fails to state a claim upon which relief can be granted, the court is required to accept as true all factual allegations in the complaint as well as all reasonable inferences that can be drawn from the complaint. *Jordan v. Fox Rothschild, O'Brien & Frankel, Inc.*, 20 F.3d 1250, 1261 (3d Cir. 1994). These allegations and inferences are to be construed in the light most favorable to the plaintiff. *Id.* But, the court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). Plaintiffs cannot prove facts they have not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Thus, "a pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678. Rather, a complaint must recite factual allegations enough to raise the plaintiff's claimed right to relief beyond the level of mere speculation. *Id.*

However, as compared to a standard Rule 12(b)(6) motion to dismiss, a complaint in a securities litigation must plead more than just "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). A plaintiff in a securities case must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA").[6] *See* 15 U.S.C. §§ 78u–4 *et seq*. The PSLRA provides two pleading requirements, both of which must be met to survive a motion to dismiss. *Id.* First, a complaint "must specify each misleading statement, why the

---

[6]     The Court notes that the PSLRA has replaced Rule 9(b) as the pleading standard governing private securities class actions. *See Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). However, the particularity requirement of Rule 9(b) is comparable and effectively subsumed by the PSLRA. *Id.*

statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Avaya*, 564 F.3d 242 at 252–53 (citing *Winer Family Trust v. Queen*, 503 F.3d 319, 326 (3d Cir. 2007)); 15 U.S.C. § 78u–4(b)(1). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). This is an exacting pleading standard for state of mind, also known as "scienter." *Avaya*, 564 F.3d 242 at 252–53 (citing *Tellabs*, 551 U.S. 308, 320). If a plaintiff fails to meet this heightened pleading requirement under the PSLRA, the complaint must be dismissed.

## IV.    DISCUSSION

Plaintiff brings claims against Defendants for violations of Sections 10(b) and 10b-5 of the Exchange Act (Count I), along with violations of Section 20(a) of the Exchange Act (Count II).[7]

### A.    <u>Sections 10(b) and 10b-5</u>

Plaintiff brings claims against Defendants under Sections 10(b) and 10b-5 of the Exchange Act, which prohibits fraud in connection with the sale or purchase of a security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5(b). To state a claim under these Sections, Plaintiff must establish "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

---

[7]    Plaintiff argues that the Court should not consider Exhibits A, C, D, G, H, J, N attached to Defendants' Motion to Dismiss. (ECF No. 39, at 19.) The Court concludes that the documents are either "integral to and/or [] explicitly relied upon" by the Complaint. *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 328–29 (3d Cir. 2007). Furthermore, to the extent that the exhibits attached to Defendants' Motion to Dismiss are documents submitted to the Securities Exchange Commission ("SEC"), those filings are public documents, and the Court is allowed to take judicial notice of them. Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *Kumar v. Kulicke and Soffa Indus., Inc.*, 2019 WL 5081896, at *3 n. 9 (E.D. Pa. Oct. 9, 2019); *In re Astea Int'l Sec. Litig.*, 2007 WL 2306586, at *7 n. 6 (E.D. Pa. Aug. 9, 2007). This is common practice in securities litigation cases. *See, e.g., Oran*, 226 F.3d at 289; *Winer Fam. Tr.*, 503 F.3d at 328–29; *Astea*, 2007 WL 2306586, at *7 n. 6; *Kumar*, 2019 WL 5081896, at *3 n. 9.

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).

Defendants argue that Plaintiffs fails to (1) allege any false or misleading statement or omission; (2) plead facts giving rise to a strong inference of scienter; and (3) plead loss causation. (ECF No. 36.)

### i.    *False/Misleading Statements*

A statement is actionable under securities laws if it "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *Dang v. Amarin Corp. PLC*, 750 F. Supp. 3d 431, 459 (D. N.J. 2024) (citing *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023)). The PSLRA does, however, provide a "safe harbor" provision for forward-looking statements. *Id.* Alleged misrepresentations are not actionable if the statements "are (1) identified as [forward-looking], and accompanied by meaningful cautionary statements; or (2) immaterial; or (3) made without actual knowledge that the statement was false or misleading." *Id.* (citing *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 278 (3d Cir. 2010)); 15 U.S.C. § 78u-5(c). Finally, the Court "must distinguish material representations from statements that 'constitute no more than puffery and are understood by reasonable investors as such.'" *Id.* (citing *In re Newell Brands, Inc. Sec. Litig.*, 837 F. App'x 869, 874 (3d Cir. 2020)).

Plaintiff argues that there are five main statements and one omission that are false or misleading.[8] The Court will discuss each of those statements (ECF No. 55, at 28–29):

1. On April 14, 2022, during a conference call with investors to discuss Q4 and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook that Donigan said "[a]fter accounting for previously known losses due [to] health plan consolidation, we're on track to retain 95% of our business for the 2023 selling season." (ECF No. 35 ¶ 47.) This

---

[8]    *See supra* n. 5.

statement was also repeated by DuPaul during a June 23, 2022 earnings call: "we feel really good about where our life count is headed. Our retention rate is still expected to come in right around 95%." (ECF No. 35 ¶ 73) ("Statement 1")

2.  Plaintiff alleges that Defendants did not disclose the loss of Virginia Premier as a client. ("Omission 1")

3.  On April 14, 2022, during a conference call with investors to discuss Q4 and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook, Donigan says "I'm excited to share that we recently renewed, in a very competitive situation, our largest Medicare advantage client with the three-year contract." (ECF No. 35 ¶ 47.) DuPaul also repeated a version of this statement during a during a June 23, 2022 earnings call: "we did retain our largest client, MCS, earlier in the year." (ECF No. 35 ¶ 73) ("Statement 2")

4.  On a June 23, 2022, earnings call, Donigan stated "we're seeing strong sales results on Elixir. So we've sold more so far this year than we sold at this time last year. And our retention rates are higher. So that's the growth story." (ECF No. 35 ¶ 75.)  Donigan also stated during an interview with Yahoo Finance that "[w]e are showing strong growth, we sold 80,000 lives just this year, and it's just the beginning of the sales season." (ECF No. 35 ¶ 77) ("Statement 3")[9]

5.  During a December 21, 2021 investor and analyst call to discuss Q3 2022 results, Donigan said "we have recently assembled a very strong seasoned sales team aligned to all of our key target market segments. These new hires are critical to Elixir." (ECF No. 35 ¶ 38) ("Statement 4")

6.  During the December 21, 2021 earnings call, Donigan said "this is unfortunate is [sic] [Bright Health], who was growing very rapidly, got merged with another health plan and they did a rollup RFP, that we -- they went with the other incumbent, which is one of the risks that we have when we get these health plan clients, because so many of these health plans are getting rolled up right now and especially, in the government programs business." (ECF No. 35 ¶ 40.) Schroeder also represented that Elixir lost Bright Health due to "industry consolidation." (ECF No. 35 ¶ 51) ("Statement 5")

---

[9]    Plaintiff cites to various parts of their Complaint for the proposition that "[a]s late as August 24, 2022, Donigan, Schroeder, and DuPaul repeatedly assured investors that Elixir was growing, portrayed the 2023 selling season as a 'growth story,' and otherwise covered up the loss of its biggest client." (ECF No. 39, at 32 (citing ECF No. 35 ¶¶ 47, 49, 51, 53, 64, 71, 73, 75, 77, 83, 85).)

STATEMENT 1 ANALYSIS

On April 14, 2022, during a conference call with investors to discuss Q4 and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook that Donigan said "[a]fter accounting for previously known losses due [to] health plan consolidation, we're on track to retain 95% of our business for the 2023 selling season." This statement was also repeated by DuPaul during a June 23, 2022 earnings call: "we feel really good about where our life count is headed. Our retention rate is still expected to come in right around 95%."

(ECF No. 35 ¶¶ 47, 73.)

Plaintiff argues that the statement regarding the Company's retention of 95% of existing business for the 2023 season was false at the time it was made. (ECF No. 39, at 20.) This is because Virginia Premier represented 15% of the total covered lives at Elixir (*Id.*) and, if Elixir lost Virginia Premier, Plaintiff alleges that it would be mathematically impossible for Elixir to retain 95% of its existing customers. (*Id.*) Furthermore, seeing as this statement was made in April of 2022 and Virginia Premier declined to renew its contract in January or February of 2022, Plaintiff alleges that this statement was false at the time it was made. (*Id.*)

Defendants make several arguments regarding the statement about retention. First, they argue that because the statement about 95% retention was qualified with "after accounting for previously known losses due [to] health plan consolidation," that the statement did in fact account for the loss of Virginia Premier and was, therefore, not a false statement. Second, they allege that the statement includes prospective or forward-looking language, "*we're on track* to retain 95% of our business," which is protected by PSLRA's safe harbor provision. (ECF No. 35 ¶¶ 47, 73 (emphasis added).)

The statement regarding 95% retention cannot, considering the included qualifying language, be considered false. Donigan explicitly says "**after accounting for previously known losses . . .** we're on track, to retain 95% of our business." (ECF No. 35 ¶ 47 (emphasis added).)

Plaintiff focuses on the statement about retention but does not address the explicit qualifier immediately preceding it.

During oral argument, Plaintiff argued that "previously known losses" refers to Bright Health. (ECF No. 55, at 60:3–6.) There are several issues with this allegation. First, nowhere in the Complaint is it alleged that the "known losses" discussed during the April 14, 2022 meeting were exclusively about Bright Health. Second, "known losses" can reasonably encompass more than one client. It is the Plaintiff's burden to show that these statements are false. They have not met this burden.

Plaintiff has not alleged that the "known losses" qualifier referred to Bright Health exclusively and did not include Virginia Premier. As a result, the Court finds that the statement could not be false because "known losses" would, by virtue of the direct meaning of the phrase, include Virginia Premier since the Complaint alleges that the loss of Virginia Premier occurred prior to the statement.[10]

<u>OMISSION 1 ANALYSIS</u>

> Plaintiff alleges that Defendants did not disclose the loss of Virginia Premier as a client.

(ECF No. 35 ¶ 54.)

Plaintiff also alleges that Defendants had a duty to disclose the loss of Virginia Premier and, therefore, failing to disclose the loss during the April 14, 2022 call constitutes a material misrepresentation, and qualifies as an actionable omission under the PSLRA. Defendants argue

---

[10]    The Court notes that for the purposes of evaluating the falsity of a particular statement, the Court is not focused on or contemplating the knowledge of the speaker. Rather, the Court is contemplating if the objective statement, regardless of the speaker, was true or not. The knowledge of the speaker is relevant for the purposes of scienter only. Therefore, when the Court is discussing the "known loss" of Virginia Premier, the Court is only concerned with the objective fact at the time the statement was made, not the state of mind of the person making the statement.

that the Company did not have a duty to disclose the loss of Virginia Premier, and therefore the omission of that information is not actionable under the PSLRA. The general rule in the case of an omission of a material fact is that "silence, absent a *duty to disclose*, is not misleading under Rule 10b-5." *United States v. Yeaman*, 987 F. Supp. 373, 378 (E.D. Pa. 1997) (citing *United States Securities Exchange Commission v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996)).

Regulation S-K Item 303 requires a company to include in its SEC filings a discussion of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(2)(ii). Plaintiff alleges that Regulation S-K Item 303 required the disclosure of the loss of Virginia Premier. Defendants argue that Regulation S-K cannot provide the basis for a duty to disclose, as the Third Circuit has rejected the argument that Regulation S-K Item 303 provides an independent duty of disclosure that would constitute a material omission under Rule 10b-5. (ECF No. 40, at 3–4 (citing *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000)).) Plaintiff further argues that because the Defendants decided to speak on the issue of client retention, that they had an obligation to do so honestly, requiring them to disclose the loss of Virginia Premier. (ECF No. 39, at 20–21.) Defendants argue that there was no duty to disclose because they did not choose to speak on Virginia Premier specifically or any other particular client. (ECF No. 55, at 13.)

As the court in *Oran* explained, Regulation S-K Item 303 is only relevant, for the purposes of liability under Sections 10(b) and 10b-5, to the extent that it either creates an independent private right of action or that the Regulation imposes an affirmative duty of disclosure that, if violated, would constitute a material omission under Rule 10b-5. *Oran v. Stafford*, 226 F. 3d 275, 287 (3d Cir. 2000). The Court in *Oran* concluded that "[b]ecause the materiality standards for Rule 10b–5

and SK–303 differ significantly, the 'demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5.'" *Id.* at 288 (quoting *Alfus v. Pyramid Tech. Corp.*, 764 F. Supp. 598, 608 (N.D. Cal. 1991)).

Plaintiff cites another Third Circuit case, *Jaroslawicz v. M&T Bank Corp.*, for the proposition that material violations of Regulation S-K can, in fact, be actionable omissions. (ECF No. 39, at 21 (citing *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 711 & n.10 (3d Cir. 2020)).) However, in *Jaroslawicz,* the Court does not address Line Item 303 specifically. In fact, the Court in *Jaroslawicz* was considering a different Line Item in Regulation S-K, Line Item 106. *Jaroslawicz* neither stands for the proposition that Line Item 303 creates a duty to disclose, nor does it supersede or contradict the reasoning in *Oran*. As a result, the Court must follow the precedent set in *Oran*, that Item 303 cannot be a basis for liability either through a private right of action or as providing an affirmative duty to disclose for the purposes of Rule 10b-5.

Second, the Court will consider whether there was an affirmative discussion of client retention that would have required Defendants to discuss the loss of Virginia Premier. Plaintiff argues that the statements made by Donigan and DuPaul are incomplete statements, as they omit the loss of Virginia Premier. Incomplete statements are only actionable if they are "so incomplete as to mislead investors." *The Winer Family Trust v. Queen*, 2004 WL 2203709, at *7 (E.D. Pa Sept. 27, 2004) (holding that disclosing a large investment partnership to investors without discussing a previous unprofitable relationship with that same partner was misleading). There is only a duty to disclose a certain fact "when necessary to make statements made, in light of the circumstances under which they were made, not misleading." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *13 (E.D. Pa. Mar. 13, 2019) (citing *Williams v. Globus Med., Inc.*, 869 F.3d 235,

241 (3d Cir. 2017)). "Even with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011). However, "[o]nce a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading." *Strougo v. Lannett Co., Inc.*, 2019 WL 1172992, at *13 (E.D. Pa. Mar. 13, 2019).

Plaintiff primarily relies on *Adams Golf* for the proposition that because Defendants discussed client retention, they were required to disclose the loss of Virginia Premier. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 275–78 (3d Cir. 2004). *Adams Golf* concerned a company, Adams Golf, who manufactured golf equipment. *Id.* The plaintiff in *Adams Golf* brought suit under Sections 11 and 12(a)(2) of the Exchange Act, arguing that in registration statements related to Adams Golf's Initial Public Offering ("IPO"), they failed to disclose the fact that unauthorized retailers were selling Adams Golf's golf clubs, despite their representation that Adams's golf exclusively sold to authorized retailers. *Id.*

*Adams Golf* is not applicable in the current case for multiple reasons. First, *Adams Golf* concerned Sections 11 and 12(a)(2) of the Securities Exchange Act which concerns materially false or misleading statements in *registration statements and prospectuses*. *See* 15 U.S.C. §§ 77k, 77l (a)(2). This is important because Sections 10(b) and 10b-5 concern a broader array of statements. As a result, the assessment of statements in these Sections of the Exchange Act are inherently different. Registration and prospectus statements are submitted to investors or the Securities Exchange Commission ("SEC"). Sections 10(b) and 10b-5 allow for liability for other statements made within the course of business and include press release statements, and other

general statements. This is further evident by the fact that statements in these documents are actionable under a completely different Section of the Exchange Act.

The statements in *Adams Golf* and the present case are also factually distinct. The statements in *Adams Golf* concerned the exclusive use of authorized retailers in selling their products. However, the company in *Adams Golf* did not disclose to investors that there were, in fact, unauthorized sellers that were selling the product. Specifically, there were 5,000 golf clubs sold at unauthorized retailers out of 235,000 total clubs sold. This was particularly important within the context of *Adams Golf* because the company in *Adams Golf* touted their success in a competitive market *primarily* because of their use of exclusive agreements with authorized sellers. This is distinct from the present case because, not only was Donigan's statement regarding client retention qualified with the language "after accounting for known losses," but the Company was not talking about client attrition and going through a client list, nor did Donigan explicitly mention Virginia Premier. The Company was generally discussing the financial situation of Elixir and the selling season. Donigan's failure to mention the loss of Virginia Premier does not make the statement about 95% retention misleading because of the qualifier, as discussed above. Furthermore, as opposed to *Adams Golf*, the Company had repeatedly disclosed the risk of losing one of its largest clients in its 10-K annual disclosures,[11] whereas the statements in *Adams Golf* were made in IPO disclosures, making a meaningful alteration to the mix of information available to investors. In the present case, investors were aware of the risk of Elixir losing a big client. *See*

---

[11]      (ECF No. 36-10, at 24–25 ("The possibility of PBM client loss and/or the failure to win new PBM business could impact our ability to secure new business.") ("2021 10-K"); ECF No. 35 ¶ 53 ("A substantial portion of our Pharmacy Services [PBM] revenue is currently generated from a limited number of customers, and, if there is a loss of a major customer, our revenue will decrease and our business and prospects could be adversely impacted.") ("2022 10-K").)

*supra* note 7. In *Adams Golf*, this risk was unknown and undisclosed, making the calculation of risk distinct from our case.

The Court concludes that neither Regulation S-K Item 303 nor *Adams Golf* provides an affirmative duty to disclose to investors the loss of Virginia Premier as a client. As a result, the omission of the loss of Virginia Premier is not an actionable omission under the PSLRA.

STATEMENT 2 ANALYSIS

> On April 14, 2022, during a conference call with investors to discuss Q4 and full-fiscal-year-2022 financial results and full-fiscal-year-2023 outlook, Donigan says "I'm excited to share that we recently renewed, in a very competitive situation, our largest Medicare advantage client with the three-year contract." DuPaul also repeated a version of this statement during a during a June 23, 2022 earnings call: "we did retain our largest client, MCS, earlier in the year."

(ECF No. 35 ¶¶ 47, 73.)

Plaintiff admits that these statements refer to MCS Classicare ("MCS"), which was a client who covered over 200,000 lives, but fewer than Virginia Premier. (ECF No. 35 ¶ 43; ECF No. 55, at 32.) Defendants do not contest this. Instead, they argue that this statement could not be false because, taking Plaintiff's allegations as true, Virginia Premier was lost several months before this statement was made, making MCS the largest Medicare advantage client at the time the statement was made. (ECF No. 40, at 4.) The Court agrees. Neither party disputes that this statement referred to MCS and, therefore, this statement is categorically true because Virginia Premier had left, making MSC the largest client, who was, in fact, renewed. (ECF No. 55, at 32–33.) Plaintiff makes the argument that although Virginia Premier had indicated that they would not be renewing their contract, Virginia Premier was still a client through the end of the year, making them the largest client at the time the statement was made. (ECF No. 55, at 60:8–13.) However, a reasonable investor would not consider a client who had indicated that they would not be renewing a current client. Although Virginia Premier was still receiving services from Elixir through the end of the

year, its departure had already been solidified and therefore, their "client" status had all but ceased. Furthermore, DuPoint explicitly mentions MCS as their "largest client," leaving no ambiguity that this was referring to MCS. As a result, this statement is neither false nor misleading, particularly because the Court has already concluded that Defendants had no duty to disclose the departure of Virginia Premier.

STATEMENT 3 ANALYSIS

On a June 23, 2022, earnings call, Donigan stated "we're seeing strong sales results on Elixir. So we've sold more so far this year than we sold at this time last year. And our retention rates are higher. So that's the growth story." Donigan also stated during an interview with Yahoo Finance that "[w]e are showing strong growth, we sold 80,000 lives just this year, and it's just the beginning of the sales season."

(ECF No. 35 ¶¶ 75, 77.)

The "growth story" and "showing strong growth" portion of these statements are the point of contention. (ECF No. 39, at 25; ECF No. 55, at 36–37.) Specifically, Plaintiff argues that representing Elixir as a "growth story" or as "showing strong growth" is misleading because Elixir was not growing and was, instead, shrinking. (*Id.*) Furthermore, Plaintiff argues that the statement about "80,000" new lives was a misstatement because the amount of "net" lives was decreasing. (*Id.*) Defendants argue that this statement amounts to mere "puffery," and even if this statement is not "puffery" it is not misleading because the number of "new" lives must be distinguished from "net" lives. (ECF No. 36-2, at 7-8; ECF No. 40, at 7.)

"Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). The terms "growth story" and "strong growth" are extremely vague. These types of statements are in line with what other courts have deemed to be puffery. *See Key Equity Investors, Inc. v. Sel-Leb Marketing, Inc.*, 246 F. App'x 780, 785–86 (3d Cir. 2007) (holding that statements about "strong

17

revenue and earnings growth" were puffery and did not give rise to liability under Section 10(b));
*In re PayPal Holdings Inc. Sec. Litig.*, 2025 WL 325603, at *21 (D. N.J. Jan. 29, 2025) (holding
that statements of "strong growth" are inactionable as statements of opinion or puffery); *In re Nice
Systems, Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 580 (holding that statements predicting "another
year of continuous growth" is nothing more than mere puffery). The Court holds the same here.

Furthermore, the Court agrees with the Defendants that the statement about 80,000 new
lives must be distinguished from any statement about "net" lives, which was not discussed here.
Plaintiff has not put forth any evidence that the statement about 80,000 "new" lives is false.
Therefore, Statement 3 is inactionable under the PSLRA.

STATEMENT 4 ANALYSIS

> During a December 21, 2021 investor and analyst call to discuss Q3 2022 results,
> Donigan said "we have recently assembled a very strong seasoned sales team
> aligned to all of our key target market segments. These new hires are critical to
> Elixir."

(ECF No. 35 ¶ 38.)

Plaintiff argues that this statement is false because DuPaul later admitted that the sales team
was "relatively new" and "had several gaps in critical areas, including sales and underwriting."
(ECF No. 35 ¶ 99.) Defendants argue that these statements are puffery. (ECF No. 40, at 7.) The
Court agrees that this statement is mere puffery regarding the "very strong" sales team. There is
no quantifiable metric to evaluate this statement as it is presented in "broad, vague, and
commendatory language," falling squarely within the definition of puffery. *See also In re Advanta
Corp. Sec. Litig.*, 180 F.3d 525, 537 (3d Cir. 1999) (finding that discussion of the strength of an
"experienced management team" was puffery) (abrogated on other grounds). Thus, Statement 4 is
inactionable under the PSLRA.

STATEMENT 5 ANALYSIS

During the December 21, 2021 earnings call, Donigan said "this is unfortunate is [sic] [Bright Health], who was growing very rapidly, got merged with another health plan and they did a rollup RFP, that we -- they went with the other incumbent, which is one of the risks that we have when we get these health plan clients, because so many of these health plans are getting rolled up right now and especially, in the government programs business." Schroeder also represented that Elixir lost Bright Health due to "industry consolidation."

(ECF No. 35 ¶¶ 40, 51.)

Defendants claim that this statement is not actionable because (1) it was not false when made and (2) this is an immaterial statement. (ECF No. 36-2, at 23.) Plaintiff argues that these statements are false because Bright Health's CEO acknowledged that the actual reason for them not renewing was due to uncompetitive pricing. (ECF No. 39, at 27.)

Looking first at falsity, Plaintiff's only argument that this statement was false is that after the statement was made, the Bright Health CEO subsequently discussed different reasons for the lack of renewal. (ECF No. 35 ¶ 41.). There is not enough on the record, at this time, to conclude that this statement was false *at the time the statement was made* since Bright Health's CEO made these alleged statements subsequent to Donigan's statement on the loss of Bright Health. (ECF No. 35 ¶ 41.) The Court is also not convinced that the Bright Health CEO made statements regarding uncompetitive pricing when he stated, "we were able to renegotiate ancillary and pharmacy contracts, reduce out of network rates, optimize existing contract structures, more closely manage high cost cases, and improve our specialty provider network." (ECF No. 35 ¶ 41.) To conclude that this statement speaks to uncompetitive pricing, specifically to Elixir, requires the Court to take a leap that is not factually supported at this juncture.

Moreover, the Court concludes that the reason for a client leaving is not material. The Court is persuaded by *Wallace* that the reason underlying Bright Health's lack of renewal is immaterial,

because the lack of renewal was fully disclosed. *Wallace v. Sys. & Comput. Tech. Corp.*, 1997 WL 602808, at *14 (E.D. Pa. Sept. 23, 1997) ("The reason [for declining sales] given [to investors] is immaterial."). "Reasonable investors know that it is common and natural to put a spin" on why a client would leave. *Id.* The Court finds that in the same way that the *Wallace* court applied this reasoning to declining sales, it would also apply to a client's departure. *Id.* Statement 5 is inactionable under the PSLRA.

### ii.    Scienter

Despite the Court holding that no statements alleged in the present case are actionable, the Court will nonetheless discuss scienter. As stated before, a plaintiff must plead, with particularity, facts giving rise to a strong inference that each Defendant acted with scienter. 15 U.S.C. § 78u–4(b)(2). Scienter is "a mental state embracing intend to deceive, manipulate, or defraud." *Id.*; *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 242 (3d Cir. 2013). A strong inference of scienter can be shown "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004). A reckless statement is "one involving not merely simple, or even inexcusable negligence, but an *extreme* departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, n.4 (3d Cir. 2013) (emphasis added) (citing *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 493 (3d Cir. 2013)). Scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This standard must be met as to *each* Defendant. *Winer Family Trust v. Queen*, 503 F.3d 319, 336–37

(3d Cir. 2007). The facts necessary to demonstrate scienter, particularly the specificity that is required, are not evident here. Plaintiff has failed to plead scienter in the present case.

As a preliminary matter, Plaintiff does not discuss any Individual Defendant's specific scienter. Other than briefly enumerating each Individual Defendant's knowledge of the Elixir business, (ECF No. 39, at 28), Plaintiff does not specifically discuss how each Individual Defendant *intended to deceive* investors. This, alone, is fatal to Plaintiff's Complaint. *See Winer Family Trust v. Queen*, 503 F.3d 319, n.6 (3d Cir. 2007) (holding that group pleading is insufficient to meet the scienter requirement under the PSLRA).

Plaintiff also fails to allege any motive in the present case. Rather, Plaintiff relies almost exclusively on circumstantial evidence to support their allegations of scienter. (*See generally* ECF No. 35.) "Because the plaintiff[] [has] not adequately pleaded that the defendants had both motive and opportunity to commit fraud, their complaint will survive the motion to dismiss only if they allege specific facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004) (quoting *Oran*, 226 F.3d at 288–89). Where a plaintiff fails to plead motive, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

Plaintiff makes several allegations about scienter. The Court must not consider all of these allegations separately, rather, the Court must address the question of whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Rahman*, 736 F.3d at 247 (emphasis in original). In short, an evaluation of the totality of the facts is necessary. First, Plaintiff alleges that Defendants held themselves out as having knowledge of the facts that they misrepresented. (ECF No. 39, at 28–29.) Second, Plaintiff alleges that Individual Defendants knew

information contradicting their public statements.[12] (ECF No. 39, at 29–31.) Third, Plaintiff argues that the "core operations doctrine" supports an inference of scienter. (ECF No. 39, at 31–32.) Finally, Plaintiff argues that temporal proximity supports a strong inference of scienter. (ECF No. 39, at 32.)

Plaintiff's primary argument relates to Individual Defendants' knowledge of the falsity of their statements. (ECF No. 39, at 28–31.) In certain circumstances, a showing of knowledge of a particular fact and then a statement contradicting that fact could be evidence of scienter. For example, in a simplistic fashion, if a plaintiff pleads that a defendant knew a car was red but then a plaintiff alleged that the defendant made a statement that "the car was blue," then that would be evidence of scienter. However, that is not what we have in the present case. As discussed above, the statements alleged are not inherently false. Therefore, knowledge of falsity could not be an adequate basis of scienter in the present case.

Plaintiff further argues that Defendants' knowledge about business operations, access to information, roles as senior executives, and role in the business serve as evidence of scienter. (ECF No. 39, at 28–31.) First, "[m]ere allegations of [defendants'] knowledge of the business, without more, does not prove scienter." *Turnofsky v. electroCore, Inc.*, 2023 WL 4527553 (D. N.J. July 13, 2023) (citing *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013)). Relatedly, "an official's knowledge of falsity or recklessness may not be inferred from his position within the company." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 161 F. Supp. 2d 349, 354 (D. N.J. 2001). There must be additional allegations "of specific information conveyed to management and

---

[12]    The Court will treat the first two arguments similarly as they essentially allege the same thing—that Defendants had knowledge of the "falsity" of the statements, either specifically or generally through their position, and made the statements anyways.

related to fraud." *Rahman*, 736 F.3d at 247. No such specific information is alleged in the Complaint.

Plaintiff asserts that specific knowledge is evident from Plaintiff's Confidential Witnesses ("CW"). (ECF No. 39, at 29–31.) Confidential Witness allegations must "create the kind of detailed picture that is required to establish scienter." *In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 575 (E.D. Pa. 2009). That picture must "illuminate [the] [d]efendants' states of mind." *Id.* Plaintiff's CWs fail to do so. Plaintiff argues that the CWs reveal that Defendants had specific knowledge about Virginia Premier and this demonstrates fraud. However, the CWs simply discuss that the Individual Defendants *had access* to a software system used to track clients. (ECF No. 39, at 30.) Plaintiff does not allege that any CW told any Individual Defendant of the loss of Virginia Premier, nor did any Individual Defendant provide any statements that evinces an intent to deceive. Plaintiff provides CW testimony that Individual Defendants discussed the loss of Virginia Premier at a July 13, 2022 employee town hall meeting. (ECF No. 39, at 30–31.) This town hall meeting does not evidence any intent to deceive because all of the challenged statements regarding Virginia Premier occurred prior to this town hall. Plaintiff also alleges that CW2 and CW5 knew that Virginia Premier had left Elixir. (ECF No. 39, at 30.) The Complaint does not contain any detail regarding how any of the Individual Defendants, specifically, were made aware of this information—either through the CWs or otherwise. Thus, the Court finds the detailed picture that is required is lacking. Therefore, Plaintiff's evidence does not support a strong inference of scienter.

There is no direct evidence that Defendants had an intent to deceive nor does the circumstantial evidence provide a strong inference of scienter. Plaintiff has failed to plead, with specificity, any facts—relating to the Defendants' knowledge or otherwise—that Defendants

intended to deceive investors with their statements. Even if the Defendants had knowledge of the loss of Virginia Premier, a complaint must allege that the Defendants *intended to deceive* and exhibited an *extreme departure* from standards of care. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 648–49 (2010); *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, n.4 (3d Cir. 2013). The Complaint, as written, fails to meet this standard. As a result, Plaintiff has not adequately pled scienter.

Plaintiff further argues that the "core operations doctrine" supports an inference of scienter. Under this doctrine, "misstatements and omissions made on 'core matters of central importance' to the company and its high level executives give rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge." *Allegheny Cnty. Employees' Retirement Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 232 (E.D. Pa. 2021) (citing *In re Urban Outfitters Sec. Litig.*, 103 F. Supp. 3d 635, 653–54 (E.D. Pa. 2015)). The Court notes that the core operations doctrine, alone, cannot suffice to support an inference of scienter. *Id.* It is only when taken in addition to specific connections to an executive's knowledge, that it can support an inference of scienter. *See In re Amarin Corp. PLC.*, 2015 WL 3954190, at *12 (D. N.J. June 29, 2015). Again, Plaintiff fails to make any allegations, with specificity, that any Individual Defendant acted with an intent to deceive. Therefore, the evaluation of the core operations doctrine leads to the same conclusion as stated above, absent specific facts alleging knowledge, there is no strong inference of scienter. Nowhere in the Complaint does it state that any of the Individual Defendants knew of the loss of Virginia Premier prior to their statements. Additionally, aside from allegations that Individual Defendants were aware of the day-to-day operations or involved in the business, the Complaint does not state, with specificity, their knowledge.

Plaintiff, lastly, argues that the temporal proximity of the statements and adverse events bolsters their strong inference of scienter. (ECF No. 39, at 32.) The Court is not convinced. *See In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *20 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002) (concluding that "the allegation of the short period between the disclosure by the [defendants] and the allegedly misleading statements does not by itself constitute strong circumstantial evidence of conscious misbehavior or recklessness, as required under the PSLRA"). As the Complaint stands, temporal proximity, without any other specific factual allegations, is not enough to sustain a finding of a strong inference of scienter. While the Court has considered temporal proximity and the arguments put forth by the Plaintiffs based on the facts presented in their complaint, the totality falls short in this instance. For these reasons, Plaintiff has failed to plead scienter.

### iii.    Loss Causation

In determining loss causation, the Court asks, "whether the misrepresentation or omission proximately caused the economic loss." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007). In other words, a plaintiff must show that "the revelation of [the alleged] misrepresentation or omission was a *substantial factor* in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Id.* at 425–26 (emphasis added). Loss causation focuses on "whether the defendant should be held responsible as a matter of public policy for the losses suffered by the plaintiff." *Id.* at 425. It is not enough for a plaintiff to show that the price of a security was artificially inflated at the time of purchase because of a defendant's misrepresentations. *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *5 (E.D. Pa. Sept. 3, 2010). Rather, a plaintiff must show that "the share price fell significantly after the truth became known." *Id.* at *5 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)).

Plaintiff argues that the $252.2 million goodwill impairment along with the 28% stock price drop are sufficient to establish loss causation. (ECF No. 39, at 33.) Defendants argue that the impairment charge had nothing to do with any statements made regarding the 2023 selling season and, rather, related to an update to valuation for the fiscal 2024 and future years. (ECF No. 36-2, at 29.) Furthermore, Defendants argue that the reason for the charge had nothing to do with the lack of disclosure of Virginia Premier (*Id.*) Lastly, Defendants argue that the decline in stock price could not have been attributed, as a substantial factor, to the statements about Elixir because the same day the stock dropped, the Company had announced that the retail pharmacy segment of the Company had "sustained significant revenue declines driven by a drop off in COVID testing and vaccine revenue—reasons wholly unrelated to Elixir's business." (ECF No. 36-2, at 30.)

The Court, finding that the statements are not actionable and that there is no strong inference of scienter, need not analyze loss causation.

**B.  Section 20(a)**

Plaintiff also brings claims against the Defendants under Section 20(a) of the Exchange Act, which imposes joint and several liability upon one who controls a violator of Section 10(b). *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006); 15 U.S.C. § 78t(a). In order to succeed on a claim under Section 20(a), a plaintiff must successfully plead a primary violation of Section 10(b) of the Exchange Act. *Id.*; *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 622 (E.D. Pa. 2009). Because the Court has determined that Plaintiff fails to plead a primary violation of Section 10(b), his Section 20(a) claim fails as well. *Anderson v. Stonemore Partners, L.P.*, 296 F. Supp. 3d 693, 704 (E.D. Pa. 2017).

## V.     CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss. An appropriate order will follow.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

_____

**HODGE, KELLEY B., J.**